# EXHIBIT A



# AWARD

International Chamber of Commerce (ICC) | Secretariat of ICC International Court of Arbitration          **iccwbo.org/arbitration**

**Paris**
33-43 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28   arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704   ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580   ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504   ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830   ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781   ica12@iccwbo.org

**ICC INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 27869/PDP**

LG H&H CO., LTD.

(Republic of Korea)

**vs/**

**1**. Insil Kim

(U.S.A.)

**2.** Sunna Kim

(U.S.A.)

This document is the original of the Partial Award rendered in conformity with the Rules of Arbitration of the International Chamber of Commerce and issued as an electronic document pursuant to the parties' agreement.

## INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

Case No. 27869/PDP

**LG H&H CO., LTD**. (Korea),
Claimant,

vs.

**INSIL KIM** and **SUNNA KIM** (U.S.A.),
Respondents.

---

### PARTIAL AWARD

---

21 MAY 2025

| Richard Chernick<br>JAMS<br>555 W. Fifth Street<br>Suite 3200<br>Los Angeles, CA 90013, USA<br>rchernick@jamsadr.com | John M. Townsend<br>Hughes Hubbard & Reed LLP<br>1775 I Street, N.W.<br>Suite 600<br>Washington, D.C. 20006, USA<br>john.townsend@hugheshubbard.com | Lawrence S. Schaner<br>Schaner Dispute Resolution LLC<br>77 West Wacker Drive<br>Suite 4500<br>Chicago, IL 60601, USA<br>LSchaner@schanerlegal.com |

**Arbitrators**

**TABLE OF CONTENTS**

REPRESENTATION OF THE PARTIES ........................................................................ iii

TABLE OF ABBREVIATIONS ................................................................................... iv

DRAMATIS PERSONAE ........................................................................................... vi

I.      INTRODUCTION ........................................................................................... 1

II.     PROCEDURAL HISTORY ............................................................................ 2

        The Agreement to Arbitrate ....................................................................... 2

        Governing Law .......................................................................................... 4

        The Pleadings and Rules ........................................................................... 4

        The Tribunal .............................................................................................. 5

        Case Management Conference and Terms of Reference ............................ 6

        First Submission on the Merits .................................................................. 7

        Document Exchange .................................................................................. 8

        Second Submissions on the Merits ............................................................ 8

        Pre-Hearing Matters .................................................................................. 9

        The Hearing on the Merits ....................................................................... 11

        Closing of the Proceedings ...................................................................... 14

III.    FACTUAL BACKGROUND ........................................................................ 14

        A.     The Parties .................................................................................... 14

        B.     The Crème Shop ........................................................................... 15

        C.     The TCS Share Purchase Transaction ........................................... 16

        D.     The Shareholders' Agreement ...................................................... 19

        E.     Sunna Kim's Employment Agreement .......................................... 23

        F.     The KPMG Purchase Price Adjustment Claim Determination ....... 25

        G.     The Initial Post-Transaction Co-Management of TCS ................... 27

        H.     Attempts to Formalize TCS's Executives' Roles and Responsibilities ... 28

        I.     Young Lee's Appointment as TCS's Co-CEO ............................... 30

        J.     The Signature Authorization and Delegation Policy Proposal ....... 37

        K.     Sunna Kim's "Good Reason" Resignation Letters ........................ 41

        L.     TCS's purported termination of Sunna Kim for cause ................... 50

        M.     The Call Option and Put Option Notices ....................................... 53

IV.     ISSUES TO BE DECIDED .......................................................................... 54

A.     Did Sunna Kim Resign for Good Reason? ...........................................................56

    1.     The Contractual Framework ......................................................57

    2.     Did Sunna Kim Resign?..........................................................58

    3.     The Reasons Given .................................................................59

    4.     The Extrinsic Evidence ...........................................................60

    5.     The First "Good Reason" - Access to the Chairman of LG.....................65

    6.     The Second "Good Reason" - Young Lee's Conduct..............................69

    7.     The Third "Good Reason" – Sunna Kim's Financial Authority...............75

    8.     The Tribunal's Conclusion as to "Good Reason".....................................77

B.     Which Option Notice Was Effective?.....................................................78

C.     Are Adjustments to the Purchase Price Required? .................................80

    1.     Amounts ordered by the Independent Referee...........................................81

    2.     Indemnification Claims...........................................................81

    3.     Claims for Breach of Warranty................................................89

D.     The Total Breach Claim........................................................93

E.     The Legal Fee Issue ..............................................................97

V.     INTEREST AND COSTS........................................................98

A.     Interest..................................................................................98

B.     Costs..................................................................................100

VI.     PARTIAL AWARD.............................................................100

**REPRESENTATION OF THE PARTIES**
**(Phase One)**

**Legal Representatives of the Claimant**

KIM & CHANG
Seyang Building
39 Sajik-ro-8-gil
Jongno-Gu
Seoul
Korea, 03170

| | |
|---|---|
| Allen C. Kim | allen.kim@kimchang.com |
| Byung-Chol (BC) Yoon | bcyoon@kimchang.com |
| Sup-Joon Byun | sjbyun@kimchang.com |
| Hyun Hoon (Sean) Lee | hyunhoon.lee@kimchang.com |
| Theodore A. Weisman | theodore.weisman@kimchang.com |
| Joonhak Choi | joonhak.choi@kimchang.com |
| Yoon Chae | dongyoon.chae@KimChang.com |

**Legal Representatives of the Respondents**

Representing both Respondents prior to 1 May 2025 and Sunna Kim only after that date:

RUSS, AUGUST & KABAT
12424 Wilshire Blvd., 12th Floor
Los Angeles, California 90025
U.S.A.

| | |
|---|---|
| Larry C. Russ | lruss@raklaw.com |
| Nathan D. Meyer | nmeyer@raklaw.com |
| Timothy M. Baumann | tbaumann@raklaw.com |
| Christine S. Shin | cshin@raklaw.com |
| Erica S. Kim | ekim@raklaw.com |
| Jean Y. Rhee | jrhee@raklaw.com |

Representing Insil Kim from 1 May 2025:

LAW OFFICES OF JUSTIN J. SHRENGER, APC
3470 Wilshire Boulevard, Suite 855
Los Angeles, California 90010
U.S.A.

| | |
|---|---|
| Justin J. Schrenger | justin@Shrenger.com |
| Rachel Lin | Rachel@Shrenger.com |

iii

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| Chron. | Chronology of Events submitted jointly by the Parties on 7 October 2024 |
| CPHB1 | Claimant's First Post-Hearing Brief dated 22 November 2024 |
| CPHB2 | Claimant's Second Post-Hearing Brief dated 20 December 2024 |
| EBITDA | Earnings Before Income Tax, Depreciation, and Amortization |
| ER | Expert Report |
| [Name] ER1 | First Expert Report of person named |
| [Name] ER2 | Second Expert Report of person named |
| ERP | Enterprise Resource Planning |
| Exh. | Exhibit |
| IBA Rules | *IBA Rules on the Taking of Evidence in International Arbitration* |
| ICC | International Chamber of Commerce |
| ICC Rules | *Rules of Arbitration* of the ICC in effect as of 1 January 2021 |
| IKEA | Insil Kim's Employment Agreement with TCS dated 9 June 2022 (Exhibit D-2) |
| IFRS | International Financial Reporting Standards |
| LG H&H | Claimant LG H&H Co., Limited |
| M&A | Mergers and acquisitions |
| PO __ | Procedural Order No. __ |
| RAK | Russ, August & Kabat |
| R&R | Roles and Responsibilities |
| RC | Response and Counterclaim dated July 24, 2023 |
| RFA | Request for Arbitration dated 19 June 2023 |
| ROC | Respondents' Rejoinder on Claims and Reply on Counterclaims |
| RPHB | Respondents Sunna Kim and Insil Kim's Post-Hearing Brief dated 22 Nov. 2024 |
| RPHRB | Respondents Insil Kim and Sunna Kim's Post Hearing Reply Brief, 20 Dec. 2024 |
| SA | Shareholders Agreement dated 9 June 2022 (Exhibit C-2) |
| SKEA | Sunna Kim's Employment Agreement with TCS dated 9 June 2022 (Exhibit D-1) |
| SOC | Claimant's Statement of Claim |
| SOD | Respondents' Statement of Defense and Counterclaims |

iv

SODC        Claimant's Statement of Defense on Counterclaims and Statement of Reply on Claims

SOR         Claimant's Statement of Rejoinder on Counterclaims

SPA         Share Purchase Agreement dated 20 April 2022 (Exhibit C-1)

TCS         The Crème Shop, Inc.

TOR         Terms of Reference dated 20 October 2023

Tr. Day __, p. __    References to transcript of Hearing on the Merits.  Day 1 is 14 October 2024

WS          Witness Statement

[Name] WS1  First Witness Statement of person named

[Name] WS2  Second Witness Statement of person named

[Name] WS3  Third Witness Statement of person named

## DRAMATIS PERSONAE

| | |
|---|---|
| Bennet, James ("Jim") | Former employee of Palm Tree hired by Sunna Kim to work in finance in The Crème Shop |
| Cha, Suk Yong | Former CEO of LG H&H and former Chairman of the Board of Directors of The Crème Shop[1] |
| Choi, Jun | Partner, Ernst & Young |
| Choi, Kenneth | Former head of LG H&H USA Inc. |
| Cooper, Phillip | Managing Director, Palm Tree |
| Friedman, Ronald | Partner, Marcum, LLP; Respondents' financial analysis and economic damages expert |
| Gaspar, Derek | Accounting Manager, The Crème Shop |
| Geisser, Lauren | Partner, Russ, August & Kabat |
| Han, Sungwon ("Eric") | Former CFO of The Crème Shop |
| Hutchins, Robert A. | Managing Director, Secretariat Advisors; Claimant's financial accounting expert |
| Kim, Hong Gi | CFO of LG H&H, Member of the Board of Directors of The Crème Shop |
| Kim, Hyosun | Legal Department Lead, LG H&H Global |
| Kim, Insil ("Christina") | Respondent; Co-founder of The Crème Shop and 15% shareholder; mother of Sunna Kim |
| Kim, Lawrence | Co-founder of The Crème Shop; Insil Kim's husband and Sunna Kim's father |
| Kim, Paul | Former Head of Sales, The Crème Shop |
| Kim, Sunna ("Olive") | Respondent; former Co-CEO of The Crème Shop and 20% shareholder |
| Lee, Bub-Joo | Partner, Lee Anav law firm |

---

[1] Suk Cha was also either the Chairman or the Vice Chairman of the Board of LG H&H until his retirement in November of 2022, but the record is contradictory as to which.  See, e.g., Exh. C-20 (Chairman); Exh. C-213 (Vice Chairman).

vi

| | |
|---|---|
| Lee, Jung-Ae | CEO of LG H&H |
| Lee, Young Chul ("Young Lee") | Co-CEO of TCS nominated by LG H&H; former team leader in LG H&H's M&A Department |
| Lopez, Alejandra | Accounting Manager, Russ, August & Kabat |
| Moon, Hyeyoung | Executive Vice President of LG H&H, CEO of LG H&H USA Inc., Chair of the Board of Directors of The Crème Shop |
| Moon, Sun Hwa ("Sun") | Managing Director, LG H&H; former Head of LG H&H's M&A Department |
| Moore, Bonita | Partner, Moore Ruddell |
| Palm Tree LLC ("Palm Tree") | Financial advisor to the Respondents and (pre-dispute) to TCS |
| Richards, Steven | Managing Director, Palm Tree |
| Russ, August & Kabat | Law firm representing TCS (pre-dispute) and the Respondents |
| Shin, Christine | Partner, Russ, August & Kabat |
| Son, Thomas | IT Manager, The Crème Shop |
| Suh, Su Yeon | Former member of LG H&H's New Business Development team |
| Villa, Rachaelle | Former junior copyrighter at The Crème Shop and friend of Sunna Kim |
| Yang, Jae Hun ("J.H.") | Head of LG H&H's Global Accounting Management Division |

vii

**PARTIAL AWARD**

## I.   INTRODUCTION

1.      This arbitration arises out of the acquisition by the Claimant from the Respondents of 65% of the shares of The Crème Shop, Inc. ("TCS"), a California corporation which is not a party to this arbitration, and the subsequent operation of TCS under the joint ownership and management of the Claimant and the Respondents.

2.      The Claimant, LG H&H Co., Limited ("LG H&H" or the "Claimant"), is a company incorporated and existing under the laws of the Republic of Korea with its principal place of business at 58 Saemunan-ro, Jongno-gu, Seoul, Republic of Korea.  The Claimant is an affiliate of the multinational conglomerate LG Group.  LG H&H purchased sixty-five percent (65%) of the shares of TCS from the Respondents on 9 June 2022.

3.      The Respondents and Counter-Claimants are Insil ("Christina") Kim and Sunna ("Olive") Kim, both natural persons residing in the United States at 3512 Viewcrest Drive, Burbank, California, who formerly owned 100% of the shares of TCS.  Following the sale of 65% of the shares of TCS to LG H&H, Insil and Sunna Kim own fifteen percent (15%) and twenty percent (20%), respectively, of the shares of TCS.

4.      The Parties entered into a series of related agreements by which LG H&H's acquisition of a majority interest in TCS was carried out.  These were: (a) the "Share Purchase Agreement" (the "SPA," Exhibit C-1) entered into on 20 April 2022, (b) the "Shareholders Agreement" (the "SA," Exhibit C-2) entered into on 9 June 2022, (c) the "Sunna Kim Employment Agreement" (the "SKEA," Exhibit D-1) entered into on 9 June 2022, and (d) the "Insil Kim Employment Agreement" (the "IKEA," Exhibit D-2) entered into on 9 June 2022.

1

5.      LG H&H contends that, when the acquisition closed on 9 June 2022, TCS's financial statements contained material misrepresentations that caused LG H&H to overpay for its sixty-five percent shareholding, in breach of the SPA's representations and warranties regarding TCS's financial condition. It further contends that Sunna Kim resigned as Co-CEO of TCS in 2023 without "Good Reason," as a result of which LG H&H is entitled to exercise its call option under the SA to acquire the balance of the shares of TCS still owned by the Respondents. The Respondents contend that LG H&H materially diminished Sunna Kim's management authority as a Co-CEO of TCS in violation of the SKEA.  As a result, they say, she resigned for "Good Reason" as provided in that agreement and the Respondents are entitled to exercise their put option under the SA.

6.      This Partial Award addresses the issues presented by the Parties' initial pleadings, which are generally summarized in the preceding paragraphs and in the Terms of Reference.  In August of 2024, the Claimant asked to add a "New Claim" alleging breach by the Respondents of the non-compete provisions of the SPA after their departure from TCS.  That New Claim was bifurcated for consideration in a second phase of this arbitration by Procedural Order No. 4, except for the Claimant's application for interim relief, which was addressed in Procedural Order No. 6.  This Partial Award does not address the New Claim.

## II.      PROCEDURAL HISTORY

### The Agreement to Arbitrate

7.      Section 8.3 of the SPA provides for the arbitration of disputes arising under it in the following terms:

> (a) The Parties shall attempt in good faith to resolve any dispute, controversy or claim between the Parties that relates to the interpretation, carrying out of obligations, breach, termination or enforcement of this Agreement or in any way arising out of or connected with this Agreement ("Dispute").

2

(b) If any Dispute cannot be resolved by the Parties pursuant to Section 8.3(a) or otherwise, such Dispute shall be exclusively referred to and finally settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce.  The arbitration proceedings shall take place in Los Angeles, California and shall be conducted in the English language.  The number of arbitrators shall be three, and the presiding arbitrator shall be chosen by the two arbitrators nominated by the Parties with input from the parties.  If the presiding arbitrator is not chosen by the two arbitrators within 30 days of the date of confirmation of the later of the two party nominated arbitrators, he or she shall be appointed by the ICC International Court of Arbitration.  The award of the arbitral tribunal shall be final and binding upon the parties and shall be the sole and exclusive remedy between the parties regarding any claims, counterclaims, issues, or requests for declaratory, accounting, or other relief presented to the arbitral tribunal.  The costs of arbitration shall be apportioned by the arbitral tribunal in the award.[2]

8.      Section 5.6 of the SA contains a substantially identical dispute resolution clause,

which states:

(a) The Parties shall attempt in good faith to resolve any dispute, controversy or claim between the Parties that relates to the interpretation, carrying out of obligations, breach, termination or enforcement of this Agreement or in any way arising out of or connected with this Agreement ("Dispute").

(b) If any Dispute cannot be resolved by the Parties pursuant to Section 5.6(a) or otherwise, such Dispute shall be exclusively referred to and finally settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce.  The arbitration proceedings shall take place in Los Angeles, California and shall be conducted in the English language.  The number of arbitrators shall be three, and the presiding arbitrator shall be chosen by the two arbitrators nominated by the Parties with input from the parties.  If the presiding arbitrator is not chosen by the two arbitrators within 30 days of the date of confirmation of the later of the two party nominated arbitrators, he or she shall be appointed by the ICC International Court of Arbitration.  The award of the arbitral tribunal shall be final and binding upon the parties and shall be the sole and exclusive remedy between the parties regarding any claims, counterclaims, issues, or requests for declaratory, accounting, or other relief presented to the arbitral tribunal.  The costs of arbitration shall be apportioned by the arbitral tribunal in the award.[3]

---

[2] Exh. C-1, § 8.3.
[3] Exh. C-2, § 5.6.

3

9.	Section 17 of both the SKEA and the IKEA provide for the arbitration of disputes arising under them in the following terms:

> Any controversy or claim arising out of or relating to this Agreement or the breach thereof or otherwise arising out of the Executive's employment or the termination of employment shall, to the fullest extent permitted by law, be settled by arbitration administered by arbitration in the State of California, U.S.A. in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including, but not limited to, the rules and procedures applicable to the selection of arbitrators.[4]

10.	The Parties agreed in the Terms of Reference ("TOR") that any dispute relating to the SKEA or the IKEA that bears on any issue arising under the SPA or SA is within the scope of the Tribunal's jurisdiction in this arbitration, notwithstanding the different provisions in the arbitration clauses in the SKEA and IKEA.[5]

**Governing Law**

11.	Section 8.2 of the SPA provides that it, and all rights and obligations of the Parties thereunder, is to be governed by and construed in accordance with the Laws of the State of California.

12.	Section 5.5 of the SA provides that it, and all rights and obligations of the Parties thereunder, is to be governed by and construed in accordance with the Laws of the State of California.

13.	Section 16 of both the SKEA and the IKEA provide that those agreements are to be governed by and construed in accordance with the Laws of the State of California.

**The Pleadings and Rules**

14.	LG H&H commenced these proceedings by filing a Request for Arbitration ("RFA") with the International Court of Arbitration of the International Chamber of Commerce

---

[4] Exh. D-1, § 17; Exh. D-2, § 17.
[5] Terms of Reference ("TOR") ¶ 20.

(the "ICC") on 19 June 2023 pursuant to the *Rules of Arbitration* of the ICC in effect as of 1

January 2021 ("ICC Rules"). The Claimant sought to have the Tribunal order the Respondents

to indemnify the Claimant for alleged breaches of the Respondents' representations and

warranties in the SPA and to impose other relief.

15.    On 24 July 2023, the Respondents filed their response and counterclaim. The

Respondents requested that the Tribunal declare that the Respondents had achieved the

benchmarks necessary to exercise their put option under the SA, declare that Sunna Kim had

"Good Reason" to resign under the SKEA, and that it order relief accordingly.

16.    On 25 August 2023, the Claimant filed its reply to the Respondents' counterclaim.

The Claimant asked that the Tribunal dismiss the Respondents' counterclaim in its entirety,

arguing that the Tribunal did not have jurisdiction over the counterclaim, which required the

Tribunal to determine whether Sunna Kim had "Good Reason" to resign from her employment

with TCS, because (i) the SKEA provided for arbitration in accordance with the Commercial

Arbitration Rules of the American Arbitration Association; and (ii) Sunna Kim's counterparty to

the SKEA is TCS, which is not a party to the present arbitration.[6]

**The Tribunal**

17.    The Parties agreed for three arbitrators to be named.[7] On 9 August 2023, pursuant

to Article 13(2) of the ICC Rules, the Secretary General of the ICC Court confirmed

Mr. Lawrence S. Schaner as co-arbitrator upon the nomination of the Claimant, and also

confirmed Mr. Richard Chernick as co-arbitrator upon the nomination of the Respondents.[8]

---

[6] These objections were resolved by paragraph 20 of the TOR.
[7] TOR ¶ 6.
[8] TOR ¶¶ 7-8.

18.     On 19 September 2023, pursuant to Article 13(2) of the ICC Rules, the Secretary General confirmed Mr. John M. Townsend as the President of the Tribunal upon the joint nomination of the co-arbitrators.[9]  The case file was submitted to the Tribunal on 21 September 2023, pursuant to Article 16 of the ICC Rules.[10]

19.     By emails dated 26 and 29 September 2023, the Parties agreed to the Tribunal's proposal to appoint Mr. Alexander Afnán as Administrative Secretary to the Tribunal, to serve as provided in *ICC's Note to Parties and Arbitral Tribunals on the Conduct of the Arbitration under the ICC Rules of Arbitration*.  On 9 July 2024, with the agreement of the Parties, Mr. Afnán was succeeded as the Administrative Secretary to the Tribunal by Mr. Holden Fitzgerald. Mr. Fitzgerald submitted his Statement of Independence on 28 October 2024.

**Case Management Conference and Terms of Reference**

20.     On 16 October 2023, the Parties participated by videoconference in a Case Management Conference with the Tribunal pursuant to Article 24 of the ICC Rules.  At that conference, the Parties and the Tribunal discussed a draft of the Terms of Reference and the timetable for these proceedings.

21.     On 20 October 2023, the Tribunal issued Procedural Order No. 1 ("PO 1") recording the agreements reached and directions given by the Tribunal during the Case Management Conference and during subsequent exchanges between Counsel and the Tribunal. A Procedural Timetable was appended to the Order.

22.     At the same time as PO 1, a final version of the Terms of Reference reflecting the agreements reached at the conference, subsequent agreements reached between the Parties, and the Tribunal's rulings concerning the few points on which no agreement was reached was

---

[9] TOR ¶ 9.
[10] TOR ¶ 10.

circulated to Counsel for the Parties for signature.  The Terms of Reference were signed on 20 October 2023.  They were transmitted to the ICC Court at its session of 1 November 2023 pursuant to Article 23(2) of the ICC Rules.

**First Submission on the Merits**

23.     On 22 December 2023, pursuant to the Procedural Timetable agreed upon by the Parties, the Claimant submitted its Statement of Claim ("SOC"), accompanied by the Witness Statement of Mr. Young Chul Lee, Co-CEO of TCS and the former Team Leader of LG H&H's M&A team, dated 22 December 2023 ("Y. Lee WS1"); the Witness Statement of Dr. Hyeyoung Moon, Executive Vice President of LG H&H and Chief Executive Officer of LG H&H USA Inc., dated 22 December 2023 ("H. Moon WS1"); the Witness Statement of Ms. Sun Hwa Moon, Managing Director at LG H&H and the President of The Avon Company, dated 22 December 2023 ("S. Moon WS1"); and the Expert Report of Mr. Robert A. Hutchins, Managing Director, Secretariat Advisors, LLC, dated 22 December 2023 ("Hutchins ER1").

24.     On 16 February 2024, pursuant to a Revised Procedural Timetable agreed upon by the Parties, the Respondents submitted their Statement of Defense and Counterclaims ("SOD"), accompanied by the Witness Statement of Ms. Sunna Kim dated 16 February 2024 ("S. Kim WS1"); the Witness Statement of Ms. Insil Kim dated 16 February 2024 ("I. Kim WS1"); the Witness Statement of Mr. Lawrence Kim, the husband of Ms. Insil Kim and father of Ms. Sunna Kim and pre-acquisition Chairman of TCS, dated 16 February 2024 ("L. Kim WS1"); the Witness Statement of Mr. Paul Kim, the former Head of Sales at TCS, dated 14 February 2024 ("P. Kim WS1"); the Witness Statement of Mr. Phillip Cooper, Managing Director of Palm Tree, LLC, dated 16 February 2024 ("Cooper WS1"); the Witness Statement of Ms. Christine Shin, Partner at Russ, August & Kabat, dated 16 February 2024 ("Shin WS1"); the Witness Statement of Ms. Lauren Geisser, Partner at Russ, August & Kabat, dated 16 February 2024

7

("Geisser WS1"); and the Expert Report of Mr. Ronald Friedman, Partner, Marcum, LLP, dated

16 February 2024 ("Friedman ER")

**Document Exchange**

25.      From 4 March 2024 through 3 May 2024, the Parties conducted document

exchanges in accordance with paragraph 38 of the Terms of Reference and the Revised

Procedural Timetable.

26.      On 29 March 2024, in accordance with the Terms of Reference and the Revised

Procedural Timetable, each Party submitted its Redfern Schedules to the Tribunal.  The Tribunal

ruled on the outstanding objections to document requests in Procedural Order No. 2 dated 8 April

2024 ("PO 2").

27.      On 24 May 2024, the Tribunal issued Procedural Order No. 3 ("PO 3"), ruling

that, under California law, Sunna Kim's emails to her attorneys at Russ, August & Kabat that

were sent from her TCS email account are not protected by attorney-client privilege and should

be produced to LG H&H.  The Tribunal also denied LG H&H's request that the Respondents

create an index detailing which document requests their produced documents were responsive to.

**Second Submissions on the Merits**

28.      On 21 June 2024, the Claimant filed its Statement of Defense on Counterclaims

and Statement of Reply on Claims ("SODC"), accompanied by the Second Witness Statement of

Mr. Young Chul Lee dated 21 June 2024 ("Y. Lee WS2"); the Second Witness Statement of Dr.

Hyeyoung Moon dated 21 June 2024 ("H. Moon WS2"); the Second Witness Statement of Ms.

Sun Hwa Moon dated 21 June 2024 ("S. Moon WS2"); the Witness Statement of Mr. Jae Hun

Yang, Head of the Global Accounting Management Division at LG H&H, dated 21 June 2024

("Yang WS1"); the Witness Statement of Ms. Su Yeon Suh, a member of LG H&H's New

8

Business Development Team, dated 21 June 2024 ("Suh WS1"); and the Reply Expert Report of Mr. Robert A. Hutchins dated 21 June 2024 ("Hutchins ER2").

29.     On 2 August 2024, the Respondents filed their Rejoinder on Claims and Reply on Counterclaims ("ROC"), accompanied by the Second Witness Statement of Ms. Sunna Kim dated 2 August 2024 ("S. Kim WS2"); the Second Witness Statement of Ms. Insil Kim dated 2 August 2024 ("I. Kim WS2"); the Second Witness Statement of Ms. Christine Shin dated 2 August 2024 ("Shin WS2"); the Second Witness Statement of Ms. Lauren Geisser dated 2 August 2024 ("Geisser WS2"); and the Expert Rebuttal Report of Ronald Friedman dated 2 August 2024 ("Friedman ER2").

30.     On 6 September 2024, the Claimant filed its Statement of Rejoinder on Counterclaims ("SOR"), accompanied by the Third Witness Statement of Dr. Hyeyoung Moon dated 6 September 2024 ("H. Moon WS3"); the Third Witness Statement of Ms. Sun Hwa Moon dated 6 September 2024 ("S. Moon WS3"); and the Second Witness Statement of Mr. Jae Hun Yang dated 6 September 2024 ("Yang WS2").

**Pre-Hearing Matters**

31.     On 26 August 2024, the Claimant submitted an Application for Directions by which it sought leave to add a new claim pursuant to Article 23(4) of the ICC Rules alleging breaches of the non-compete provisions of the SPA.

32.     On 19 September 2024, a Pre-Hearing Conference was held by videoconference. Outstanding procedural matters and various issues regarding the October 2024 Hearing on the Merits, including the hearing schedule, format, and arrangements, were discussed.

33.     On 23 September 2024, the Tribunal issued Procedural Order No. 4 ("PO 4") to record the agreements reached and decisions made at the Pre-Hearing Conference.  PO 4 also contained the Tribunal's ruling on Claimant's Application for Directions of 26 August 2024.

34.     In PO 4, the Tribunal permitted the Claimant to submit its new claim in this arbitration.  The Tribunal agreed to hear argument concerning the Claimant's application for interim relief related to its new non-compete claim during the October 2024 Hearing on the Merits.  The Tribunal determined that the other aspects of the new claim would be bifurcated and would be the subject of a second evidentiary and damages hearing to be held in June 2025.

35.     Also in PO 4, the Parties agreed that disputes over document translations would be resolved during the October 2024 Hearing on the Merits.  The Tribunal also concluded that matters involving Section 2.5 of the SPA and the Purchase Price Adjustments made by KPMG acting as an "Independent Referee" are beyond the scope of the Tribunal's jurisdiction.

36.     In PO 4 the Tribunal also admitted, by mutual consent of the Parties, new factual exhibits C-279 to C-285 proffered by the Claimant and new factual exhibits D-113 and D-114 proffered by the Respondents.

37.     The Parties agreed to develop a remote hearing protocol for the presentation of Mr. Phillip Cooper and Ms. Su Yeon Suh as witnesses by video link at the Hearing on the Merits.  On 5 October 2024, the Parties submitted a draft remote hearing protocol to the Tribunal and requested that the Tribunal settle a dispute regarding Mr. Phillip Cooper's request to be represented by his independent attorney during his cross-examination.  The Claimant objected to permitting outside persons to join the Hearing.  On 6 October 2024, the Tribunal issued a decision permitting Mr. Cooper's lawyer to attend the hearing provided that the lawyer signed an undertaking, in a form agreed to by the Parties, not to disclose any information learned through attendance at the hearing, and that the lawyer was not to speak at the hearing other than as the Tribunal might, on application, permit.  On 10 October 2024, the Tribunal issued rulings to

resolve an additional dispute related to the remote hearing protocol and confidentiality undertakings.

38.    On 7 October 2024, at the request of the Tribunal in PO 4, the Parties submitted an agreed chronology of the dispute ("Chron.") and an agreed *dramatis personae*.

**The Hearing on the Merits**

39.    The Hearing on the Merits was held in Los Angeles, California, over six days from Monday, 14 October through Saturday, 19 October 2024.

40.    The following persons attended on behalf of each Party:

On behalf of the Claimant:

Legal Team

- Allen Kim (Senior Foreign Attorney, Kim & Chang)
- Byung-Chol ("B.C.") Yoon (Attorney, Kim & Chang)
- Theodore Weisman (Foreign Attorney, Kim & Chang)
- Keun Young Heo (Attorney, Kim & Chang)
- Sup-Joon Byun (Foreign Attorney, Kim & Chang)

Party Representatives

- Hyosun Kim (Head of Global Legal Department, LG H&H)
- Nara Lee (Senior Counsel, LG H&H)

Interpreter

- Olivia Kim

On behalf of the Respondents:

Legal Team

- Larry Russ (Partner, Russ, August & Kabat)
- Jean Rhee (Partner, Russ, August & Kabat)
- Nate Meyer (Partner, Russ, August & Kabat)
- Erika Arambula (Paralegal, Russ, August & Kabat)

Parties

- Sunna Kim

11

- Insil Kim

Interpreter

- Soomi Ko

41.     Each party began by presenting an opening statement.

42.     The following fact witnesses and expert witnesses appeared, were duly sworn, and were examined by both Parties and the Tribunal:

Fact witnesses for the Claimant:

- Sun Hwa Moon (Managing Director at LG H&H and President of The Avon Group from 2022 to present; former Head of M&A Department at LG H&H from 2017 to 2022)
- Dr. Hyeyoung Moon (Executive Vice President at LG H&H, and Chief Executive Officer of LG H&H USA Inc. from January 2023 to the present, and Chairperson of the Board of Directors of TCS from March 2023 to present)
- Young Chul Lee (Co-Chief Executive Officer at TCS from March 2023 to present; former Team Leader of M&A Team at LG H&H from 2013 to 2023)
- Jae Hung Yang (Head of the Global Accounting Management Division at LG H&H)

Fact witnesses for the Respondents:

- Insil Kim (Co-founder and 15% shareholder of TCS)
- Sunna Kim (Former Co-Chief Executive Officer and 20% shareholder of TCS)
- Paul Kim (Former Head of Sales at TCS)
- Phillip Cooper (Managing Director at Palm Tree LLC)
- Lawrence Kim (Co-founder of TCS; Insil Kim's husband and Sunna Kim's father)
- Christine Shin (Partner at Russ, August & Kabat)

Expert witness for the Claimant:

- Robert A. Hutchins (Managing Director at Secretariat Advisors, LLC)

Expert witness for the Respondents:

- Ronald Friedman (Partner at Marcum, LLP)

12

43.     On 16 October 2024, the Respondents requested that the Tribunal allow for post-hearing briefing and an opportunity to present brief closing remarks.  The Claimant requested an opportunity to present closing remarks but thought that post-hearing briefing was unnecessary.  The Tribunal proposed that the Parties present oral closings and took the issue of post-hearing briefing under advisement.

44.     On 18 October 2024, the Tribunal heard argument from both Parties on the Claimant's application for interim relief relating to its new claim for breach of the SPA's non-competition provision introduced through the Claimant's Application for Directions on 27 August 2024.

45.     Also on 18 October 2024, the Tribunal ruled that it would accept post-hearing briefing.  The Parties agreed on a post-hearing briefing and costs submission schedule as well as a schedule for the evidentiary briefing and hearing for the Claimant's new claim, to be heard in a "Phase Two" of this arbitration.

**Post-Hearing Matters**

46.     On 22 October 2024, the Tribunal issued Procedural Order No. 5 ("PO 5"), documenting the agreed upon schedule for the post-hearing briefing and costs submissions, and the document production, briefing, and hearing schedule for Phase Two.

47.     Having heard both Parties on the Claimant's application for interim relief related to its new claim, the Tribunal issued Procedural Order No. 6 ("PO 6") on 29 October 2024, denying the Claimant's application for interim relief without prejudice to the ultimate merits of the claim to be decided in Phase Two.

48.     On 22 November 2024, the Parties submitted their first-round post-hearing briefs.

49.     On 20 December 2024, the Parties submitted their reply post-hearing briefs.

50.     On 17 January 2025, the Parties submitted their respective applications for costs.

13

**Closing of the Proceedings**

51.     By letter dated 2 November 2023, the ICC Court fixed 30 April 2025 as the time limit for the final award.  By letter dated 1 May 2025, the ICC Court extended that time limit until 31 December 2025.

52.     On 3 April 2025, in accordance with Article 27 of the ICC Rules, the Tribunal declared the proceedings closed as to the matters to be decided in Phase One in this Partial Award.

## III.    FACTUAL BACKGROUND

### A.    The Parties

53.     Claimant LG H&H is a publicly traded company incorporated and existing under the laws of the Republic of Korea.  LG H&H is a leading cosmetics and household goods company in Korea and an affiliate of the multinational conglomerate, LG Group.[11]  LG H&H, after the transaction giving rise to this dispute, owns sixty-five (65%) of the shares of The Crème Shop ("TCS").[12]

54.     LG H&H is a relative newcomer to the United States market.  LG H&H manages its U.S. operations through its wholly owned subsidiary, LG H&H USA Inc. ("LG H&H USA").[13]  LG H&H has sought to expand its U.S. sales and its direct access to the U.S. Korean Beauty ("K-Beauty") market as "the cultural 'Korean wave' continues to make inroads."[14]  LG H&H, in pursuit of these goals, has acquired such U.S. companies as Avon and Boinca, Inc.[15]

---

[11] SOC ¶ 23.
[12] SOC ¶ 1.
[13] SOC ¶ 24.
[14] SOC ¶ 33.
[15] SOC ¶¶ 24, 33.

55.     Respondent Insil Kim, a Korean immigrant to the United States, co-founded TCS with her husband, Lawrence Kim, in Los Angeles, California, in 1988.[16]  Over the past thirty-plus years, Insil Kim and her family have managed TCS and have served on TCS's Board of Directors.[17]  Insil Kim, after the transaction giving rise to this dispute, owns fifteen percent (15%) of the shares of TCS.[18]

56.     Respondent Sunna Kim, the daughter of Insil and Lawrence Kim, became the CEO of TCS in 2018 or 2019.[19]  Sunna Kim has spent most of her life working for TCS, helping turn it into a "highly profitable and internationally renowned and respected cosmetics and skincare brand."[20]  Sunna Kim, after the transaction giving rise to this dispute, owns twenty percent (20%) of the shares of TCS.[21]

### B.     The Crème Shop

57.     TCS is a cosmetics and skincare company that produces, distributes, and sells products into the K-Beauty market in the United States.  Over the past thirty years, TCS has become a highly profitable company, selling its products in numerous brick-and-mortar and online retailers, such as ULTA Beauty, CVS Pharmacy, Macy's, Walgreens, Nordstrom, Walmart and Amazon.[22]

58.     The success of TCS has been largely attributable to its ability to position itself as a leading supplier of cosmetics to consumers in the Gen Z and Gen Alpha age-demographics. Among those consumers, TCS cultivates "an image and culture of whimsy and 'over-the-top'

---

[16] SOD ¶ 8; I. Kim WS1 ¶ 4.
[17] SOD ¶ 17.
[18] SPA, at Recitals.
[19] S. Kim WS1 ¶ 4.
[20] SOD ¶ 10; S. Kim WS1 ¶¶ 5-6.
[21] SPA, at Recitals.
[22] SOD ¶ 11; SOC ¶ 35; S. Kim WS1 ¶ 7.

cuteness through the use of pastel tones, glitter, and logos and images of K-Pop celebrities and beloved cartoon characters like Sanrio's Hello Kitty and Disney's Cinderella."[23]

59.    Before 9 June 2022, TCS was a family company—wholly owned and largely operated by Insil and Sunna Kim.[24]  The TCS Board of Directors at that time was comprised of Sunna Kim, Insil Kim, and three other Kim family members.[25]

### C.    The TCS Share Purchase Transaction

60.    In early 2019, the Kim family began exploring opportunities to sell TCS.[26]  As part of this process, TCS engaged Palm Tree LLC, an investment banking and financial services firm, to assist in reviewing and revising TCS's books and records.[27]

61.    On 8 December 2021, Palm Tree sent an email to Suk Cha, then the CEO of LG H&H, informing LG H&H of the opportunity to acquire TCS from Sunna and Insil Kim.[28] Thereafter, the Parties engaged in preliminary discussions regarding LG H&H's potential acquisition of TCS from the Kims.

62.    On 10 February 2022, Palm Tree solicited letters of intent from prospective purchasers of TCS.  Palm Tree's solicitation requested that any letter of intent specify, among other things, the proposed purchaser's valuation of TCS and the underlying assumptions supporting that valuation.[29]  On 21 February 2022, LG H&H submitted a preliminary, non-binding letter of intent to acquire a 51% equity interest in TCS for a price within a range from USD 77 to USD 92 million.[30]

---

[23] SOD ¶ 12; S. Kim WS1 ¶ 8.
[24] SOD ¶ 10.
[25] SOD ¶ 17; S. Kim WS1 ¶ 12.
[26] SOD ¶ 18; S. Kim WS1 ¶ 13.
[27] SOD ¶ 19; S. Kim WS1 ¶ 14.
[28] SOC ¶ 31; Exh. C-34 (8 December 2021 Email from Phillip Cooper to Suk Cha).
[29] Exh. D-82A (10 February 2022 Letter from Palm Tree to Prospective TCS Purchasers).
[30] Exh. D-3 (21 February 2022 Letter from LG H&H to Palm Tree).

63.    On 23 February 2022, after further discussions between the Parties, LG H&H emailed an updated purchase offer to Palm Tree, offering to purchase 60% of TCS's equity at a total enterprise valuation of approximately USD 185 million.[31]  Palm Tree responded requesting that LG H&H purchase the greater of USD 120 million worth of TCS's equity or 65% of TCS's equity.[32]

64.    On 25 February 2022, LG H&H made a final, non-binding offer to purchase "the greater in terms of purchase price of (i) 65% equity interest in [TCS], or (ii) percentage of equity for USD 120 million depending on final valuation of the company."[33]  None of LG H&H's letters of intent contained an explanation of how its purchase price valuation was calculated or whether it was based on multiples of EBITDA or net sales.  Philip Cooper, the principal of Palm Tree who conducted the initial negotiations with LG H&H, testified that he did not know during the negotiations what multiples formula LG H&H was using to calculate the price it offered,[34] although he recognized the multiples that LG H&H now says that it used as "standard multiples."[35]  He added that, "for any company that has a purchase price and . . . revenue and EBITDA, you can calculate the multiple, . .  just so you have a kind of guesstimate of where you are."[36]

65.    After LG H&H's final offer, the Parties began exclusive negotiations of a share purchase agreement, a shareholders' agreement, and employment agreements for Sunna and Insil Kim.[37]  Between March and May 2022, LG H&H's financial deal team visited TCS's offices

---

[31] SOD ¶ 26; Exh. D-4 (23 February 2022 Email from Young Chul Lee to Phillip Cooper).
[32] SOD ¶ 27; Exh. D-5 (25 February 2022 Email from Phillip Cooper to Young Chul Lee).
[33] Exh. C-13 (25 February 2022 Letter from LG H&H to Palm Tree); SOC ¶ 44; SOD ¶ 28.
[34] Tr. Day 4, p. 7.
[35] Tr. Day 4, p. 16.
[36] Tr. Day 4, p. 18.
[37] SOC ¶ 63.

more than a dozen times and conducted approximately three months of due diligence into TCS's financial condition.[38]

66.    One of the features of the deal that came together during the spring of 2022 was that it would include put and call options that would at some time in the future permit LG H&H to acquire, or the Kims to sell, the shares of TCS remaining with the Kims after LG H&H's initial purchase of a majority interest.

67.    During negotiation of a shareholders' agreement, the Parties discussed how the price applicable to Insil and Sunna Kim's put option and to LG H&H's call option would be calculated.  In an email dated 22 March 2022, Sun Moon noted that the put option price would be equivalent to the EBITDA of the previous fiscal year multiplied by the "current multiple."[39]  Sun Moon later clarified that this meant a formula by which the net sales of the previous fiscal year would be multiplied by 4.9 and weighted by 50%, and then added to the EBITDA of the previous fiscal year multiplied by 18 and weighted by 50%.[40]

68.    On 3 April 2022, Sunna Kim sent a letter to LG H&H advocating for a higher enterprise valuation for TCS after the company executed a new agreement with Walmart.  In that letter, she included a table using multiples—4.9 times net sales and 18 times EBITDA—as the bases for a total enterprise value of USD 185 million for TCS.[41]

69.    On 20 April 2022, the Parties signed the Share Purchase Agreement ("SPA") which provided for LG H&H to pay USD 120,250,000 to acquire 65% of TCS's outstanding shares.  After the execution of the share purchase transaction, Insil Kim and Sunna Kim would

---

[38] SOC ¶ 89; SOD ¶ 63.
[39] Exh. C-12, at 5.
[40] *Id.* at 1-2.
[41] Exh. C-15, at 5.

18

continue to own fifteen and twenty percent of TCS's outstanding shares, respectively.[42]  At the

same time, the Parties agreed on the form of shareholders' agreement and a term sheet for Sunna

Kim's employment agreement ("SKEA").[43]

70.    On 9 June 2022, as the share purchase transaction was nearing completion, LG

H&H sent Sunna and Insil Kim a letter regarding the need to satisfy certain conditions precedent

to the closing.  Pursuant to this letter, the Parties agreed to continue with the closing of the share

purchase transaction on 9 June 2022 subject to the Kims taking steps to quickly satisfy the

outstanding requirements after the closing.[44]

71.    On 9 June 2022, the share purchase transaction closed, resulting in LG H&H

owning 65%, Sunna Kim owning 20%, and Insil Kim owning 15% of TCS's shares.[45]

### D.    The Shareholders' Agreement

72.    After signing the 25 February 2022 letter of intent, the Parties began negotiating

the Shareholders' Agreement ("SA") to govern the Parties' relationship as co-owners of TCS

upon the SPA closing.[46]  The SA would eventually contain provisions concerning: (i) a Co-CEO

arrangement at TCS whereby both LG H&H and the Kims would separately appoint a "co-CEO"

for TCS;[47] and (ii) the put and call option rights of both Parties.[48]

73.    On 23 March 2022, the Kims sent LG H&H a revised draft of the SA.[49]  Insil and

Sunna Kim's lawyers had proposed adding to Section 1.6 the following language:

> For so long as [Sunna] Kim is the The Crème Shop CEO, she shall
> be vested with the authority to hire and terminate the Company's
> employees, including the Company's chief financial officer, chief

---

[42] Exh. C-1.
[43] SOC ¶ 63.
[44] Exh. C-20.
[45] SPA, at Recitals.
[46] SOC ¶ 63.
[47] SA, at § 1.6.
[48] SA, at §§ 2.4, 2.5.
[49] Exh. C-17.

19

> operating officer, general counsel and chief marketing officer, and
> service providers, and to establish any salary, other compensation or
> other terms of employment or service for such Persons, and
> moreover, with the authority to delegate such authority; provided,
> that she will obtain approval from the LG Co-CEO for such matters;
> provided, that the LG Co-CEO shall not unreasonable withhold
> approval for the hiring the foregoing employees which are selected
> by the The Crème Shop CEO.[50]

This proposed addition was rejected by LG H&H, with the explanation that:

> As this Section provides for the general principle that the Co-CEOs
> will jointly be responsible for the day-to-day operations, we believe
> that it would not be necessary to specifically describe the Crème
> Shop CEO's responsibilities, especially given that such details may
> raise consolidation issues for LG.[51]

Christine Shin confirmed that "this language that I inserted and LG deleted was not in the final draft."[52]  She explained that LG's concern with Section "1.6 [was] that it would pass the smell test under IFRS, and they could consolidate the subsidiary into its financial statements."[53]  Ms. Shin felt that "it was reasonable that LG would be concerned about consolidation issues."[54]

74.    Sung Hwa Moon explained at the Hearing that LG H&H's ability to consolidate TCS's financial statements with its own depended on being able to demonstrate that it had control of TCS:  "We need to control the company, and we need to consolidate the financials . . . First we actually have to have control, and then we have to show that we have control over this company to any of the authorities."[55]  The final version of Section 1.6 of the SA does not contain any specification of the particular duties, responsibilities, or authorities that one Co-CEO would have to the exclusion of the other.[56]

---

[50] Exh. C-18, p. 6.
[51] *Id.* n.9.
[52] Tr. Day 4, p. 126.
[53] Tr. Day 4, p. 128.
[54] Tr. Day 4, p. 176.
[55] Tr. Day 1, p. 154.
[56] SA, at § 1.6.

20

75.     The Respondents contend that, throughout the negotiation of the SPA and SA, they had multiple telephone conversations with senior LG H&H representatives, including Kenneth Choi and Suk Yong Cha, who "assured Respondents that the LG Co-CEO role was specifically created for Mr. Cha (or his successor as CEO of LG H&H global), and that said CEO would only be nominally involved with TCS during the time Sunna Kim continued to manage and operate it as Co-CEO, weighing in only on major decisions."[57]  Neither Mr. Choi nor Mr. Cha gave evidence in this arbitration.

76.     Sunna Kim testified that "Mr. Cha had always made it clear that he wanted us to run [TCS] as a freestanding operation."[58]  She said that Mr. Cha "wanted us to run the company as is, and the help that we needed, he would try to send us."[59]  She quoted Mr. Cha as saying, "you guys have the magic touch, keep doing your thing."[60]  Christine Shin, the RAK partner who acted as deal counsel during the negotiations with LG H&H, testified that "[i]t was clear from day one that LG wanted Olive [Sunna Kim] to have all authority to run the business and operate The Crème Shop after the closing."[61]  Ms. Shin said that she understood "that the former chairman, chairman Cha, informed the family that he intended The Crème Shop to be run exactly as it had been to this day."[62]

77.     The Claimant denies that any such representations were made.  It asserts that the Parties "negotiated for two Co-CEOs who would be jointly responsible for the day-to-day operations of TCS," and that the SA's language, which is silent as to how the Co-CEOs would split this responsibility, reflects this bargain.[63]

---

[57] SOD ¶¶ 35, 37; S. Kim WS1 ¶¶ 18-19; I. Kim WS1 ¶ 8; L. Kim WS1 ¶ 6.
[58] Tr. Day 3, p. 75.
[59] Tr. Day 3, p. 83.
[60] Tr. Day 3, p. 84.
[61] Tr. Day 4, p. 121.
[62] Tr. Day 4, pp. 122-23.
[63] SODC ¶ 29; S. Moon WS2 ¶¶ 10-13; SOC ¶ 84; RPHRB ¶¶ 4-5.

78.     Asked whether she would "agree that Sunna Kim was to continue to lead operations while only consulting with her Co-CEO on major issues," Sun Hwa Moon testified: "With the initial CEO, yes."[64]  Her testimony distinguished the relationship between Sunna Kim and Suk Cha during the months following the closing from the relationship between the co-CEOs contemplated by the SA:  "To my understanding, SHA clearly said both co-CEO had the same right."[65]

79.     The SA was executed on 9 June 2022.[66]  Section 1.6 of the SA is titled "Co-CEO" and states:

> The Company shall have two (2) chief executive officers (the "Co-CEOs"), who shall be responsible for all matters related to day-to-day operations of the Company within the limitations set forth in the annual budget and the annual business plan, and except for items requiring the resolutions of the Board of Directors pursuant to Sections 1.2 and 1.3.  The Majority Shareholder shall be entitled to nominate one (1) individual to be appointed as a Co-CEO and the Minority Shareholders shall be entitled to jointly nominate one (1) individual to be appointed as the other Co-CEO.[67]

80.     On 12 April 2022, the Parties reached agreement on the valuation of the put and call option rights for the remaining shares held by Insil and Sunna Kim to be included in the SA. The option exercise price was to be calculated through the use of the multiples previously referenced in the Parties' correspondence—4.9 times net sales and 18 times EBITDA, weighted equally.[68]

81.     Subsection 2.4 of the SA is titled "Minority Shareholders Put Option; General," and provides that Insil and Sunna Kim would be able to exercise their put option right after the

---

[64] Tr. Day 1, p. 122.
[65] Tr. Day 1, p. 128.
[66] SOD ¶ 54; SOC ¶ 73.
[67] Exh. C-2 §1.6.
[68] SOD ¶ 54.

22

earlier of (a) five years from the execution of the SA; or (b) three years from the execution of the

SA provided the put option price had exceeded a USD 130 million option price cap.  Subsection

2.4(a) also provides in relevant part that:

> [T]he Minority Shareholders may jointly exercise such Put Option
> at any time upon (A) resignation by S. Kim from her employment
> with the Company for Good Reason . . . or (B) termination by the
> Company (or the Majority Shareholder) of S. Kim's employment
> with the Company without Cause . . . .[69]

82.    Subsection 2.5 of the SA is titled "Majority Shareholder Call Option; General,"

and provides in subsection 2.5(a), in relevant part, that:

> [T]he Majority shareholder may exercise such Call Option at any
> time upon the earlier of: (i) the resignation by S. Kim from her
> employment with the Company without Good Reason . . . or (ii) a
> termination by the Company of S. Kim for Cause . . . .[70]

**E.    Sunna Kim's Employment Agreement**

83.    Sunna Kim and Insil Kim each entered into employment agreements with TCS on

9 June 2022.[71]  Sunna Kim's employment agreement (the "SKEA") provided that Sunna Kim

would serve as a Co-CEO of TCS.[72]  Insil Kim's employment agreement (the "IKEA") provided

that Insil Kim would have the title of Founder of TCS.[73]

84.    Section 1 of the SKEA is titled "Appointment."  It states ("Executive" is defined

to mean Sunna Kim; the "Company" is defined as TCS):

> The Company hereby agrees to appoint Executive as Co-Chief
> Executive Officer of the Company and Executive hereby agrees to
> such appointment to perform the functions and carry out the duties
> and responsibilities as Co-Chief Executive Officer of the Company
> (the "Position").  Executive shall have such other duties, powers,
> and authority commensurate with the Position under the Company's
> policies and bylaws, including creative direction, product

---

[69] SA, at § 2.4(a).
[70] SA, at § 2.5(a).
[71] Exh. D-1 (S. Kim Employment Agreement); Exh. D-2 (I. Kim Employment Agreement).
[72] Exh. D-1, at 1.
[73] Exh. D-2, at 1.

23

innovation and development, overseeing sales and marketing and client, partner and influencer relations management and such other duties and responsibilities as specifically delegated to her from time to time by the board of directors of the Company (the "Board"). Executive shall also serve as a member of the Board.[74]

85.     Section 5 of the SKEA provides for the termination of the agreement, including termination of Sunna Kim's employment by TCS with and without cause, and Sunna Kim's resignation from TCS with and without "Good Reason."  Subsection 5(c) of the SKEA, titled "Resignation by Executive for Good Reason," provides:

Executive's employment pursuant to this Agreement may be voluntarily terminated by Executive for "Good Reason", if Company:

(i)     Reduces the amount of Executive's Base Salary;

(ii)    Materially diminishes Executive's authority, duties or responsibilities, except where such diminution is: (x) in connection with the termination of Executive's employment for Cause, (y) a result of Executive's death or disability, or (z) temporary as a result of Executive's illness or other absence; provided changes to Executive's reporting structure that otherwise comply with the requirements of this Agreement shall not be considered as a material diminution of Executive's authority, duties or responsibilities hereunder;

(iii)   Materially breaches the terms of this Agreement that, if subject to cure, is not cured by the Company within sixty (60) days of written notice by Executive; or

(iv)    Requires a geographical relocation of Executive more than thirty (30) miles from the Company's current executive office location in Los Angeles, California.

Executive must notify Company in writing within thirty (30) calendar days of an event that is or would constitute Good Reason, and Company shall have sixty (60) calendar days to cure any alleged Good Reason.  If Company does not cure an event of Good Reason within sixty (60) calendar days, Executive's employment will terminate at the expiration of such sixty (60)-day period.  Any such event shall cease to be a Good Reason if Executive does not provide

---

[74] Exh. D-1, at 1.

notice to terminate her employment within thirty (30) calendar days after the event occurs.[75]

86.    Subsection 5(a) of the SKEA, titled "Termination by Company for Cause,"

provides:

Company may terminate this Agreement for "Cause." "Cause" shall exist if Executive:

(i)     Is convicted of a felony or a crime involving dishonesty or moral turpitude;

(ii)    Commits material breach of Executive's duties to the Company, including, without limitation any fiduciary duty (including the duty of loyalty), where such breach is documented in writing;

(iii)   Engages in gross neglect or willful misconduct (including, but not limited to, any theft, embezzlement or other criminal misappropriation of funds by Executive from the Company), which causes material harm to the property, business, goodwill, or reputation of the Company; or

(iv)    Commits breach of any provision of this Agreement, any articles of incorporation, bylaws or policy of the Company or SHA, where such breach is documented in writing and causes material harm to the property, business, goodwill, or reputation of the Company.

Before terminating Executive's employment for Cause, the Board will specify in writing to Executive the nature of the act, omission, refusal, or failure that it deems to constitute Cause and give Executive sixty (60) calendar days after she receives such notice to correct the situation.[76]

**F.      The KPMG Purchase Price Adjustment Claim Determination**

87.    During the initial post-closing period, LG H&H conducted reviews of TCS's financials to create a closing statement and in order to exercise the post-closing purchase price adjustment mechanism.[77]  On 5 August 2022, LG H&H sent Sunna and Insil Kim its Closing Statement for Inventory and Business Indebtedness, requesting a closing price adjustment of

---

[75] *Id.* at 3.
[76] *Id.*
[77] SOC ¶ 89.

USD 2,495,282.  These adjustments were said to result from LG H&H's total inventory

inspection and review of TCS's books and records, which the Claimant asserted should be

handled through the purchase price adjustment provisions of Section 2.5 of the SPA.[78]

88.     On 22 May 2023, LG H&H sent a Notice of Indemnity Claim and Purchase Price

Adjustment to the Respondents seeking indemnity for the financial discrepancies it had

discovered.[79]  LG H&H claimed that the financial misstatements caused LG H&H to overpay

USD 17,653,131 for its 65% share of TCS through its use of a multiples formula—4.9 times net

sales and 18 times EBITDA, weighted equally.[80]  LG H&H also claimed entitlement to a

Purchase Price Adjustment stemming from a working capital shortfall and inventory amount

shortfall totaling USD 6,752,899.[81]  The Respondents' disputed LG H&H's claims.[82]

89.     The Parties referred their purchase price adjustment dispute to KPMG pursuant to

Section 2.5(d) of the SPA.[83]

90.     KPMG rendered its decision on the Parties' purchase price adjustment dispute on

5 September 2023.[84]  KPMG, acting as an independent referee, determined that the Kims must

pay LG H&H USD 2,115,695 as a working capital shortfall adjustment and USD 2,331,015 as an

inventory amount shortfall adjustment.[85]  To date, the Kims have not paid LG H&H any part of

these amounts and maintain that these amounts should be deducted from any final award LG

H&H must pay to the Kims pursuant to this Arbitration.[86]

---

[78] Exh. C-97; SOC ¶¶ 91-92.
[79] SOC ¶ 98; Exh. C-5; SOD ¶ 114 (noting that while the letter is dated 22 March 2023, the Respondents received the letter on 21 March 2023 due to the time difference between Korea and Los Angeles).
[80] Exh. C-5, at 2.
[81] *Id.* at 3.
[82] SOC ¶ 8.
[83] SOC ¶ 100.
[84] Exh. C-22 (5 September 2023 KPMG Independent Referee's Determination).
[85] *Id.* at 3.
[86] SOC ¶ 101; ROC ¶ 103.

91.     The Claimant now contends that it found other deficiencies in TCS's financial statements that caused the Claimant to overpay for its purchase of TCS's equity.[87]  The Claimant points specifically to three categories of financial discrepancies:  (1) undercounting of chargeback cost adjustments, resulting in an overstatement of FY 2021's revenue and EBITDA; (2) misclassification of certain customer chargebacks as costs instead of revenue deductions, which resulted in an overstatement of FY 2021 revenues; and (3) mischaracterization of certain construction costs as capitalized costs rather than expenses, which resulted in an overstatement of FY 2021 EBITDA.[88]

92.     On 19 June 2023, LG H&H submitted a Request for Arbitration to the ICC related to these financial discrepancies and its resulting indemnity claim, initiating this Arbitration.[89]

**G.      The Initial Post-Transaction Co-Management of TCS**

93.     Following the closing of the share purchase transaction on 9 June 2022, Suk Cha, LG H&H's CEO, was appointed by LG H&H as the Co-CEO and Chairman of the Board of TCS.  The Respondents contend that, during the five months between the closing and Suk Cha's resignation, TCS's management structure operated as the Parties had originally envisioned— where Sunna Kim "periodically update[ed] LG's Co-CEO, Suk Yong Cha, and consult[ed] with him and various of his team members at LG on major business matters involving TCS, but [] otherwise [was] left to continue to act as CEO at TCS' day-to-day operations to increase sales and EBITDA."[90]

---

[87] SOC ¶ 93; CPHB1 ¶48.
[88] SOD ¶ 115; ROC ¶ 82; SOC ¶ 94; Exh. C-5 (22 May 2023 Notice of Indemnity Claim and Purchase Price Adjustment).
[89] RFA.
[90] S. Kim WS1 ¶ 25; *see also* SOD ¶ 66.

94.     Suk Cha resigned from his positions at LG H&H and TCS on 24 November 2022. LG H&H did not immediately fill his positions as Chairman of the Board and Co-CEO of TCS.[91] On 3 March 2023, LG H&H nominated Dr. Hyeyoung Moon, who had become the head of LG H&H USA in January of 2023, as chair of the TCS Board.[92]

95.     Sunna Kim told Hyeyoung Moon that her understanding with Suk Cha had been that "she had primary responsibility and authority to manage TCS with no interference from anyone other than the chairman of the boards of TCS and LG," but Dr. Moon "assumed that Sunna Kim was not telling [her] the truth."[93]

**H.      Attempts to Formalize TCS's Executives' Roles and Responsibilities**

96.     TCS initially appointed Sungwon Han, the designee of LG H&H, as its Chief Financial Officer ("CFO") in June 2022.[94]

97.     Before Sungwon Han's appointment as Chief Financial Officer ("CFO"), Sunna Kim had advocated for the appointment of Jim Bennett, who had worked on TCS's financials while a partner at Palm Tree.[95]  LG H&H was amenable to hiring Jim Bennett, but not in the role of CFO, and proposed that he be hired to a different position, such as Chief Operations Officer ("COO") or Chief Strategy Officer.[96]  Jim Bennett continued to work at TCS after June 2022, but his role remained undefined.  Sunna Kim continued to refer to Jim Bennett as the CFO,[97] and in October 2022 Sunna Kim began negotiating with Jim Bennett the terms of an employment

---

[91] SOC ¶¶ 106-7.
[92] SOC ¶ 107.
[93] Tr. Day 2, p. 20.
[94] Exh. C-163 (9 June 2022 TCS Board of Directors Unanimous Consent).
[95] Exh. D-14, at 2-3 (7 June 2022 Email from Christine Shin to Young Lee).
[96] *Id.* at 1, 4 (7 June 2022 Emails from Young Lee & Sun Moon to Christine Shin); Exh. C-166 at 1 (30 November 2022 Email from Kenneth Choi to Christine Shin).
[97] Exh. C-21, at 5 (11 August 2022 Email from Sunna Kim to Young Lee); Exh. C-133, at 2-3 (24 October 2022 Email from Sunna Kim to Christine Shin); Exh. C-165 (27 October 2022 Email from Sunna Kim to Young Lee); Yang WS1 ¶ 12.

agreement to be TCS's CFO.[98]  This prompted LG H&H, beginning in December 2022, to attempt to better define the roles of Jim Bennett, Sungwon Han, and other TCS executives, through a formal roles and responsibilities ("R&R") document.[99]

98.    The Respondents contend that this was when "the first real conflict between the parties" began to arise, after "progress the parties had been jointly making towards replacing [Sungwon] Han with [Jim] Bennett as CFO abruptly halted."[100]  The Claimant denies there was ever any agreement to appoint Jim Bennett as TCS's CFO, and asserts that it was Sunna Kim's "undermin[ing] the authority of the TCS board-appointed CFO, Sungwon Han," that resulted in the first proposal of a formal roles and responsibilities document.[101]

99.    On 14 November 2022, LG H&H's CFO, Hong Gi Kim, instructed LG H&H employees to clearly define the roles and responsibilities of TCS's CFO.[102]  Sungwon Han, together with Jae Hun Yang and other LG H&H employees, began drafting a CFO R&R document which, according to Mr. Yang, "systematically organized various financial and accounting tasks to be overseen by TCS's CFO, detailing in a table the items that needed to be reported to or approved by TCS's CEO or the Board of Directors."[103]

100.    On 19 December 2022, Sungwon Han presented the CFO R&R document to Insil and Lawrence Kim.[104]  According to Sungwon Han, Lawrence Kim tore up the document in front of him.[105]  The Respondents assert that Sungwon Han then began threatening Lawrence and

---

[98] Exh. C-166 (27 October 2022 Email chain between Sunna Kim, Young Lee, and Kenneth Choi re: Jim Bennett's employment with TCS).

[99] The presentation of the proposed R&R document to TCS and its hostile reception there are described in an email dated 20 December 2022 from Sungwon Han to Jae Hun Yang, LG H&H's Global Head of Accounting (Exh. C-108).

[100] SOC ¶ 74; Exh. C-166, at 5 (27 October 2022 Email from Sunna Kim to Sun Hwa Moon).

[101] SODC ¶¶ 47-50; Exh. C-166, at 1 (30 November 2022 Email from Kenneth Choi to Christine Shin).

[102] Yang WS1 ¶ 23.

[103] *Id.*; Exh. C-108.1 (Korean CFO R&R table).

[104] SOD ¶ 74; SOC ¶ 108; Exh. C-108.

[105] SOD ¶ 74; SOC ¶ 108; Exh. C-108.

Sunna Kim that he would not leave TCS until the Kims had consented to his demands, which resulted in Lawrence Kim firing Sungwon Han.[106]  The Claimant asserts that Sunna Kim fired Sungwon Han and threatened to call the police if he did not vacate his office promptly.[107] Sungwon Han told Mr. Yang that he "tried to calm [Lawrence Kim] down by saying I could make changes by communicating with the headquarters if he was unpleased about some parts [of the CFO R&R] and I could even report that he did not like the whole document," while stating that it was Sunna Kim who fired him.[108]

### I.      Young Lee's Appointment as TCS's Co-CEO

101.    Sun Hwa Moon and Young Lee visited TCS's headquarters on 21 December 2022 to discuss operational matters related to TCS's integration as an LG H&H subsidiary.[109]  The Claimant contends that, during this visit, the Kims stated that they would welcome Young Lee's participation in TCS's management and requested that Sungwon Han be replaced.[110]  The Respondents deny that there was any mention during this visit of Young Lee potentially joining TCS's management.[111]

102.    After the December 2022 visit, Young Lee appears to have spent more and more time at TCS.  One of Sunna Kim's complaints is that Young Lee made a practice of speaking with her parents, Insil and Lawrence Kim, rather than with her.[112]  Since she also complains that Young Lee had a tendency to waste her and TCS's employees' time, it seems apparent that she found the mere presence of Young Lee in TCS's offices to be irritating.[113]

---

[106] SOD ¶ 74; S. Kim WS1 ¶ 32; L. Kim WS1 ¶ 10.
[107] SOC ¶ 108.
[108] Exh. C-108, at 2 (20 December 2022 Email from Sungwon Han to Jae Hun Yang).
[109] SOC ¶ 109; SOD ¶ 75.
[110] SOC ¶ 109; S. Moon WS1 ¶ 34.
[111] SOD ¶ 76; I. Kim WS1 ¶ 13; L. Kim WS1 ¶ 11.
[112] S. Kim WS1 ¶ 34.
[113] S. Kim WS1 ¶¶ 54-55; S. Kim WS2 ¶ 25.

103.    The Claimant asserts that, on 9 January 2023, Young Lee informed Insil and Lawrence Kim that LG H&H intended to nominate and appoint him as TCS's new Co-CEO.[114] The Respondents deny having been told by Young Lee that he would be appointed as the new Co-CEO, instead asserting that Young Lee had told Lawrence and Insil Kim that he would be coming on as an "intermediary who could accurately report the goings on at TCS."[115]  During this meeting Young Lee stated that LG H&H was willing to replace Sungwon Han as CFO.[116] The Claimant contends that Young Lee also requested, in conjunction with replacing Sungwon Han, that the Kims "jointly discuss and clarify the duties and authorities of the CFO position."[117]

104.    During another meeting on 16 January 2023, the Claimant contends that Insil Kim asked Young Lee to join TCS's management as COO instead of Co-CEO.[118]  The Claimant asserts that Young Lee then raised this possibility with LG H&H, which agreed to appoint Young Lee as COO rather than Co-CEO on the condition that the shareholders agree "to a Letter Agreement setting out the R&R among TCS's high-level officers."[119]  The Respondents assert that, at some point in late January 2023, Young Lee informed Lawrence and Insil Kim that he "desired to become TCS' LG COO," and that the Kims pushed back because Young Lee had no executive experience.[120]

105.    At some point between 17 January 2023 and 23 January 2023, Young Lee and members of the Kim family discussed the proposed R&R agreement.[121]  Sunna Kim received a draft R&R letter agreement on 23 January 2023, and informed Young Lee that she would discuss

---

[114] SOC ¶ 111; Lee WS1 ¶ 18.
[115] SOD ¶ 78; L. Kim WS1 ¶¶ 13, 15; I. Kim WS1 ¶¶ 15, 17.
[116] SOC ¶ 111; SOD ¶ 78.
[117] SOC ¶ 111.
[118] SOC ¶ 113; Lee WS1 ¶ 20.
[119] SOC ¶ 114; Lee WS1 ¶ 21
[120] SOD ¶ 79; L. Kim WS1 ¶ 15; I. Kim WS1 ¶ 17.
[121] SOC ¶¶ 114, 116; SOD ¶ 81.

the proposal with her legal advisors and revert with comments or questions.[122]  The proposed

R&R draft defined four TCS executive positions:  (1) the Co-CEO, who was defined as Sunna

Kim, responsible for the "business aspect of the Company including but not limited to creative

direction, product innovation and development, overseeing sales and marketing and client,

partner and influencer relations management"; (2) the Founder, who was defined as Insil Kim,

responsible for "manufacturer and vendor relations management, product development,

overseeing production and operations and property management"; (3) a COO, to be nominated

by LG H&H, and to be responsible for "risk management, regulatory and legal affairs,

overseeing CFO duties," and other matters requiring cooperation with LG H&H; and (4) a CFO,

to be nominated by LG H&H, to be responsible for "tax, insurance, receivables management and

debt collection, having custody of all funds and securities, keeping or causing to be kept the

books of account of the Company in a thorough and proper manner and rendering financial

statements of the Company."[123]

106.    Christine Shin, of the Russ, August & Kabat law firm ("RAK"), responded to the

draft R&R agreement on behalf of the Kims on 15 February 2023.[124]  Her response asserted that

the contents of the R&R letter agreement "expressly go against the terms of the Shareholders

Agreement."[125]  She noted that, to the extent the R&R letter provided for LG H&H to nominate

and appoint TCS's CFO and COO, such unilateral appointment was contrary to Section 1.2 of

the SA.[126]  Ms. Shin noted that "[i]f LG H&H wants to put in place increased oversight and

---

[122] Exh. D-15 (24 January 2023 Email from Sunna Kim to Young Lee); SOD ¶ 81.
[123] Exh. C-69 (18 January 2023 Draft R&R Agreement).
[124] Exh. C-23, at 3-5 (15 February 2023 Email from Christine Shin to Young Lee).
[125] *Id.* at 3.
[126] *Id.* at 4.

exercise management control over the affairs of The Crème Shop, in effect re-negotiating the

terms of the existing Shareholders Agreement, we are open to discussions."[127]

107.    On 24 February 2023, Hyosun Kim responded to Christine Shin's rejection of the

proposed R&R agreement.[128]  Hyosun Kim noted that Young Lee is LG H&H's designated

officer at TCS.  She said that LG H&H originally intended to appoint Young Lee as Co-CEO but

agreed to appoint him as COO to address the Kims' concerns.[129]  Hyosun Kim asked whether the

Kims intended to refuse any R&R agreement, or if they were still open to commenting on the

then circulating draft.[130]  Except for some discussion at the TCS Board meeting on 29 March

2023 (see paragraph 202 below), there was no further discussion of the proposed R&R

agreement after this communication and neither Party continued to press the issue.[131]

108.    On 2 March 2023, LG H&H formally notified the Kims that it intended to

nominate Dr. Hyeyoung Moon to serve as a member and the Chairperson of the TCS Board of

Directors, Hong Gi Kim and Young Lee to also serve as Directors on the TCS Board, and Jinbo

Shim to replace Sungwon Han as TCS's CFO and corporate secretary.[132]  LG H&H also noted,

given that the R&R Letter Agreement was "off the table," that it would be nominating Young

Lee as the LG H&H-appointed Co-CEO of TCS.[133]

109.    The Parties corresponded regarding LG H&H's nominations throughout the

month of March 2023.[134]  The Kims, through their counsel at RAK, noted that LG H&H had the

right to appoint three Directors of the Board and a Co-CEO, but questioned whether Young Lee

---

[127] *Id.* at 5.
[128] *Id.* at 1-2 (24 February 2023 Email from Hyosun Kim to Christine Shin).
[129] *Id.* at 2.
[130] *Id.*
[131] Lee WS1 ¶ 23; SOD ¶ 95.
[132] SOC ¶ 117; SOD ¶ 96; Exh. C-24, at 10 (2 March 2023 Email from Hyosun Kim to Christine Shin).
[133] Exh. C-24, at 10 (2 March 2023 Email from Hyosun Kim to Christine Shin).
[134] Exh. C-24.

was qualified for that position and whether it was appropriate for both Young Lee and Jinbo Shim to be located at TCS's offices in Los Angeles.[135]  In a 15 March 2023 email, the Kims' counsel requested that they be given an opportunity to discuss these proposed appointments with someone in LG H&H's "upper management," emphasizing that Sunna Kim should have "a direct report to the Chairperson of the Board," and that if Sunna Kim did not have such a direct reporting ability her "authority, duties and/or responsibilities may be materially diminished" under the SKEA.[136]

110.    LG H&H responded that, once the Kims consented to the appointment of Dr. Hye Young Moon as Chairperson of the Board, they would have an "open line of communication" with her.[137]  Hye Young Moon joined LG H&H only in January of 2023, and testified that she had no communication with Sunna Kim until the TCS Board meeting by video on 29 March 2023 at which Dr. Moon's appointment as the Chairperson of that board was ratified.[138]  Dr. Moon met Sunna Kim in person for the first time on 21 April 2023.[139]

111.    Sun Hwa Moon conceded at the Hearing that Young Lee was "the main communication channel from the beginning."[140]  She said that "he was there communicating, meeting with the Kim family, so that was natural that he should be the main contact point person, the communication channel with The Crème Shop."[141]

---

[135] *Id.* at 4 (15 March 2023 Email from Nate Meyer to Hyosun Kim).
[136] *Id.* at 4.
[137] *Id.* at 3 (15 March 2023 Email from Hyosun Kim to Nate Meyer).
[138] Tr. Day 2, p. 12.
[139] Tr. Day 2, p. 16.
[140] Tr. Day 1, p. 168.
[141] Tr. Day 1, p. 177.

112.    All of the TCS shareholders – LG H&H and both Sunna and Insil Kim – executed a written consent document, dated 3 March 2023, to appoint Dr. Hye Young Moon, Hong Gi Kim, and Young Lee to the TCS Board of Directors at some point in late March 2023.[142]

113.    On 29 March 2023, during the TCS Board of Directors video meeting, Hye Young Moon's appointment as Chairman of the Board was ratified.  During this meeting, Young Lee was also appointed as Co-CEO by a vote of three to two, with Insil and Sunna Kim voting against his appointment.[143]

114.    Dr. Hyeyoung Moon, the newly elected Chairperson of the TCS Board, visited TCS's offices in Los Angeles for the first time on 21 April 2023.[144]  In meetings held during this visit, Sunna Kim expressed her frustration with LG H&H's appointment of Young Lee as Co-CEO and LG H&H's interactions with the Respondents since the departure of Suk Cha.[145]  The Kims proposed that LG H&H should appoint Dr. Hyeyoung Moon as TCS's Co-CEO and should relegate Young Lee to VP of Operations.[146]

115.    On 28 April 2023, Dr. Hyeyoung Moon and the Kims met in New York City.[147] During this meeting, Dr. Moon presented the Kims with three draft documents:  (1) an amendment to the SA giving LG H&H the right to appoint a COO in lieu of a Co-CEO at TCS; (2) an R&R document outlining the roles and responsibilities of the Co-CEOs (or the COO should LG H&H elect to nominate this officer instead of a Co-CEO) appointed by each side; and (3) a Board of Directors Unanimous Written Consent adopting the aforementioned R&R

---

[142] Exh. C-25 (3 March 2023 Action by Written Consent of the Stockholders of TCS).  Note that although the Unanimous Written Consent is dated 3 March 2023 it was not signed until some later date in March 2023.
[143] Exh. C-26 (29 March 2023 Minutes of Board of Directors' Meeting).
[144] H. Moon WS1 ¶ 15.
[145] H. Moon WS1 ¶¶ 16-18; S. Kim WS1 ¶ 44; SOD ¶ 106.
[146] SOD ¶ 108; SOC ¶ 138.
[147] SOC ¶ 141; SOD ¶ 109.

document and appointing Young Lee as TCS's COO.[148]  The Kims responded by agreeing to the draft Unanimous Written Consent and SA side agreement, and flagging comments on the proposed R&R document.[149]

116.    In their comments on the draft R&R, the Kims proposed that Young Lee be required to seek Sunna Kim's consent on any action taken in his role as either Co-CEO or COO.[150]  The Kims also proposed that R&R document should make the Kims responsible for assisting in the succession of management after they sold their remaining shareholdings.[151]  LG H&H responded to this proposal by saying that the document should "use the language of 'consent' for both sides consistently," and noting that "eventually we will have delegation of authorities also designated, which will provide further clarity."[152]  The Kims responded that they did not believe they needed to seek Young Lee's consent for any actions, and that, had they had such an understanding "they would not have agreed to such terms at closing."[153]

117.    On 9 May 2023, Sunna Kim sent Dr. Hyeyoung Moon an email imploring her to remove Young Lee as LG H&H's appointed Co-CEO at TCS and objecting to the draft R&R document to the extent it made Young Lee's "demot[ion] to COO meaningless as he is being given the Co-CEO authority."[154]  Dr. Moon did not respond to this email,[155]  and she "never offered to appoint someone other than Young Lee as co-CEO."[156]

---

[148] Exh. D-21 (28 April 2023 Emails between Young Lee, Dr. Hye Young Moon, and Sunna Kim).
[149] Exh. D-56, at 7 (2 May 2023 Email from Christine Shin to Young Lee).
[150] Exh. D-22, at 4-5 (Respondents' Edits to Draft R&R dated 2 May 2023).
[151] *Id.* at 4 (Respondents' Edits to Draft R&R dated 2 May 2023).
[152] Exh. D-56, at 2-3 (5 May 2023 Email from Hye Young Moon to Christine Shin).
[153] *Id.* at 2 (5 May 2023 Email from Christine Shin to Hye Young Moon).
[154] Exh. D-53, at 2 (9 May 2023 Email from Sunna Kim to Hye Young Moon).
[155] SOD ¶ 114.
[156] Tr. Day 2, p. 25.

118.    There was no further written negotiation of, nor agreement to, the draft documents and agreements LG H&H had presented on 28 April 2023.[157]  Young Lee continued to act as Co-CEO and to annoy Sunna Kim.  He also seemed to annoy other TCS employees.  Sunna Kim said that she received employee complaints about Young Lee's "aggressive and toxic attitude and dictator-like manner."[158]  Paul Kim, the head of sales at TCS, found it so difficult to work with Young Lee that he decided to resign.[159]  He complained that Young Lee wasted his time by asking him "to teach him the basics of retail, and that's where I found offense."[160]  Paul Kim said that "I do these types of teachings quite honestly to our interns, . . .  and to know that, okay, a CEO is going to ask me these type of questions, and I have to in effect teach him, I think that's where I said, okay, something is wrong here."[161]  He said that Young Lee was the sole reason for his resignation.[162]

### J.    The Signature Authorization and Delegation Policy Proposal

119.    On 7 July 2023, LG H&H sent a draft Signature Authorization and Delegation Policy (the "Proposed Signature Policy") to Sunna and Insil Kim for review.[163]  Hyosun Kim, on behalf of LG H&H, explained that "the purpose of adopting this policy is to improve and enhance internal control of TCS."[164]  The Proposed Signature Policy would have established limits on the ability of company officers to enter contracts on TCS's behalf.[165]

120.    In relevant part, the Proposed Signature Policy gave the Co-CEOs of TCS the authority to execute and approve all contracts on behalf of TCS that:  (1) are valued at USD

---

[157] SOD ¶ 114.
[158] Tr. Day 3, p. 172.
[159] Tr. Day 3, p. 151.
[160] Tr. Day 3, p. 152.
[161] Tr. Day 3, p. 155.
[162] Tr. Day 3, p. 156.
[163] Exh. D-25, at 1 (7 July 2023 Email from Hyosun Kim to Sunna and Insil Kim).
[164] *Id.* at 1.
[165] *Id.* at 3 (Draft Signature Authorization and Delegation Authority Policy).

100,000 or less; (2) are in TCS's ordinary course of business and have been approved in the annual budget and business plan, as approved by the Board of Directors; and (3) are checks, notes, or other financial instruments of TCS with a face amount of USD 100,000 or less.[166]  The Proposed Signature Policy also allowed for any check, note, or other financial instrument of TCS with a face amount above USD 100,000 to be approved with the signature of both Co-CEOs.[167] The Proposed Signature Policy, pursuant to Section 1.2(f) of the SA, would have required the Board of Directors' approval for any disposal or purchase of assets worth more than USD 200,000, other than sales of TCS's products in the ordinary course of business.[168]

121.    On 10 July 2023, LG H&H sent a revised draft of the Proposed Signature Policy incorporating its own edits, making a downward adjustment to the value of contracts that could be independently approved by TCS's CFO.[169]  Christine Shin, of RAK, responded on behalf of Sunna and Insil Kin on 12 July 2023, confirming receipt and requesting that LG H&H copy RAK attorneys Nate Meyer and Tim Baumann on all TCS-related correspondence going forward.[170]

122.    On 14 July 2023, Nate Meyer of RAK sent an email to Hyosun Kim explaining the SKEA's provisions that would allow Sunna Kim to resign for "Good Reason."[171]  Mr. Meyer explained that the Kims believed that a diminution in Sunna Kim's authority had already occurred under the SKEA and that "execution of this [Proposed Signature Policy] would also drastically curtail Sunna Kim's authority as a co-CEO of The Crème Shop.  Please confirm you

---

[166] *Id.* at 5.
[167] *Id.*
[168] *Id.* at 7.
[169] Exh. C-32, at 2-17 (10 July 2023 Email from Hyosun Kim to Sunna and Insil Kim).
[170] *Id.* at 1-2 (12 July 2023 Email from Christine Shin to Hyosun Kim).
[171] *Id.* at 1 (14 July 2023 Email from Nate Meyer to Hyosun Kim).

agree that this is the case and we will get this executed and provide a calculation of the Put Option price for LG to pay."[172]

123.    Sunna Kim testified with reference to the Proposed Signature Policy that she "didn't want to quit," but that she "wanted someone to reach out and address, or I think it was called cure, the contents of the Good Reason notice."[173]  When "LG's counsel" responded "that it found absolutely no merit in your grounds for resignation," Sunna Kim said that she was "very sad about that, . . .but this was when I knew that they didn't want me any more."[174]  When it was put to Sunna Kim that the signature policy was never adopted, she responded that "[i]t was never withdrawn."[175]

124.    On 18 July 2023, Sunna Kim forwarded an email from Young Lee to her counsel Christine Shin and Nate Meyer at RAK.[176]  In his email, Young Lee had made numerous requests related to Sunna Kim's business plan and ERP ("Enterprise Resource Planning"), among other things.[177]  Sunna Kim's email forwarding Lee's email to Nate Meyer requested assistance in drafting a response and also expressed her exasperation.  She told Meyer:

> - I already shared my business plans with Young during our business meeting with Ms. Moon last month, not sure why he couldn't take notes and is asking me to send it again. I have 5,000 things to do that are more important than giving him my strategies, plans, and ideas so he can take credit
> - Also not sure why this is even important at all since according to Young, he's the CEO and LG is just "letting my me run operations". Shouldn't he be sharing HIS business plans then? Lol
> - Not sharing my 5 year business plans, I'm resigning lol
> - My mom already gave him the small accounts verbally which he said was fine, at this point he wants us to be his secretary.

---

[172] Exh. C-32, at 1 (14 July 2023 Email from Nate Meyer to Hyosun Kim).
[173] Tr. Day 3, p. 182.
[174] Tr. Day 3, p. 183.
[175] Tr. Day 4, p. 53.
[176] Exh. C-121, at 2-3.
[177] *Id.* at 2-3 (18 July 2023 Email from Young Lee to Sunna and Insil Kim).

- ERP — I refuse to share Netsuite's proposal (which I forwarded you in one of the ERP Proof emails) until he shares his ERP plans (which he was supposed to do but just sent a sorry ass screenshot that wasn't specific in any way)
- Process Innovation Schedule — this is is [sic] his own schedule in which he wants to bring in visitors from Korea to audit our ERP system (auditing on our dime, travel on our time). I said we can't accommodate because of our holiday shipping season so he snuck behind my back to get confirmation from my mom and other managers who -surprise- also said the same thing. He's still insistent on doing this (on our dime btw!) which is going to undoubtedly interfere with our holiday business. I have no other words to say at this point.

It also repulses me that I have to have any form of communication with this piece of human garbage while they are litigating my family and me and causing us tremendous stress.[178]

125.    Nate Meyer, in response, explained that RAK was working on a "formal 'good reason' letter" and that "[u]nder the Employment Agreement, you can't be 'out' until 60 days after the good reason letter, so you need to be very careful in the meantime."[179]

126.    On 20 July 2023, Sunna Kim emailed advisors at Palm Tree LLC asking "[i]s there a minimum revenue and/or EBITDA I have to meet to/when I exercise the put option?"[180] Palm Tree responded that there was "no minimum threshold related to performance," to exercise the put option under the SA.[181]  On 21 July 2023, Sunna Kim again emailed Palm Tree requesting confirmation of her analysis that, as of July 2023, TCS's value calculated on the basis of the multiples of revenue specified in the SA would be high enough that the Kims' put option price would surpass the USD 130 million price cap in the SA.[182]

---

[178] *Id.* at 2.  The Claimant had commenced this arbitration on 19 June 2023.
[179] *Id.* at 1 (20 July 2023 Email from Nate Meyer to Sunna Kim).
[180] Exh. C-128, at 3-4 (20 July 2023 Email from Sunna Kim to Steven Richards and Phillip Cooper).
[181] *Id.* at 3 (20 July 2023 Email from Steven Richards to Sunna Kim).
[182] *Id.* at 1-2 (21 July 2023 Email from Sunna Kim to Steven Richards and Phillip Cooper).  *See* SA §§ 2.4(b) & 2.6(a).

K.      **Sunna Kim's "Good Reason" Resignation Letters**

127.    On 21 July 2023, Nate Meyer sent a "Good Reason" notice to LG H&H on behalf of Sunna Kim,[183] pursuant to Section 5(c) of the SKEA (quoted above at paragraph 85).

128.    Sunna Kim's "Good Reason" notice contended that "LG ha[d] taken multiple steps to diminish Sunna Kim's authority, duties and responsibilities materially; none of these changes were alterations of her reporting structure that otherwise complied with the [SKEA]." The "Good Reason" notice asserted that:

> LG undermined Ms. Kim's right to act as co-CEO of the Company, as all access to the Board of LG or higher-ups at LG (the majority owner of the Company) was denied her.  She was forced to go through an LG-appointed co-CEO, Young Lee.
>
> Pursuant to Ms. Kim's employment agreement, she was to report directly to the Chairman of LG.  The lack of access to the Chairman materially diminished Ms. Kim's authority, duties and/or responsibilities.
>
> Over the past thirty (30) days, Mr. Lee:  (1) has been advising employees of the Company that he is the "CEO" (not a co-CEO) of the company; (2) has been actively undermining Ms. Kim's authority in direct violation of her employment agreement; (3) has excluded Ms. Kim from his meetings with Company employees; and (4) has informed Sunna Kim that he has replaced her as the primary contact between Company and LG, and prevented her from accessing LG employees and board members.  According to Mr. Lee, LG expressly approves those actions.  These actions confirm LG's intent to reduce Ms. Kim's role within the company, in violation of her Employment Agreement.
>
> LG has also demanded that Ms. Kim greatly reduce her ability to spend funds, rendering it impossible for her to manage her duties on a day-to-day basis.
>
> [] LG and Mr. Lee have now taken steps diminishing Sunna Kim's authority, thus providing Good Reason for her to resign. Please

---

[183] Exh. C-33 (21 July 2023 "Good Reason" Notice from Sunna Kim to LG H&H).  The same letter is also marked as Exh. C-9.

41

advise whether these diminutions in Ms. Kim's authority will be cured within 60 days [184]

129.     Hyosun Kim responded on behalf of LG H&H to Sunna Kim's "Good Reason" notice by letter dated 31 July 2023.[185]  LG H&H's letter pointed out that LG H&H was not a party to the SKEA, and thus, recommended that Sunna Kim's notice be addressed to the Board of Directors of TCS, Sunna Kim's counterparty to the SKEA.[186]  Additionally, LG H&H's letter took issue with Sunna Kim's contention that the SKEA provided for Sunna Kim to report to the chairperson of LG H&H's Board of Directors.[187]

130.     On 7 August 2023, Nate Meyer responded to LG H&H's 31 July 2023 letter by asserting that the initial 21 July 2023 notice was effective, but also copying Dr. Hye Young Moon, the Chairperson of TCS's Board of Directors and incorporating Sunna Kim's 21 July 2023 "Good Reason" notice "out of an abundance of caution."[188]  Nate Meyer's letter noted that it was "clear that the parties disagree on merits" and explained that, if LG H&H and TCS did not cure the claimed "Good Reasons" by 19 September 2023, "Sunna Kim's employment shall terminate."[189]

131.     On 15 August 2023, Sunna Kim sent an email to J.A. Lee, Dr. Hyeyoung Moon, and Hyosun Kim attaching "a formal grievance regarding the appointment of Young Lee as Co-CEO" addressed to TCS's Board of Directors on behalf of herself and Insil Kim as minority shareholders.[190]  Sunna Kim asserted in this grievance that:

> During negotiations for the sale of a 65% stake in the Company to LG, there were various communications between the us [*sic*] and representatives of LG, including persons on the LG M&A team, Mr.

---

[184] Exh. C-33, at 1-2.
[185] Exh. C-10 (31 July 2023 Letter from Hyosun Kim to Nate Meyer).
[186] *Id.*
[187] *Id.*
[188] Exh. C-11 (7 August 2023 Letter from Nate Meyer to Hyosun Kim and Hye Young Moon).
[189] *Id.*
[190] Exh. D-57 (15 August 2023 Email from Sunna Kim to Hye Young Moon).

Cha and other management level executives at LG. The main assurance that we received from various LG representatives, including Kang Wook [Kenneth] Choi, the former US director of LG was that I would have "free-standing" management of the Company as it relates to operational matters.[191]

132.   The Kims' grievance recounts Young Lee's attempt to implement a new ERP system at TCS, complaints from TCS's employees about Young Lee's "aggressive and toxic attitude and dictator-like manner" as well as wasting employees' time with "meaningless" meetings, and the Proposed Signature Policy giving Young Lee authority to spend up to USD 100,000 without Sunna Kim's approval.[192]  It asserted that Young Lee's and LG H&H's actions "undoubtedly and irrefutably undermine [Sunna Kim's] ability to manage the Company or realize any value in the Put Option at all."[193]  It requested that "Young Lee be removed from the Company immediately," and be replaced as Co-CEO.[194]  The Respondents state that no LG H&H-appointed TCS Board member nor any LG H&H representative responded to this grievance letter.[195]

133.   Sunna Kim's "Good Reason" notice was discussed at a meeting of the TCS Board of Directors on 16 August 2023.[196]  During this meeting, Dr. Hye Young Moon brought up the issue of making transition arrangements in case of Sunna Kim's departure from TCS.[197]  Sunna Kim objected to this topic being discussed by the Board, because her resignation for "Good Reason" was an active litigation matter and any action taken might affect her counterclaim against LG H&H in this Arbitration.[198]  The Board authorized Young Lee to retain counsel to

---

[191] *Id.* at 2.
[192] *Id.* at 2-5.
[193] *Id.* at 4.
[194] *Id.* at 6.
[195] SOD ¶ 145.
[196] Exh. C-42 (16 August 2023 TCS Minutes of Meeting of the Board of Directors).
[197] *Id.* at 2.
[198] *Id.* at 2.

represent TCS in connection with Sunna Kim's "Good Reason" notice and potential departure from TCS.[199]

134.    TCS acknowledged receipt of the 7 August 2023 version of Sunna Kim's "Good Reason" notice on 28 August 2023 through its external counsel, Lee Anav Chung White Kim Ruger & Richter LLP ("Lee Anav").[200]  TCS's letter stated that TCS considered the 7 August 2023 "Good Reason" notice as effective written notice under Section 5(c) of the SKEA, but that it deemed the earlier 21 July 2023 "Good Reason" notice sent to LG H&H ineffective.[201]  In email correspondence dated 13 September 2023, Bub-Joo Lee of Lee Anav asked whether Sunna Kim considered the 21 July 2023 or the 7 August 2023 "Good Reason" notice to be the effective notice.[202]  Nate Meyer responded that, without parsing which "Good Reason" notice was effective, Sunna Kim would agree to extend TCS's cure period to 6 October 2023.[203]

135.    Throughout September 2023, Sunna Kim, through her counsel at RAK, sent offers to extend her employment with TCS beyond 6 October 2023 in order to effect a "mutually agreeable transition plan," from her management to LG H&H's sole management of TCS.[204]  On 29 September 2023, Larry Russ of RAK sent a letter proposing settlement terms to Allen Kim— LG H&H's external counsel in this Arbitration.[205]  The terms of this offer included the Kims staying on at TCS through mid-December 2023 in exchange for LG H&H's expedited payment

---

[199] *Id.* at 3.
[200] Exh. D-61 (28 August 2023 Letter from Bub-Joo Lee to Nate Meyer and Christine Shin).
[201] *Id.* at 1.
[202] Exh. D-40, at 2 (13 September 2023 Email from Bub-Joo Lee to Nate Meyer and Christine Shin).
[203] *Id.* at 1-2 (13 September 2023 Email from Nate Meyer to Bub-Joo Lee).
[204] Exh. D-38 (5 September 2023 Letter from Larry Russ to Bub-Joo Lee); D-39 (11 September 2023 Email from Larry Russ to Bub-Joo Lee); SOD ¶ 154.
[205] Exh. C-199 (29 September 2023 Letter from Larry Russ to Allen Kim).  This letter is marked "PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION."  Such communications would normally be excluded from evidence by Article 9(4)(b) of the IBA Rules, but neither Party has raised any objection to the consideration of this letter by the Tribunal.

of the Kims' put option—to be valued as of 31 December 2023—for the sale of their remaining 35% shareholding of TCS.[206]

136.    On 29 September 2023, Sunna Kim sent an additional list of grievances directly to Dr. Hye Young Moon regarding Young Lee's actions as Co-CEO at TCS.[207]  Sunna Kim contended that Young Lee had:  (1) given inappropriate notice regarding TCS Board meetings, including meetings held on 16 August 2023, 15 September 2023, and 22 September 2023; (2) called "fictional" Board meetings "involving matters that had already been decided and placed into action, where [Sunna and Insil Kims'] vote would not count"; (3) inappropriately used TCS's funds to engage law firms and investigators to investigate Sunna Kim's payment of funds to RAK; (4) entered Sunna Kim's office with forensic investigators without Sunna Kim's counsel present; (5) disrespected and lied to the Kim family; (6) incompetently acted as Co-CEO, including asking TCS employees to teach him things about the business, and annoyed TCS employees; (7) created unnecessary interference to revenue generating activities through requests for information and investigations; (8) smoked cigarettes in front of employees and clients, which reflected poorly on TCS; and (9) intentionally caused distress and trauma to Sunna Kim.[208]  Hyosun Kim responded to this email on 4 October 2023, asserting that Sunna Kim's accusations were baseless and requesting that all future correspondence between the Parties be through their respective counsels.[209]

---

[206] Exh. C-199, at 1-2.
[207] Exh. D-46, at 11-14 (29 September 2023 Email from Sunna Kim to Hye Young Moon).
[208] *Id.* at 11-14.
[209] *Id.* at 10-11 (4 October 2023 Email from Hyosun Kim to Sunna Kim).

137.    On 3 October 2023,[210] TCS responded substantively to Sunna Kim's "Good Reason" notice through its counsel Lee Anav.[211]  TCS asserted that Sunna Kim did not have "Good Reason" to resign pursuant to Section 5(c) of the SKEA, telling her that it had not taken any action that had "materially diminished your authority, duties or responsibilities as Co-CEO," and contending that Sunna Kim's purported resignation pursuant to the notice "is invalid and would constitute a breach of the [SKEA]."[212]  TCS broadly denied Sunna Kim's allegations regarding TCS's and Young Lee's actions.[213]  TCS stated, among other things, that:

- [Sunna Kim's] Good Reason Notice is not well taken, because Ms. Kim's complaints are about management and operational changes that flow from the simple fact that she is a Co-CEO. The fact that Ms. [Sunna] Kim has to share her management powers, prerogatives, and responsibilities with another executive are not "material diminishments" of her "authority, duties or responsibilities"; rather, they are obvious consequences of being a Co-CEO and being subject to the general supervision of the Board of TCS. . . .  The addition of a Co-CEO has not altered, let alone materially reduced, her responsibilities. Rather, her complaint is that the other Co-CEO (namely, Mr. Young C. Lee) is also exercising his own duties, powers, and authority over the same areas, in a manner commensurate with his position as the Co-CEO, and that she does not like sharing her authority.[214]

- [Sunna Kim] has interfered with Mr. Lee's performance of his duties and responsibilities as the Company's other Co-CEO, and sought to minimize his role to that in name only, even though Mr. Lee was *duly* nominated by LG H&H and *duly* appointed to his current position by TCS's Board.[215]

- [Sunna] Kim contends that she does not have to report or answer to TCS's Board of Directors or cooperate in any manner with Co-CEO Lee.  Rather, Ms. Kim claims she only needs to report

---

[210] The letter is dated 2 October 2023, but Respondents assert, and email records establish, that the response letter was transmitted to Sunna Kim and RAK on 3 October 2023.  *See* Exh. D-37 (3 October 2023 Email from Bub-Joo Lee to Sunna Kim).
[211] Exh. C-35 (2 October 2023 Letter from Bub-Joo Lee to Sunna Kim).
[212] *Id.* at 1.
[213] *Id.* at 6-7.
[214] *Id.* at 3.
[215] *Id.* at 4.

and answer to the <u>Chairperson</u> of the board of directors of <u>LG
H&H</u> . . . Ms. [] Kim's contentions go against the basic
principles of corporate law . . . ***and***, more importantly, the plain
language of the [SKEA].[216]

- [Sunna Kim] suggests that before she entered into the [SKEA],
  representations were made that she could *effectively* continue to
  run the Company as its sole CEO, unfettered by any constraints
  or limitations on her powers and authority, including the need to
  cooperate with a Co-CEO.  No such oral representations were
  made to Ms. Kim.[217]

- [Sunna Kim] continues to be responsible for her own duties and
  responsibility, and neither the Board nor her Co-CEO Lee has
  taken those duties away from her.[218]

138.    With specific reference to Sunna Kim's allegation that the Proposed Signature

Policy constituted "Good Reason" for her resignation, TCS responded that:

- The Policy was floated as a proposal, together with a proposed
  unanimous written consent for the Board members' review,
  consideration, and signature.  The written consent . . . was never
  signed.  Following Ms. Kim's refusal to sign the written consent,
  the proposal has not been brought to a vote at a Board meeting,
  and the Board has not voted on the matter.  The proposal remains
  just that – a proposal.  The mere discussion of a proposal cannot
  "materially diminishes [sic] Executive's authority, duties or
  responsibilities."[219]

- The Policy was proposed by the Board because the Company
  did not have in place express policies setting its officers' and
  executives' disbursements and payment authority, and
  authorized amounts. . . .  The lack of express policies spelling
  out check writing authority and rules therefor, among other
  things, is against industry best practices on internal financial
  controls, and may arguably amount to a dereliction of duty on
  the part of the executives in charge.  Accordingly, the Company
  disagrees that the proposed Policy, even if it is implemented,
  would materially diminish her authority.[220]

---

[216] *Id.* at 4.
[217] *Id.* at 4-5.
[218] *Id.* at 5.
[219] *Id.*
[220] *Id.* at 5-6.

47

- [Sunna] Kim's *Employment Agreement* expressly provides that "Executive shall be subject to and act in accordance with . . . the Company's . . . rules, regulations, and policies, and instructions issued from time to time by the Board, as may be amended from time to time." The proposed Policy and similar fiscal oversight mechanisms are well within the "policies, and instructions" that the Board is entitled to adopt as a routine matter, and they do not constitute a material diminishment of Co-CEO Kim's authority . . . .[221]

- The Policy, as proposed, would impose identical controls on both Co-CEO Kim and Co-CEO Lee, equally. Therefore, even if the TCS Board were to adopt and implement such Policy (which has not been done), Co-CEO [Sunna] Kim's "authority" would not be diminished and taken away for the benefit of Co-CEO Young Lee.[222]

139. On 4 October 2023, TCS followed up with a further letter to Sunna Kim.[223] TCS requested clarification of "whether Ms. [Sunna] Kim intends October 6, 2023 to be her last day of employment at TCS."[224] Later that day, Sunna Kim's employment counsel responded that Sunna Kim "has the right to have her last day be Friday [October] 6th," but that Sunna Kim "is prepared to extend her employment at least through Monday [the 9th]," because the outstanding settlement offer the Kims had made to LG H&H expired 9 October 2023.[225] Sunna Kim's counsel noted also that Sunna Kim had "repeatedly offered to stay for a longer time as part of a mutually agreed transition period, but these offers have been ignored."[226]

140. Correspondence between Sunna Kim's and TCS's lawyers regarding the effective date of Sunna Kim's resignation from TCS continued through 5 October 2023.[227] Sunna Kim's counsel requested clarification whether it was TCS's position that Sunna Kim "cannot

---

[221] *Id.* at 6.
[222] *Id.*
[223] Exh. C-193 (4 October 2023 Letter from Bub-Joo Lee to Sunna Kim).
[224] *Id.* at 2.
[225] Exh. D-45, at 1 (4 October 2023 Email from Bonita Moore to Bub-Joo Lee).
[226] *Id.*
[227] Exh. D-47, at 1-6 (5 October 2023 Emails between Bonita Moore and Bub-Joo Lee).

48

voluntarily extend the date of her termination without prejudice to her Good Notice resignation in order to better align with the timing/negotiation of a potential global settlement . . . ?"[228] TCS's counsel responded by citing Section 5(f) of the SKEA and noting "[Sunna Kim] controls the issuance and timing of the Good Reason Notice, and the [SKEA] says what it says. . . . Similarly, if your client is offering to withdraw the Notice of Good Reason, please so state clearly."[229]  Sunna Kim's counsel responded that Sunna Kim had "offered to extend the cure period by one business day . . . through Monday [October] the 9th."[230]

141.    Simultaneously on 5 October 2023, Larry Russ of RAK sent a letter to LG H&H's and TCS's counsel regarding arrangements for Sunna Kim's smooth departure from TCS.[231] This letter expressed concern that LG H&H had "not attempted to facilitate a collegial transition plan which will support the financial prosperity of [TCS]," given that Sunna Kim and the Kim family had been "one and the same with the Company since its exception [sic]."[232]  The letter reiterated the Kim family's discontent with the continued employment of Young Lee as TCS's Co-CEO and implored LG H&H to "participate in a meaningful dialogue about a productive transition plan with appropriate personnel."[233]

142.    On 6 October 2023, TCS's counsel made multiple inquiries to Sunna Kim's counsel as to whether Sunna Kim intended to withdraw her Good Reason notice—noting that if the notice was not withdrawn, the provisions of Section 5(c) would apply and her employment

---

[228] *Id.* at 3 (5 October 2023 Email from Bonita Moore to Bub-Joo Lee).
[229] *Id.* at 1-3 (5 October 2023 Email from Bub-Joo Lee to Bonita Moore).
[230] *Id.* at 1 (5 October 2023 Email from Bonita Moore to Bub-Joo Lee).
[231] Exh. D-54 (5 October 2023 Letter from Larry Russ to LG H&H and TCS counsel).
[232] *Id.* at 3-4.
[233] *Id.* at 5.

would terminate that day.[234]  That afternoon, Sunna Kim's counsel again offered to extend Sunna Kim's employment through Monday, 9 October 2023.[235]

143.    At 5:20 p.m. on 6 October 2023, TCS's counsel sent Sunna Kim an email notifying her that it did not agree to extend the 60-day cure period under the SKEA, thus rejecting Sunna Kim's offer to extend her employment through 9 October 2023.[236]  TCS noted that "[b]ecause [Sunna] Kim's 'Good Reason Notice' for resignation has not been withdrawn, Section 5(c) of the [SKEA] remains in force and controls, including the self-executing provision thereof," which TCS asserted meant her resignation became effective that day.[237]  TCS prepared a final paycheck, provided for Sunna Kim's collection of her personal belongings, and informed her that she would not have access to TCS's electronic systems or offices beyond 9 October 2023, on which date she could visit the office to collect her personal belongings.[238]

### L.    TCS's purported termination of Sunna Kim for cause

144.    In August 2023, LG H&H had begun to make inquiries into TCS's payment of a 20 June 2023 invoice, submitted to TCS by RAK for USD 240,567.58 for unspecified legal services and approved by Sunna Kim.[239]  LG H&H now alleges that Sunna Kim instructed RAK to redact bill itemization descriptions and then forwarded this invoice, USD 200,000 of which was to retain RAK's legal services for Sunna Kim's personal benefit, to TCS for it to pay.[240]

145.    The Respondents concede that RAK billed TCS for legal services meant for the personal benefit of Sunna Kim, but assert that sending this invoice to TCS was a mistake which they and RAK have sought to rectify by attempting to return the funds to TCS and by placing the

---

[234] Exh. D-48, at 2-3 (6 October 2023 Emails from Bub-Joo Lee to Bonita Moore).
[235] *Id.* at 1 (6 October 2023 Email from Bonita Moore to Bub-Joo Lee).
[236] Exh. D-49 (6 October 2023 Email from Bub-Joo Lee to Sunna Kim).
[237] *Id.* at 1.
[238] *Id.*
[239] H. Moon WS1 ¶¶ 29-30; Exh. C-47, at 2 (20 June 2023 RAK invoice to TCS).
[240] SOC ¶¶ 173-177.

funds in an RAK trust account when TCS refused to receive the repayment.[241]  To date, TCS has

refused to accept the return of the funds which continue to be held in trust by RAK.[242]  Dr.

Hyeyoung Moon testified that she had "made a determination that returning the USD 200,000

was not going to correct the situation."[243]  She said, "I don't know how you can cure these

things."[244]

146.    The TCS Board of Directors held a meeting on 15 September 2023 at which the

Board authorized Young Lee to investigate TCS's records reflecting its transactions and

relationship with RAK to assess whether Sunna Kim had caused TCS to transfer funds to RAK

under false pretenses.[245]  The Respondents contend that they could not be present at this meeting

because their counsel at RAK were observing Rosh Hashanah, a scheduling conflict which was

raised with Young Lee but which he rebuffed.[246]

147.    The TCS Board of Directors held a further meeting on 26 September 2023 at

which Insil and Sunna Kim were not present.  Bub-Joo Lee of Lee Anav presented the findings

of his investigation into RAK's invoices to TCS and Sunna Kim's authorization of payment of

those invoices since the SPA's close in June 2022.[247]  The TCS Board resolved at that meeting to

terminate Sunna Kim's employment with TCS "for Cause" based upon the following:

- On or about June 26, 2023, Ms. Kim intentionally directed an
  employee of the Company to pay USD 200,000 to RAK in
  attorneys' fees that TCS did not incur.  At that time, RAK was
  also providing personal legal services and advice to Ms. Kim.
  [Sunna] Kim misrepresented that she has confirmed details with
  RAK attorneys that this sum was for services previously
  rendered by RAK on behalf of TCS, despite not being provided

---

[241] SOD ¶¶ 138-142.
[242] Exh. D-36 (20 September 2023 Letter from David Parker to Larry Russ); SOD ¶ 142.
[243] Tr. Day 2, p. 44.
[244] Tr. Day 2, p. 43.
[245] Exh. C-37, at 2 (15 September 2023 TCS Minutes of Meeting of the Board of Directors).
[246] SOD ¶¶ 151-52; S. Kim WS1 ¶ 61.
[247] Exh. C-39 (26 September 2023 TCS Minutes of Meeting of the Board of Directors); Exh. C-28 (26 September
2023 Lee Anav Presentation to the Board of Directors).

with a breakdown of the work allegedly performed and lacking information that there was a basis for the USD 200,000 billed amount. . . .[248]

- On or about May 17, 2023, Ms. Kim intentionally directed the employees of [TCS] to pay USD 40,567.58 to RAK in attorneys' fees which included numerous charges that TCS did not incur. She misrepresented that she had reviewed the bill dated the same date with Christine Shin of RAK and confirmed that everything in the invoice was correct. The May 17 invoice contained no details showing that all of USD 40,567.58 was on account of legitimate legal expenses of [TCS]. . . .[249]

- [Sunna] Kim was directed by the Board, pursuant to the resolutions adopted on September 15, 2023, to cooperate with the investigation by the Board of her actions pertaining to the RAK invoices. As part of this investigation, the Board ordered that she immediately provide the passwords and login information needed to access her [TCS] email accounts and network servers . . . Initially, [Sunna] Kim refused to do so, materially delaying the investigation. Thereafter, [Sunna] Kim only provided certain limited passwords to the investigators, withheld other passwords, and conditioned her disclosure of the same on the Board not being allowed to view the contents of the [TCS] email account assigned to her.[250]

148. On 27 September 2023, TCS sent Sunna Kim a notice of termination for cause of her employment agreement with TCS.[251] TCS's notice explained that the termination "shall become effective sixty (60) calendar days after" Sunna Kim's receipt of the notice and that Sunna Kim would have sixty days "to exercise the rights, *if any*, available to you under" Section 5(a) of the SKEA.[252] Pursuant to the terms of this notice, Sunna Kim's termination for cause was to become effective on 26 November 2023.[253]

---

[248] Exh. C-39, at 1-2.
[249] *Id.* at 2.
[250] *Id.*
[251] Exh. C-66 (27 September 2023 Letter from Bub-Joo Lee to Sunna Kim).
[252] *Id.* at 2. Section 5(a) of the SKEA provides that TCS's Board of Directors will give Sunna Kim sixty calendar days after receipt of the notice of termination to "correct the situation."
[253] SOD ¶ 155; SOC ¶ 194.

52

149.    The Claimant asserts that Sunna Kim's "Good Reason" resignation notice, which had been sent first to LG H&H on 21 July 2023 and again to TCS on 7 August 2023, became effective on 6 October 2023 and that she had therefore resigned from her employment on that date.[254]  The Respondents assert that Sunna Kim was terminated without cause on 6 October 2023 when TCS informed her that she would no longer be permitted to access TCS's offices or computer systems.[255]  Alternatively, the Respondents contend that Sunna Kim resigned on 6 October 2023 with contractual "Good Reason."[256]

150.    On 12 January 2024, Sunna Kim filed a shareholders' derivative action against the LG H&H appointed directors of TCS in California Superior Court in Los Angeles.[257]  While that action raises issues different from those presented by this Arbitration, the Claimant argues that Sunna Kim should be held to her statements in the complaint and the first amended complaint in that action, both of which state that she "resigned from her position" with TCS, and that her "resignation became effective on October 6, 2023."[258]

### M.    The Call Option and Put Option Notices

151.    On 29 November 2023, pursuant to Section 2.5 of the SA, LG H&H sent a Call Option Notice letter to the Respondents seeking to exercise its call option rights based on Sunna Kim's resignation from TCS without "Good Reason," or in the alternative, Sunna Kim's termination for cause effective on 25 November 2023.  LG H&H calculated the option exercise price to be USD 66.8 million based on the financial statements of TCS for the year ended

---

[254] SOC ¶ 193.
[255] SOD ¶ 172.
[256] SOD ¶ 179.
[257] Exh. C-129 (12 January 2024 Complaint).
[258] *Id.* at ¶¶ 2, 22; Exh. C-194, at ¶¶ 2, 22 (10 May 2024 First Amended Complaint).

December 31, 2022 and requested that consummation of the transaction be completed no later than 28 December 2023.[259]

152.    On 5 March 2024, the Respondents sent a Put Option Notice to LG H&H seeking to exercise their respective put options on the premise that "Sunna Kim's employment with the Company was terminated without Cause (as such term is defined in the S. Kim Employment Agreement) on October 6, 2023," and that "Sunna Kim had Good Reason (as such term is defined in the S. Kim Employment Agreement) to resign from her employment with the Company on October 6, 2023."[260]  Respondents calculated the Put Option Exercise price to be USD 130,000,000.  The Put Option Notice stated that the "gross option purchase price" was USD 137,199,000, presumably on the basis of the financial statements of TCS for the year ended December 31, 2023, but that the price was capped by the terms of the SHA at USD 130 million.

## IV.    ISSUES TO BE DECIDED

153.    The Claimant contends that Respondents Insil and Sunna Kim have breached their obligations under the SPA and the SA, and specifically their undertaking to continue with TCS long enough to achieve an orderly transition to full ownership of TCS by LG H&H, as well as the corresponding portions of their respective employment agreements.  As a consequence, the Claimant says, the Respondents are not entitled to exercise their option under Section 2.4 of the SA to put their remaining TCS shares to LG H&H, and the Claimant is entitled to exercise its call option to purchase those shares at the lower price provided in Section 2.5 of the SA.

154.    The Claimant asks the Tribunal to award the following relief:[261]

(a)    A determination that Claimant's Call Option exercise is valid;

---

[259] Exh. C-64 (29 November 2023 Call Option Notice Letter).
[260] Exh. C-200 (5 March 2024 Put Option Notice).
[261] Email of 19 October 2024 from counsel for the Claimant to the Tribunal.

(b)     An order that Respondents consummate the Call Option transaction at the Option Exercise Price of USD 66,838,449.48 (Option Exercise Price Per Share of USD 191) set forth in Claimant's Call Option exercise notice dated November 29, 2023, by executing and delivering the Option SPA in accordance with Section 2.5(c) of the SHA or otherwise in accordance with the terms of the Option SPA;

(c)     An order that Respondents jointly and severally pay Claimant damages for breach of the SHA and the implied covenant of good faith and fair dealing in a USD amount equivalent to KRW 85,991,000,000 at the then-current currency exchange rate on June 9, 2022, or in an amount as determined by the Tribunal;

(d)     An order that Respondents jointly and severally indemnify Claimant in the amount not to exceed US$ 14,400,000, satisfied in accordance with Section 6.4(d) of the SPA, consisting of:

> i.      Base Purchase Price Indemnity: USD 15,024,806;
>
> ii.     Sanrio Indemnity: USD 984,257; and
>
> iii.    (in the alternative to (e) below) Disney Indemnity: USD 137,150;

(e)     An order that Respondents jointly and severally pay Claimant "Transaction Expenses" in the amount of USD 211,000;

(f)     An order that Respondents' counterclaim is dismissed in its entirety;

(g)     An order that Respondents jointly and severally pay Claimant's costs of the arbitration, including the fees and expenses of the Arbitral Tribunal, the ICC's filing fee and administrative fees, and the legal and other costs incurred by the Parties, together with interest on costs;

(h)     An award of interest on the sums payable as a result of the above orders at a rate as the Arbitral Tribunal determines; and

(i)     Any other relief the Arbitral Tribunal deems appropriate.

155.    The Respondents contend that LG H&H and TCS diminished Sunna Kim's authority in breach of the SKEA, thus entitling her to resign her position for Good Reason and permitting both Respondents to exercise their put option to require LG H&H to purchase their remaining shares of TCS stock at the price provided by Section 2(4) of the SA.

156.    The Respondents ask the Tribunal for the following relief:[262]

---

[262] Respondent's Closing Statement at the Hearing, October 19, 2024, Slide 44.

(a)    Respondents shall be entitled to exercise their Put Option and shall be awarded USD 130,000,000.00 for their 35% interest in the company because the Board of The Crème Shop, which was controlled by LG at all relevant times, terminated Sunna Kim without Cause. In the alternative, Respondents shall be entitled to exercise their Put Option and shall be awarded USD 130,000,000.00 for their 35% interest in the Company because Sunna Kim had one or more Good Reasons to resign and had followed all the procedural requirements for doing so;

(b)    LG shall be enjoined from abusing its majority shareholder control to cause The Crème Shop to refuse to accept the return of the retainer payment from Russ August & Kabat;

(c)    LG shall be awarded USD 1,452,158.00 for the balance sheet adjustment, without any multiplier; and

(d)    LG shall take nothing on its Disney, Sanrio, and "Total Breach" claims.

157.    As can be seen from these demands, the Parties' requests for relief are effectively the mirror images of each other.  In this posture, the Tribunal considers that each Party bears the burden of showing by a preponderance of the evidence that it is entitled to prevail and to the relief it seeks as to each issue.

158.    In this section of this Partial Award, the Tribunal identifies the factual and legal issues in dispute between the Parties and presents its analysis and conclusions as to each such issue.

## A.    Did Sunna Kim Resign for Good Reason?

159.    Although this question – whether Sunna Kim had "Good Reason" to resign from her position at TCS in the summer of 2023 – is posed most directly by the Respondents' Counterclaim,[263] the Tribunal addresses it first because so many other issues turn on it.[264]  Most

---

[263] The Counterclaim requests a declaration "that LG's conduct constitutes 'Good Reason' for Sunna Kim to resign and be paid the Put Option Price under the Employment Agreement and PSA."  RC ¶ 59.

[264] The Claimant initially objected that the Tribunal did not have jurisdiction to consider the counterclaim's request for a declaration that Sunna Kim had resigned for Good Reason, because (a) the dispute resolution clause in Sunna Kim's Employment Agreement calls for arbitration under a different set of rules (those of the AAA), and because Sunna Kim's employer, the counterparty to the SKEA, was TCS, which is not a Party to this arbitration.  These objections were resolved by paragraph 20 of the Terms of Reference.  See pars. 9-10 above.

56

significantly, the terms on which the Respondents may exercise their put option under Subsection 2.4 of the Shareholders Agreement and the terms on which the Claimant may exercise its call option under subsection 2.5 of that agreement both turn on whether Sunna Kim resigned from TCS or was terminated, and on whether any resignation was for "Good Reason" or any termination was for "Cause."[265]

### 1.      The Contractual Framework

160.     Although Sunna Kim could have resigned from her position at TCS at any time,[266] her ability to resign for Good Reason was circumscribed by her Employment Agreement.[267]  She was required to notify TCS in writing within 30 days of "an event that is or would constitute Good Reason," and to allow TCS 60 days to cure such an event.  The SKEA provides that any such event shall cease to be a Good Reason if notice is not given "within thirty (30) days after the event occurs."[268]

161.     Under the SKEA, to give Sunna Kim Good Reason to resign, an event must, within these time limits, either have:

- Breached the terms of the SKEA;[269] or

- Materially diminished Sunna Kim's authority, provided that "changes to Executive's reporting structure that otherwise comply with the requirements of this Agreement shall not be considered as a material diminution of Executive's authority, duties or responsibilities hereunder."[270]

---

[265]*See* pars. 81-82 above.

[266]Section 5(d) of the SKEA allowed Sunna Kim to terminate her employment at any time by giving TCS 90 days' notice.

[267] Subsection 5(c) of the SKEA, titled "Resignation by Executive for Good Reason," is quoted in full at par. 85 above.

[268] SKEA § 5(c).

[269] SKEA § 5(c)(iii).

[270] SKEA § 5(c)(ii).  Other possible grounds are enumerated in § 5(c) of the SKEA, but were not invoked by Sunna Kim's letters.

162.    Sunna Kim's reporting relationship was defined in Section 2 of the SKEA as follows:

> Executive's direct reports at the Company and LG H&H shall be the Chairman of the Board, and the Board and Executive shall not be subject to the supervision or instruction by any other persons or entities other than the foregoing.[271]

163.    The SKEA contains a standard integration clause, which provides:

> **Entire Agreement.**  This Agreement contains the entire agreement between the Parties relating to the subject matter hereof.  No modification, alteration or amendment of this Agreement and no waiver of any provision hereof may be made unless such modification, alteration, amendment, or waiver is set forth in writing signed by the Parties hereto.[272]

### 2.    Did Sunna Kim Resign?

164.    The Respondents take the position that Sunna Kim resigned from TCS for Good Reason, or alternatively that she was terminated without Cause.[273]  While the Claimant takes the position that she cannot both have resigned and been fired,[274] it argues that her employment was terminated by the TCS Board, for Cause, because of the RAK invoices,[275] or alternatively that she resigned without Good Reason.[276]

165.    The Tribunal concludes that Sunna Kim resigned.  She said that she was resigning in her two Good Reason letters, and TCS accepted the second of those letters as effective.  Both sides agreed that the resignation would take effect on 6 October 2023.[277]

---

[271] SKEA § 2.
[272] SKEA § 15.
[273] SOD ¶¶ 172, 179.  Nevertheless, the Respondents' Post Hearing Reply Brief argues (at ¶ 31) that "LG has no basis for asserting that Sunna Kim resigned."
[274] CPHB2 ¶ 40.
[275] See paragraphs 144-148 above.
[276] SOC ¶ 194.
[277] See par. 134 above.

166.    In addition, Dr. Moon, who was then and is now the Chairman of the Board of

TCS, testified at the Hearing that "we did not kick her out.  She resigned on October 6."[278]  Dr.

Moon added, "[w]e never terminated Sunna Kim."[279]

167.    We turn in the next sections of this Partial Award to whether Sunna Kim's

resignation from TCS was or was not for Good Reason.

### 3.    The Reasons Given

168.    Sunna Kim's lawyers sent two letters announcing her resignation for Good

Reason (the "Good Reason Letters").  The first letter, addressed to LG H&H and dated 21 July

2023, asserted that "LG ha[d] taken multiple steps to diminish Sunna Kim's authority, duties and

responsibilities materially."[280]

169.    After Hyosun Kim responded on behalf of LG H&H that Sunna Kim's first Good

Reason Letter had been addressed to the wrong company, because her employer was TCS, not

LG H&H,[281] Sunna Kim's lawyers sent the second letter, containing essentially the same terms,

to both LG H&H and TCS on 7 August 2023, repeating that Sunna Kim's employment would

terminate if the Good Reasons were not cured by 19 September 2023.[282]  TCS's lawyer

acknowledged receipt, but denied that the earlier 21 July letter was effective to begin the 60-day

cure period.[283]  Without arguing the point, Ms. Kim's lawyers agreed that the cure period would

run until 6 October 2023.[284]

170.    Both Good Reason Letters sent on behalf of Sunna Kim advanced three "Good

Reasons" for her resignation.

---

[278] Tr. Day 2, p. 33.
[279] Tr. Day 2, p. 55.
[280] Exh. C-33.  The letter is quoted at length at par. [128] above.
[281] Exh. C-10.
[282] Exh. C-11.
[283] Exh. D-40.
[284] *Id.*.

59

a.     First, the letters contended that, "[p]ursuant to Ms. Kim's employment agreement, she was to report directly to the Chairman of LG."[285]  The letter contended that she was now being required to report to LG H&H through Young Lee, and that this lack of access to the Chairman of LG H&H "materially diminished Ms. Kim's authorities, duties, and/or responsibilities."[286]

b.     Second, the letters alleged that Young Lee had undermined Sunna Kim's authority with employees of TCS and was preventing her "from accessing LG employees and board members."[287]

c.     Third, the letters asserted that LG H&H had demanded "that Ms. Kim greatly reduce her ability to spend funds, rendering it impossible for her to manage her duties on a day-to-day basis."[288]

### 4. The Extrinsic Evidence

171.    The Parties have argued over whether the Tribunal may consider evidence other than the texts of the agreements between the Parties in construing those agreements, without first finding the agreements to be ambiguous in some respect.[289]

172.    Under California law, the "primary object of contract interpretation is to ascertain and carry out the mutual intention of the parties at the time the contract was formed, determined from the writing alone, if possible."[290]  The "whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."[291]

---

[285] Exh. C-33, at 1.
[286] *Id.*.
[287] *Id.*
[288] *Id.*
[289] SODC ¶¶ 135-137; ROC ¶¶ 41-42, 51.
[290] *In re Marriage of Nassimi*, 3 Cal. App. 5th 667, 688 (2016) (DL-007).
[291] Cal. Civ. Code § 1641 (DL-005).

"If contractual language is clear and explicit, it governs."[292]  "The fundamental rules of contract

interpretation are based on the premise that the interpretation of a contract must give effect to the

'mutual intention' of the parties, which should be inferred solely from the written provisions of

the contract if possible."[293]  "A contract term will be considered ambiguous when it is capable of

two or more constructions, both of which are reasonable.  But 'courts will not strain to create an

ambiguity where none exists.'"[294]

173.    California law permits a court or tribunal to consider extrinsic evidence, not only

to resolve an ambiguity in a contract notwithstanding an integration clause, but also "to explain

the meaning of a written contract."[295]  In the latter case, "the test for admissibility is whether the

meaning urged is one to which the written contract terms are reasonably susceptible."[296]

174.    We therefore examine briefly the evidence put forward concerning the negotiating

history of the SKEA and the related SPA and SA, as well as the evidence concerning the course

of dealing between the Parties immediately after those contracts entered into effect, that is

alleged to assist in the interpretation of the relevant provisions of the SKEA.

**Contract Negotiations**

175.    Looking first at the negotiations that led up to the signing of the SPA in April and

the SA and SKEA in June of 2022, the Respondents contend that:

> [S]tarting in March 2022 . . . then-LG Chair and CEO, Mr. Cha, and
> then-CEO of LG USA, Mr. Choi, coaxed Respondents to do the deal
> by assuring them over the course of multiple calls attended only by
> them and Respondents and/or Lawrence Kim that the Co-CEO roles

---

[292] *RLI Ins. Co. v. City of Visalia*, 297 F. Supp. 3d 1038 (E.D. Cal. 2018) (CL-028), quoting *ACL Techs., Inc. v. Northbrook Prop. & Cas. Ins. Co*., 17 Cal. App. 4th 1773 (1993).
[293] *RLI Ins. Co.* (CL-028), quoting *MacKinnon v. Truck Ins. Exch*., 31 Cal. 4th 635, 647 (2003).
[294] *RLI Ins. Co.* (CL-028), quoting *Westport Ins. Corp. v. N. California Relief*, 76 F. Supp. 3d 869, 879 (N.D. Cal. 2014).
[295] *Ellis v. Klaff*, 96 Cal.App.2d 471, 476 (Cal. Ct. App. 1950) (DL-42).
[296] *Id*.

would be "precisely as delineated in Hyosun Kim's email" for as long as Sunna Kim was running TCS as Co-CEO.[297]

176.    The email to which the Respondents refer was sent by Hyosun Kim, the head of LG's legal department, to Christine Shin, the Respondents' deal lawyer, on March 22, 2022, prior to the signing of any of the contracts at issue.  In that email, Hyosun Kim said, *inter alia*:

> In terms of management/operation, we now propose to appoint Co-CEOs so that Sellers and Purchaser can each have the right to appoint a CEO, with a term of 3 years.  The initial CEO from our side would be the same person as the Chairman of the Board to be appointed at closing, but will be based in Seoul so that Olive Kim can continue to lead the operation, and obtain consent from the other CEO on only major issues.[298]

177.    Sunna Kim confirmed at the Hearing that, "ever since we went into talks with LG H&H, Mr. Cha had always made it clear that he wanted us to run [TCS] as a freestanding operation."[299]  She described this as "a very important assurance,"[300] without which "the Kim family might not even have gone forward with [the] share purchase agreement."[301]  Sunna Kim testified that Mr. Cha had told her family:  "You guys have the magic touch, keep doing your thing."[302]  Insil Kim also recalled that "Chairman Cha, what he told me, is that they will be involved at very minimum, and that we will be freestanding."[303]

178.    Christine Shin testified that, in negotiating the deal documents, she had tried to include in what became the Shareholders Agreement the provision quoted at paragraph 73 above, which would have codified what Sunna Kim had told her about her conversations with

---

[297] RPHB ¶ 8.
[298] Exh. D-8.
[299] Tr. Day 3, p. 75.
[300] Tr. Day 3, p. 76.
[301] Tr. Day 3, pp. 76-77.
[302] Tr. Day 3, p. 84.
[303] Tr. Day 3, p. 37.

Mr. Cha.[304] Ms. Shin said that LG H&H would not accept that insertion. Her understanding was that the proposed language was rejected, because "for accounting purposes, it could not seem that LG had no control."[305] That understanding was confirmed by the "Note to Sellers" inserted by LG H&H on one of the mark-ups of the draft SA, which referred to LG H&H's concern that, in order to be able to consolidate TCS's financial statements with those of LG H&H, it must not appear that LG H&H did not have control of TCS:

> As this Section provides for the general principle that the Co-CEOs will jointly be responsible for the day-to-day operations, we believe that it would not be necessary to specifically describe the Crème Shop CEO's responsibilities, especially given that such details may raise consolidation issues for LG.[306]

The final version of the SA simply provided that TCS would have two co-CEOs, one appointed by LG H&H and one appointed by the Minority Shareholders, with no specification of their respective roles.[307]

179. The provision that finally made its way into the SKEA (as opposed to the SA) to deal with Sunna Kim's reporting relationship was more complicated. The first sentence of the second paragraph of Section 2 of that agreement, headed "Direction," is quoted at paragraph 162 above.[308] However, that first sentence was followed by a second sentence, which appears to permit either LG H&H or the Board of Directors of TCS to designate additional persons to whom Sunna Kim was to report:

> Promptly after the Effective Date, and no later than three (3) weeks from the Effective Date, LG H&H or the Board shall provide Executive with the names and contact information of certain persons at LG H&H (who

---

[304] Tr. Day 4 pp.118-119, 122-123. The draft insert is on page 6 of Exh. C-17, the RAK draft of the SA dated 3/23/2022. It is struck out on page 6 of Exh. C-18, the LG H&H draft of 3/25/2022.
[305] Tr. Day 4, pp. 123-124.
[306] Exh. C-18, at 6.
[307] The final version of the SA is quoted at par. 79 above.
[308] Exh. D-1, at 2.

may be Board members) (the "Designated Approval Persons") who need to approve the business decisions of Executive.[309]

It does not appear that LG H&H or the board of TCS ever exercised this right to designate "Approval Persons."

### Course of Dealing

180.    We turn next to the course of dealing between the Parties during the period immediately after the contracts were entered into.  Sunna Kim reported to Suk Cha between June and November of 2022, when Suk Cha was both the CEO of LG H&H and the Chairman of the Board of TCS.  While the record is not clear as to whether Suk Cha was then also the Chairman or Vice Chairman of the LG H&H Board,[310] he signed both the SPA and the SA at issue in this arbitration on behalf of LG H&H as "Suk Cha, CEO and Chairman,"[311] so the Tribunal will consider that Mr. Cha was the Chairman of the Board of LG H&H during the months following the closing of the transaction with TCS.

181.    As long as Mr. Cha was the Co-CEO of LG H&H and Chairman of the Board of TCS, he followed his own advice and allowed Sunna Kim to continue to run TCS with little or no interference.  Both sides of this arbitration would probably have been better off had he continued to hold those positions or had LG H&H continued to follow his policy after he left.  It did not, however, and his policy never made it into the formal agreements that were signed after the conversations to which Sunna Kim testified.

---

[309] *Id.*  The same paragraph goes on to say:  "Executive shall only be required to seek written approval (which may be in the form of an email) from the Designated Approval Persons prior to making binding business and legal decisions for the Company; provided, that, no more than one (1) Designated Approval Person shall be designated for each business category (i.e., marketing, finance, accounting, etc.); and, provided, further that the Designated Approval Persons shall respond as promptly as practicable to approval requests or requests for responses from Executive and use best efforts not to hinder, delay or impede the business efficiency of the Company."

[310] Both the Dramatis Personae submitted jointly by the Parties on 7 October 2024 and a news report (Exh. C-213) from the time of his retirement refer to Mr. Cha as having been the Vice Chairman of the LG H&H Board, but he signed certain documents (E.g. Exh. C-20) for LG H&H Co. Ltd. as "Suk Cha, CEO & Chairman."

[311] Exh. C-1, at 54 of 96; Exh. C-2, at 12 of 31.

182.   After Suk Cha resigned from his positions at LG H&H and TCS in November of 2022, LG H&H did not immediately exercise its right to appoint a new chairman of the TCS Board of Directors.[312]  It was only after Dr. Hyeyoung Moon became Executive Vice President of LG H&H and the CEO of LG H&H USA in January of 2023 that she was also named to chair TCS and thus became Sunna Kim's direct report.  On the Respondents' construction of the SKEA, someone should at the same time have been named as Sunna Kim's new direct report at LG H&H, but no such designation seems to have been made.

183.   Dr. Hyeyoung Moon was elected "Chairman of the Board of [TCS] by unanimous consent of the shareholders of the Company dated March 3, 2023."[313]  Her election was ratified at a meeting of the Board of Directors of TCS on 29 March 2023, with both Sunna Kim and Insil Kim voting in favor.[314]

184.   Dr. Moon never seemed to develop the rapport with Sunna Kim that Suk Cha had enjoyed, nor indeed to have made much effort to do so.

### 5.   The First "Good Reason" - Access to the Chairman of LG

185.   The first "Good Reason" given by Sunna Kim's lawyers for her resignation was that:

> Pursuant to Ms. Kim's employment agreement, she was to report directly to the Chairman of LG.  The lack of access to the Chairman materially diminished Ms. Kim's authority, duties and/or responsibilities.[315]

186.   What the key provision of Section 2 of the SKEA actually says, as quoted above, is that "**Executive's direct reports at the Company and LG H&H shall be the Chairman of**

---

[312] LG H&H's right to appoint the chair of the TCS Board is specifically provided for in Section 1.1(c)(i) of the SA.
[313] Exh. C-26, at 1.
[314] *Id.*
[315] *Id.*

**the Board**."  The Claimant reads the sentence to provide that Sunna Kim was to report only to the Chairman of the Board of TCS, because "Board" is defined in Section 1 of the SKEA to mean the Board of Directors of TCS.[316]

187.   The Respondents, however, read this sentence to provide that Sunna Kim was to report to two people:  the Chairman of the Board of LG H&H *and* the Chairman of the Board of TCS.[317]  That reading might be seen to be supported by the use of the plural "reports" rather than the singular "report."

188.   Based on the text of the agreement alone, the Tribunal finds the Claimant's reading more persuasive than the Respondents'.  The definition of "Board" to mean the Board of TCS seems dispositive, although the use of the plural "reports" is difficult to reconcile with the Claimant's reading.

189.   Nothing in the negotiating history of the SKEA itself has been drawn to the Tribunal's attention as casting any light on which Party's reading of this clause is correct.  But the negotiation history of the transaction as a whole seems to the Tribunal to weigh in favor of the Claimant's reading of the SKEA.[318]

190.   During the negotiations, the Respondents' lawyer proposed explicit language for the SA that would have incorporated the Respondents' understanding of their discussions with Mr. Cha about the role that Sunna Kim was to have after the transaction closed, but that language was rejected by LG H&H and never made it into any of the final transaction documents.[319]  The only addition to the final documents concerning Sunna Kim's reporting relationship, the second

---

[316] SODC ¶¶ 160-161.
[317] SOD ¶¶ 193-195.
[318] Under California law, "several papers relating to the same subject-matter and executed as parts of substantially one transaction, are to be construed together as one." *Holguin v. DISH Network LLC*, 229 Cal. App. 4th 1310, 1320 (2014).
[319] See paragraph 73 above.

66

sentence of Paragraph 2 of the SKEA (quoted at par. 179 above) gave LG H&H the right to designate "Designated Approval Persons" at LG H&H whose purpose would be "to approve the business decisions" of Sunna Kim.  The incorporation into the SKEA of a provision allowing LG H&H to designate multiple people to approve Sunna Kim's business decisions weighs against reading that document to assure her that she would always report to the Chairman of the Board of LG H&H, and only to him, as the Respondents now contend.

191.    The evidence of the course of dealing between the Parties during the first five months after LG H&H's purchase of 65% of the shares of TCS leads to the same conclusion.  First, while during that period Sunna Kim had direct access to Suk Cha, his departure from LG H&H occurred more than 30 days before the first Good Reason Letter was sent, and therefore neither the loss of access to Mr. Cha nor the failure of LG H&H to designate a replacement contact upon his departure could have been a "Good Reason" as defined in the SKEA.

192.    Nor was the designation of Dr. Moon to succeed Suk Cha as Chairman of TCS a "Good Reason" for Sunna Kim's resignation.  First, Sunna Kim never asserted that it was.  Second, she cast her vote as a member of the TCS Board in favor of Dr. Moon's election as Chairman of TCS at the Board meeting on 29 March 2023.  And third, Dr. Moon's election also occurred more than 30 days prior to the first Good Reason letter, so it cannot have been a Good Reason for Sunna Kim's resignation.

193.    It is apparent from a recording of the conversations among the Kim family and the representatives of LG H&H during and following the 29 March Board meeting that considerable distrust and frustration had built up between the two since Mr. Cha's retirement the previous November.[320]  Hong Gi Kim, the CFO of LG H&H who was one of the LG H&H-appointed

---

[320] A transcript of the discussions, which appear to have gone back and forth between English and Korean, is Exh. C-132(e), in which the Korean portions have been translated into English.

directors of TCS, expressed his irritation that Sunna and Insil Kim had not agreed to the roles

and responsibilities (R&R) document that LG H&H management had drawn up around the time

of Mr. Cha's departure to try to define the roles and responsibilities of TCS's CFO and other

managers.[321]  He told them, in what Insil Kim described as an "intimidating manner":[322]

> I'm very disappointed because I see no point in having this meeting.
> . . . [W]e are the controlling owner.  Then, between the partners, we
> proposed that we should create a governance system, a governance
> process system.  We made the proposal, but . . . you still don't sign
> it after all that, which I don't understand.  I mean, that is basically
> why we are where we are right now.[323]

194.    The Kim family (Sunna, Insil, and Lawrence) expressed at the same meeting their

feelings that they and TCS had been neglected by and cut off from the top management of LG

H&H since Mr. Cha's departure.  Sunna Kim said:

> [W]e continuously requested to talk to someone after Vice
> Chairman Cha, well, resigned in late November during
> thanksgiving.  But, continuously, we were never allowed to meet
> anybody.  So, again today, too, we're really happy and excited to
> meet you, but you know I think it's just, it didn't get on the right
> foot as we had hoped.
>
> But there was nobody that we could talk to, so we were feeling very
> frustrated.   And, likewise, we wanted to communicate with
> someone, but nobody's allowing us to meet anybody at the top, so
> that was our positioning as well.[324]

195.    The change in Sunna Kim's position vis-à-vis the top management of LG H&H

was thus more than clear to Sunna Kim by no later than 29 March 2023.  It was also abundantly

clear at that date that neither Dr. Hyeyoung Moon, who had become her direct report, nor Hong

Gi Kim, the most senior member of LG H&H management on the Board of TCS, expressed any

---

[321] See paragraphs 99-100 above.
[322] Exh. C-132(e), at 12.
[323] *Id*. at 11.
[324] *Id*. at 18.

interest in her concerns about that change.  The SKEA requires a Good Reason to be raised

within thirty days, and the shift in Sunna Kim's relationship with the top management of LG

H&H began in November 2022 and was firmly in place by 29 March 2023.  It thus could not

form the basis for a Good Reason notice in July of 2023.

196.    The extrinsic evidence provided by the contract negotiations and the Parties'

course of conduct after the contracts were entered into persuades the Tribunal that, even if there

were an ambiguity in the terms of Section 2 of the SKEA, the Tribunal would resolve that

ambiguity against the Respondents.  That evidence tends rather to support the Claimant's reading

that the SKEA provided for Sunna Kim to report to the Chairman of the TCS Board.

197.    The Tribunal accordingly rejects the Respondents' contention, as stated in the

Good Reasons Letters, that Sunna Kim's lack of access to the Chairman of LG H&H "materially

diminished Ms. Kim's authorities, duties, and/or responsibilities" or otherwise breached the

SKEA in such a way as to amount to a Good Reason for Sunna Kim's resignation in July of

2023.

### 6.    The Second "Good Reason" - Young Lee's Conduct

198.    The second Good Reason cited in Sunna Kim's Good Reason letters had to do

with the conduct of Young Lee.  The Good Reason Letter said:

> Over the past thirty (30) days, Mr. Lee:  (1) has been advising
> employees of the Company that he is the "CEO" (not a co-CEO) of
> the company; (2) has been actively undermining Ms. Kim's
> authority in direct violation of her employment agreement; (3) has
> excluded Ms. Kim from his meetings with Company employees; and
> (4) has informed Sunna Kim that he has replaced her as the primary
> contact between Company and LG, and prevented her from
> accessing LG employees and board members.  According to Mr.
> Lee, LG expressly approves those actions.  These actions confirm

69

LG's intent to reduce Ms. Kim's role within the company, in violation of her Employment Agreement.[325]

199.     Under the SKEA, Sunna Kim may resign for Good Reason only if "the Company," meaning TCS, takes one or more of the four types of action affecting her specified in Section 5(c) of the SKEA.[326]  The complaints about Young Lee in the Good Reason Letter and quoted in the preceding paragraph can thus only amount to Good Reasons if (a) they breach one of the provisions of Section 5(c), and (b) if they are attributable to TCS.  While the Good Reason Letter alleges that "LG expressly approves those actions," the actions cannot amount to Good Reasons unless they were directed or approved by TCS; whether they were approved by LG H&H is not relevant under the SKEA.

200.     Sunna Kim was Co-CEO of TCS and manifestly did not approve Young Lee's conduct, and Young Lee was the other Co-CEO and presumably approved his own actions.  The two Co-CEOs essentially cancel each other out in terms of what TCS approved or did not approve at the CEO level.  Since both Co-CEOs reported to the Board of TCS and its Chairman, Hyeyoung Moon, we look to see whether the Board or Dr. Moon directed or approved of the conduct attributed to Young Lee by the Good Reason Letter.

201.     The SHA provides for TCS to have two Co-CEOs, one nominated by the majority shareholder and one by the minority.[327]  Young Lee was elected Co-CEO of TCS by the TCS Board at the same meeting on 29 March 2023 at which Hyeyoung Moon was elected Chairman.[328]  At the 29 March Board meeting, the three directors appointed by LG H&H all voted for the election of Young Lee as Co-CEO.  Sunna and Insil Kim voted against the election

---

[325] Exh. C-33.
[326] Section 5(c) of the SKEA is quoted in full at par. 85 above.
[327] SA, § 1.6.
[328] Exh. C-26, at 1.

of Young Lee as Co-CEO and Sunna Kim voiced her opposition to his holding that position at the Board meeting and at every subsequent opportunity that presented itself.

202.    During the two or three months prior to the 29 March Board meeting, Young Lee had tried to persuade the Kim family to agree to the draft R&R that had been proposed to TCS by the CFO appointed by LG H&H.[329]  At the 29 March Board meeting, Young Lee told Insil and Sunna Kim that the draft R&R was "off the table" by February:

> So – later, we ended up preparing the R&R, right?  So, our counsel sent you [an email] stating:  let us know soon exactly whether you are going to sign it or not, and if you do not sign this by the end of February . . ., this will be off the table.  But even then, you eventually did not sign it.  So, at that time, the R&R was taken off the table because you said let's handle this through legal.  That's when it was taken off the table.  I had worked on this for a month.  I was very upset, and I separately told Founder Christina at the time.  If you don't sign this, it's really over.[330]

203.    At the same meeting, Sunna Kim told Hyeyoung Moon and Hong Gi Kim that she didn't "think that [Young Lee was] suitable to take Mr. Cha's [place] or be Mr. Cha's successor as Co-CEO."[331]  Hong Gi Kim responded that he was "not sure whether it is constructive to repeatedly state your opposition to the appointment of the Co-CEO, Co-CEO Young Chul, which has already been legally approved."[332]  Hyeyoung Moon said that "my understanding is it is in our legal right to appoint the Co-CEO."[333]  She continued:

> I don't think we put--we selected Young at whim.  This was a very well thought out plan, and we do believe that Young will be able to help you Olive as well as learn from you, so that when the right time

---

[329] The proposed R&R is discussed at paragraphs 99-100 above.

[330] Exh. C-132(e), at 15-16.  "Founder Christina" is Insil Kim.  Insil Kim testified that she "personally thought that Young Lee was a good person," but that her understanding was that he was to "help me and take on a role as a bridge" to LG H&H (Tr. Day 3, p. 43).  She said that neither she nor her husband had ever "agreed to the arrangement Young Lee was seeking in the second half of January 2023" (I. Kim WS1 ¶19).

[331] Exh. C-132(e), at 9.

[332] *Id.* at 10.

[333] *Id.* at 9.

comes, we're prepared to contribute more to running this business.[334]

204.    The full TCS Board does not appear to have met again before Sunna Kim's first Good Reason letter. Sunna Kim did, however, have two face-to-face meetings with Hyeyoung Moon after the Board meeting, one on 21 April 2023 in Los Angeles and one on 28 April 2023 in New York, and Young Lee was a subject of conversation at both meetings.[335]

205.    Dr. Moon testified that, at the first of these meetings, on 21 April, "Sunna Kim seized the opportunity to complain at length about Young Lee."[336] Sunna Kim told Hyeyoung Moon at this first face-to-face meeting that Young Lee "was not qualified to be the Co-CEO of TCS" and that "his behaviors are inappropriate."[337] She also called him a "snake."[338]

206.    Dr. Moon was not sympathetic. She concluded that "Sunna Kim's real complaint was not about Young Chul Lee's personal qualifications as Co-CEO, but about LG H&H's appointment of an on-site Co-CEO – and that she was upset about sharing the title of 'Co-CEO' with someone else."[339] She thought that Sunna Kim was "acting like a child."[340] Dr. Moon also opined that the Kim family "would accept no one else as Co-CEO unless the person had a career experience similar to that of Mr. Cha."[341] Dr. Moon also "didn't believe what Sunna Kim was telling [her] about Mr. Cha's promise."[342]

207.    Sunna Kim's recollection of Dr. Moon's visit to TCS in Los Angeles does not differ materially from Dr. Moon's. Sunna Kim said:

---

[334] *Id.*
[335] Chron. p. 2
[336] H. Moon WS2 ¶ 4.
[337] H. Moon WS1 ¶ 18. Dr. Moon testified that "April 21 was the first time that [she] met respondents in person." Tr. Day 2, p. 14.
[338] *Id.* ¶ 19.
[339] H. Moon WS1 ¶ 20.
[340] Tr. Day 2, p. 24.
[341] *Id.*
[342] Tr. Day 2, p. 18.

72

> I expressed to Hyeyoung Moon my growing concerns over Young Lee's lack of qualifications and conflicts with TCS employees. Young Lee, who was present, insisted that he was qualified. And he insisted "your parents agreed to this," which was not just false, but offensive because it implied that my views as Co-CEO and minority shareholder were irrelevant simply because he had spoken to my parents. It was Young Lee's patronizing and unprofessional attempt to misstate and leverage his behind-the back conversations with my parents against me that provoked me to call Young Lee a snake, which was admittedly unprofessional as well.[343]

208.    In their second in-person meeting, in New York a week later, Dr. Moon said that Sunna Kim "re-raised her allegations against Young Chul Lee and made new ones," which Dr. Moon said that she "investigated and was unable to corroborate."[344] Dr. Moon did not "think the Kim Family's complaints about Young Chul Lee were really about his qualifications as Co-CEO of TCS; they simply did not like having someone from LG H&H as Co-CEO on the ground at TCS."[345] Dr. Moon said that she "was really astonished at some of the things that were said about Young Chul Lee," but thought "it was less about the person, it was more about the role of co-CEO."[346]

209.    Hyeyoung Moon and Hong Gi Kim were both members of the Board of Directors of TCS appointed by LG H&H (Young Lee was the third), and Dr. Moon was the Chairman of that Board. It appears clear from their exchanges with Sunna Kim on the subject of Young Lee that they considered the situation a test of LG H&H's prerogatives as the majority shareholder of TCS. For reasons that are puzzling to the Tribunal, they treated Sunna Kim as a disrespectful subordinate, rather than as a valuable and productive asset. While Dr. Moon said that she "had little choice but to try to keep Sunna Kim happy,"[347] she made no apparent effort to do so. She

---

[343] S. Kim WS1 ¶ 44.
[344] H. Moon WS1 ¶ 24.
[345] *Id.* ¶ 25.
[346] Tr. Day 2, p. 61.
[347] H. Moon WS1 ¶ 22.

73

and Hong Gi Kim might have been wiser from a business perspective to remove the source of the

friction by moving Young Lee to a different position, but they chose to stand on the letter of the

contract.

210.    The contract is not helpful to Sunna Kim.  She and Insil Kim had agreed in the SA

to LG H&H's right to appoint a Co-CEO.  Sunna Kim liked and admired Mr. Cha and neither

liked nor respected Young Lee.  Young Lee appears to have lacked tact and to have had a

remarkable gift for irritating people.[348]  His presence at TCS clearly annoyed Sunna Kim and

may have made her life more difficult.  But it did not diminish her authority, because she and

many of the other employees of TCS basically ignored him.  Nor did it breach her agreement

with LG H&H, because the SA expressly permitted LG H&H to appoint whomever it chose.

211.    More important, the SKEA required Sunna Kim to notify TCS of any Good

Reason for resignation within 30 days.  Young Lee's presence at TCS had been a fact since the

beginning of 2023, and his position at Co-CEO had been formalized on 29 March 2023.  At least

from 29 March, Sunna Kim had made it abundantly clear to Hyeyoung Moon, her superior at

TCS, that she objected to having to work with Young Lee as Co-CEO of TCS.  As late as 9 May

2023, Sunna Kim sent Dr. Moon an email complaining in detail about Young Lee and telling her

that "[i]f we had known that after the closing, we would be in a day-to-day working relationship with

Young, we would not have closed the deal."[349]  But Sunna Kim never specifically identified

Young Lee's conduct as a reason to resign until the first Good Reason Letter was sent in July,

and no aspect of Young Lee's conduct appeared to have changed between March and July.  The

Good Reason letter was sent well past 30 days from the inception of a situation that Sunna Kim

---

[348] Paul Kim, who was head of sales at TCS, testified that it was "so difficult to work with Mr. Lee to such extent
that [he] decide[d] to resign from the company."  Tr. Day 3, p. 151.
[349] Exh. D-53, at 2.

had been complaining about since March, and therefore cannot have been a Good Reason within

the narrow grounds permitted by the SKEA.

### 7.    The Third "Good Reason" – Sunna Kim's Financial Authority

212.    The third Good Reason advanced by the Good Reason letters was that:

> LG has also demanded that Ms. Kim greatly reduce her ability to
> spend funds, rendering it impossible for her to manage her duties on
> a day-to-day basis.[350]

This third good reason appears to refer to the Proposed Signature Policy sent by LG H&H to

Sunna and Insil Kim on 7 July 2023.[351]

213.    As explained above, the Proposed Signature Policy would give both of the Co-

CEOs of TCS the authority to execute and approve all contracts on behalf of TCS that:  (1) are

valued at USD 100,000 or less; (2) are in TCS's ordinary course of business and have been

approved in the annual budget and business plan, as approved by the Board of Directors; and (3)

are checks, notes, or other financial instruments of TCS with a face amount of USD 100,000 or

less.[352]  The Proposed Signature Policy also allowed for any check, note, or other financial

instrument of TCS with a face amount above USD 100,000 to be approved with the signature of

both Co-CEOs.[353] The Proposed Signature Policy, pursuant to Section 1.2(f) of the SA, would

have required Board of Directors' approval for any disposal or purchase of assets worth more

than USD 200,000, other than sales of TCS's products in the ordinary course of business.[354]

214.    Sunna Kim explained why she considered the Proposed Signature Policy to

diminish her authority:

> Where there had been *no limits* prior, except specifically with
> respect to the disposition or acquisition of assets in excess of USD

---

[350] Exh. C-33.
[351] Exh. D-25.  See pars. 119-123 above.
[352] *Id.* at 5.
[353] *Id.*
[354] *Id.* at 7.

75

200,000, other than the sale of TCS products in the ordinary course of business, LG was now seeking to limit my authority to enter contracts and sign checks and other financial instruments in excess of USD 100,000.  Moreover, the new LG policy would give Young Lee and Mr. Shim the authority to unilaterally approve contracts and expenditures of USD 100,000 and USD 50,000, respectively, which meant they theoretically had the ability to manage and operate TCS without my oversight or approval.[355]

215.    The Respondents argue that the Proposed Signature Policy *would have* diminished Sunna Kim's authority if it had been imposed on her, for the reasons she explains in the preceding paragraph.[356]  The Tribunal agrees.  But the record is clear that the Proposed Signature Policy was sent to Sunna Kim as a proposal, not as an edict.  Hyosun Kim's email to Sunna and Insil Kim transmitting the Proposed Signature Policy read as follows:

> I am writing on behalf of LG nominated directors to seek your consent/comments to the draft Signature Authorisation and Delegation Policy as attached.  As stated in the draft written resolution, the purpose of adopting this policy is to improve and enhance internal control of TCS and for your reference, the threshold for Co-CEO and CFO approval in the draft is the same threshold that we have at LG H&H Korea.
>
> If you consent to the draft policy, please sign the draft written resolution of the Board and return it to us at your earliest convenience.  Otherwise, please send us your comments by Friday, July 21.[357]

Asked at the Hearing if it was correct that the Proposed Signature Policy was never adopted, Sunna Kim's response was that "[i]t was never withdrawn."[358]

216.    There is no evidence that Sunna Kim ever provided any substantive comments to Hyosun Kim or anyone else at LG H&H on the Proposed Signature Policy.  Rather, she left it to her lawyer to respond to Hyosun Kim's email, and his response simply said that "the execution

---

[355] S. Kim WS1 ¶ 53.
[356] RPHRB ¶ 17.
[357] Exh. D-25, at 1 of 10.
[358] Tr. Day 4, p. 53.

of this board resolution would [] drastically curtail Sunna Kim's authority as a co-CEO of The Creme Shop."[359]

217. The Proposed Signature Policy was sent to Sunna Kim two weeks before her lawyer sent the first Good Reason Letter. She never commented on or responded to it other than to assert that it would give her Good Reason to resign, and it was never implemented while Sunna Kim was at TCS. The Tribunal does not consider that the mere proposal of the policy, accompanied by a request for Sunna Kim's comments or consent, can be said to have diminished her authority or to have given her Good Reason to resign, even though (as Sunna Kim noted) the proposal was not withdrawn prior to Sunna Kim's departure from TCS.

### 8.      The Tribunal's Conclusion as to "Good Reason"

218. For the reasons explained in the foregoing section, the Tribunal concludes that Sunna Kim did not have Good Reason under Section 5(c) of the SKEA to resign from TCS for the reasons put forward in her two Good Reason Letters at the time those letters were sent, and that she should therefore be considered to have resigned "without Good Reason" under Section 5(d) of the SKEA.

219. Section 5(d) of the SKEA, which deals with "Resignation by Executive Without Good Reason," requires Sunna Kim to give 90 days' written notice to TCS, rather than the 60 days' notice given in the Good Reason Letters and required by Section 5(c), which deals with "Resignation by Executive for Good Reason."  But Section 5(d) also allows TCS to "immediately accept such termination." This is effectively what occurred on 6 October 2023,[360] so the Tribunal considers Sunna Kim to have resigned from her position at TCS without Good Reason, effective on 6 October 2023.

---

[359] Ex. C-32, at 1 of 7.
[360] See pars. 142-143 above.

### B.    Which Option Notice Was Effective?

220.    Both the minority and majority shareholders of TCS gave notice to the other of their respective intentions to exercise the options provided for in the SA:  LG H&H sent Sunna and Insil Kim a Call Option Notice Letter on 29 November 2023, and Sunna and Insil Kim sent LG H&H a Put Option Notice on 5 March 2024.[361]  Both sides ask for a determination in this arbitration that its exercise of its option was valid.[362]

221.    Section 2.4(a) of the SA provides that Sunna and Insil Kim may exercise their Put Option at any time if Sunna Kim resigns for Good Reason or is terminated without cause.  That section provides:

> From and after the earlier of (i) the third anniversary of the Effective Date (provided the Option Exercise Price calculated in accordance with this Agreement is equal to or exceeds the Option Purchase Price Cap) and (ii) the fifth anniversary of the Effective Date, the Minority Shareholders shall have the right, but not the obligation (a "Put Option"), to jointly sell to the Majority Shareholder, all (but not less than all) of the Company Securities owned by the Minority Shareholders (the "Option Securities"), in accordance with this Section 2.4; provided, however, that the Minority Shareholders may jointly exercise such Put Option at any time upon (A) resignation by S. Kim from her employment with the Company for Good Reason (as such term is defined in and under the Employment Agreement, dated as of the Effective Date, by and between the Company and S. Kim, as amended from time to time ("S. Kim Employment Agreement")), or (B) termination by the Company (or the Majority Shareholder) of S. Kim's employment with the Company without Cause (as such term is defined in the S. Kim Employment Agreement).[363]

---

[361] See paragraphs 151-152 above.  LG H&H's Call Option Notice is Exh. C-64.  The Kims' Put Option Notice is Exh. C-200.

[362] Claimant's counsel's email to the Tribunal of 19 October 2024; Respondents' Closing Statement, 19 October 2024, p. 44.

[363] SA § 2.4(a).

222.    Section 2.5(a) of the SA allows LG H&H to exercise its Call Option to purchase the 35% of the shares of TCS retained by Insil and Sunna Kim at any time if Sunna Kim resigns from her position without Good Reason or is terminated for Cause.  That section provides:

> From and after the fifth anniversary of the Effective Date, the Majority Shareholder shall have the right, but not the obligation (a "Call Option"), to purchase all (but not less than all) of the Option Securities held by both Minority Shareholders, in accordance with this Section 2.5; provided, however, that the Majority Shareholder may exercise such Call Option at any time upon the earlier of: (i) the resignation by S. Kim from her employment with the Company without Good Reason (as such term is defined in and under the S. Kim Employment Agreement) or (ii) a termination by the Company of S. Kim for Cause (as such term is defined in and under the S. Kim Employment Agreement).[364]

223.    Because neither condition to the early exercise of the Put Option (Sunna Kim's resignation for Good Reason or her termination without Cause) was satisfied, the Respondents were not entitled to exercise their Put Option before the third anniversary of the Effective Date, which will be June 9, 2025.  The Respondents' Put Option Notice of 5 March 2025 is consequently ineffective.

224.    The Tribunal having determined in the preceding section of this Partial Award that Sunna Kim resigned, effective 6 October 2023, without Good Reason, LG H&H was entitled to exercise its Call Option under Section 2.5(a) and did so on 29 November 2023, asking that the shares be delivered on 28 December 2023.

225.    The Claimant's Call Option Notice was consequently valid and effective.  Under Section 2.5(c) of the SA, the Minority Shareholders had a period of 30 days to consummate the sale and purchase of their shares.  They have not yet done so.

---

[364] SA § 2.5(a).

226.    The Claimant calculates the Option Exercise Price to be USD 66,838,449.48 as of 29 November 2023, based on an Option Exercise Price Per Share of USD 191.[365]  The Claimant set forth its calculation of that Option Exercise Price in Appendix A to the Call Option Notice.[366]  The Respondents contend that the Option Exercise Price should be USD 130 million based on the different provisions of Section 2.4(b) of the SA for calculating the Option Exercise Price for a put option, but they do not dispute the Claimant's calculation of the Option Exercise Price under the provisions of Section 2.5(b) of the SA for calculating the Option Exercise Price for a call option.[367]

227.    The Tribunal accordingly determines that the Respondents are obligated by the SHA to deliver to the Claimant the 35% of the shares of TCS that they currently hold within 30 days of the conclusion of this Arbitration.  The Claimant is obligated by the SHA to pay the Respondents USD 66,838,449.48 for those shares, plus interest at the rate specified in Part V.A from 28 December 2023, the date on which the Call Option Notice called for the shares to be delivered, until the date of payment.

### C.    Are Adjustments to the Purchase Price Required?

228.    The "Base Purchase Price" paid in cash by LG H&H for 65% of the shares of TCS was USD 120,250,000.[368]  That Base Purchase Price was subject to a number of adjustments, which are detailed in Article 2.2 and Article 2.5 of the SPA.

---

[365] Exh. C-64, at 2; Claimant's counsel's email of 19 October 2024.
[366] Exh. C-64, at 4.
[367] RC ¶ 220; ROC ¶ 69.  The Respondents state that they "do not dispute the accuracy of LG's calculation of the Option Exercise Price based on 2022 financials, the only question bearing on quantum is which fiscal year's financials – i.e. 2022 or 2023 – control."  SOD ¶246.  The Tribunal's determination that the Claimant's 29 November 2023 exercise of its call option was valid carries with it the determination that the 2022 financial statements control, as the "audited financial statement for the most recently ended fiscal year immediately preceding the date of the Call Option Notice." (SA §2.5(c)).
[368] SPA Art. 1.1, p. 2.

80

### 1.    Amounts ordered by the Independent Referee

229.    The SPA provides for a set of purchase price adjustments to be made following the closing and for any disputes about such adjustments to be determined by an Independent Referee.[369]  The independent referee, KPMG, ultimately determined that the Respondents owe LG H&H USD 2,115,695 as a working capital shortfall adjustment and USD 2,331,015 as an inventory amount shortfall adjustment.[370]  Those amounts remain unpaid, and the Tribunal determines that they are to be paid to the Claimant by the Respondents, with interest at the rate specified in Part V.A from 5 September 2023, the date of the Independent Referee's decision, until payment is made.

### 2.    Indemnification Claims

230.    The Claimant contends that it overpaid for its shares in TCS[371] and seeks, in addition to the adjustments made by the Independent Referee, indemnification under Article 6 of the SPA for alleged losses caused by three further adjustments related to (a) chargebacks, (b) chargeback reclassifications, and (c) capitalized expenses.  In its demand letter of 22 May 2023, the Claimant asserted:

> We have identified the following misrepresentations which affected Purchaser's calculation of the Base Purchase Price, based on the FY2021 Financial Statements: a. *Chargeback Cost Adjustment*: USD 1,725,209 reduction in sales *and* EBITDA. b. *Chargeback Cost Reclassification*: USD 2,677,412 reduction in sales. c. *Capitalized Cost*: USD 93,929 reduction in EBITDA.[372]

231.    The Claimant further seeks to have a multiple applied to these adjustments by "[a]pplying the agreed 4.9x multiple to sales and 18.0x multiple to EBITDA, weighting (*i.e.*,

---

[369] SPA Art. 2.5(d).  See pars. 87-90 above.
[370] Exh. C-22, at 3 (5 September 2023 KPMG Independent Referee's Determination).
[371] CPHB2 ¶ 48.
[372] Exh. C-005, p. 2.

reducing) each by 50%, and then multiplying by Purchaser's 65% shareholding ratio, this
amounts to a reduction to the Base Purchase Price" of USD 17,653,131 in total.[373]

### The Chargeback Cost Adjustment

232.    Chargebacks, as described by the Claimant's expert witness, Mr. Hutchins, are
costs incurred by a company's customer that the customer charges back to the company.  The
examples he gave are advertising, promotions, returns, damaged goods, and discontinued items.
Chargebacks are excluded from, and thus reduce, the payment made by the customer to the
company.[374]  The chargebacks at issue are mostly chargebacks submitted to TCS by its customer
CVS for fiscal year 2021.[375]

233.    Mr. Hutchins considers that TCS understated its accrued fiscal 2021 chargeback
reserve, resulting in a reduction of TCS's reported net revenue and EBITDA by USD
1,422,858.[376]  The Respondents' expert, Mr. Friedman, agrees in principle that these chargebacks
reduced TCS's net revenue and EBITDA, and calculates a slightly higher number for this
reduction, USD 1,725,209.[377]

### The Chargeback Cost Reclassification

234.    Mr. Hutchins considers that certain chargebacks were mis-classified by Palm
Tree, TCS's financial adviser.  TCS had originally accounted for these chargebacks as costs
which reduced the company's revenues.  In preparing TCS's GAAP financial statements for the
transaction with the Claimant, Palm Tree reclassified these chargebacks as selling, general and
administrative expenses ("SG&A").  The effect of the reclassification was to allow TCS to report

---

[373] *Id.*
[374] Robert A. Hutchins, Direct Presentation on Behalf of the Claimant, October 18, 2024 ("Hutchins Slides"), p. 5.
[375] Expert Report of Ronald Friedman, February 16, 2024 ("Friedman ER1"), p.10.
[376] Hutchins Direct Presentation Slides, p. 7; Tr. Day 5, pp. 7, 13.
[377] Friedman ER1, p. 8; Tr. Day 5, pp. 55, 66.

higher net revenue.[378]  Mr. Hutchins regards the reclassification of the chargebacks as SG&A as a mistake by Palm Tree.  In his view, the chargebacks should have been accounted for as a reduction in gross sales, as TCS had treated them before Palm Tree revised its financial statements.  As a result of this misclassification, Mr. Hutchins opines, TCS's 2021 net revenue was overstated by USD 2.677 million.[379]

235.    The chargebacks in question were mostly for advertising costs.[380]  They would have been properly accounted for as SG&A if they had been paid directly by TCS, but accounting rules treat them as chargebacks because they were paid by the customer.[381]  Mr. Hutchins believes that the USD 2.677 million should be treated as a deduction from gross sales.[382]  Mr. Hutchins acknowledged that, if TCS had paid for the advertising directly, the cost would properly have been charged to SG&A, but he said that such costs paid by the customer and charged back to TCS should properly be accounted for as a reduction in sales.[383]  He acknowledged that "there's no logic; it's just the rule."[384]

236.    Mr. Friedman disagrees that Palm Tree's allocation of the cost of this advertising should be reclassified.  He considers that we lack sufficient information to decide one way or the other whether this sum should be reclassified and what the effect of reclassifying it would be.[385]

237.    When questioned together by the Tribunal at the Hearing, Mr. Hutchins and Mr. Friedman agreed that the issue is whether Palm Tree had a proper basis for its treatment of these

---

[378] Hutchins ER1, ¶¶58-59.
[379] *Id.* at ¶¶ 73-76; Hutchins ER2, ¶¶ 63-64, 68; Hutchins Slides, p. 8; Tr. Day 5, pp. 7, 31-32.
[380] Tr. Day 5, p. 31.
[381] Tr. Day 5, pp. 32-33.
[382] Tr. Day 5, p. 36.
[383] Tr. Day 5, pp. 32-33.
[384] Tr. Day 5, p. 33.
[385] Friedman ER1, p. 11; Friedman ER2, p. 6; Tr. Day 5, pp. 60-66, 69.

83

chargebacks, and that the record does not provide that information. [386]  Mr. Hutchins would

reverse the re-classification in the absence of a showing of a proper basis for Palm Tree's action;

Mr. Friedman would not.[387]  As they testified at the Hearing:

> PRESIDENT: Just to come back to you on that. If I've understood both of
> you correctly, you think or you're saying you've seen no sufficient basis
> for Palm Tree to have reclassified?
>
> MR HUTCHINS: Yes.
>
> PRESIDENT: And Mr Friedman says: I see no basis for changing what
> Palm Tree did, but I don't know why they did it.
>
> MR HUTCHINS: Well, I think that's generally correct but he also said
> they could be 100% wrong or 100% right, it's just he doesn't know and I
> think that's why, looking at the accounting literature and what we do know
> that Palm Tree did is, from my opinion, the best way to evaluate this
> accounting issue.
>
> PRESIDENT: But you're down to what lawyers call a burden of proof
> problem, right?
>
> MR FRIEDMAN: Yes.
>
> PRESIDENT: Both of you agree to that?
>
> MR HUTCHINS: Yes.
>
> MR FRIEDMAN: I agree. We just don't know.[388]

**The Capitalized Cost Adjustment**

238.    According to Mr. Hutchins, capitalized costs are expenditures that are recorded as

an asset of a company, rather than as an immediate expense.[389]  He considers that TCS should

---

[386] Tr. Day 5, p. 65.  Philip Cooper of Palm Tree appeared at the Hearing on Day 4 (pp. 3-20), but he was not
questioned on this subject.
[387] Tr. Day 5, pp. 84-86.
[388] Tr. Day 5, pp. 85-86.
[389] Hutchins Slides, p. 6.

have expensed USD 29,300 of expenses that it capitalized in 2021, resulting in an overstatement

of USD 29,300 of TCS's 2021 EBITDA.[390]  Mr. Friedman agrees.[391]

### Should a Multiple Be Applied?

239.    The claimant contends that it should be credited with a multiple of these

chargeback and cost adjustments, based on how the Claimant calculated its offer to purchase the

majority of the shares of TCS.  Mr. Hutchins quantified the multiple that the Claimant seeks to

recover:

> In aggregate the three misstatements resulted in an increase in the
> base purchase price of USD 15,024,806, again, based on the
> claimant's asserted multiples methodology.[392]

The calculation, which involves multiplying revenue by 4.9 and EBITDA by 18 and then

weighting the two results equally by taking 50% of each, is shown on Mr. Hutchins' Hearing

slide 11.  That is the formula apparently used by LG H&H in valuing TCS,[393] although it does

not appear in the transaction documents except as the basis for calculating what would be paid

under the put and call options provided for in the SA.  Any such adjustment would then be

capped at USD 14,400,000 by the indemnification cap in Article 6.4(b) of the SPA.

240.    Mr. Friedman considers that the Claimant is entitled to recover USD 1,725,209

plus USD 29,300 (= USD 1,754,509) as a working capital adjustment,[394] but that no multiple

should be applied to either number.  He explained:

> In my opinion, if they wanted to have a formula for the purchase
> price, and they wanted an adjustment made, if it was wrong, I think
> it should have been put in the contract that:  not only are we doing a
> working capital adjustment, but we'll do a purchase price adjustment
> if you don't hit your 18 times EBITDA number, and it's wrong; and
> that's not in the contract.  And I think if they wanted that -- I've never

---

[390] Hutchins Slides, p. 9; Tr. Day 5, p. 7.
[391] Tr. Day 5, p. 53.
[392] Tr. Day 5, p. 10.
[393] SOC ¶ 45.
[394] Tr. Day 5, pp. 66-67.

85

seen it put in like that.  I have seen:  we arrive at our number, we put that number in the contract.  I've never in my career, and I've done a lot of M&A deals, have I seen it in that contract that:  we're going to penalize your working capital plus a purchase price adjustment if you miss your EBITDA target.  Never seen that. [395]

**The Tribunal's Analysis as to Indemnification**

241.    The Claimant contends that the shares of TCS that it purchased "were worth USD 15,024,806 less than what Claimant paid because TCS's FY2021 EBITDA and Net Revenue were inflated.  This shortfall in the shares' value represents 'Losses' as that term is broadly defined in the SPA."  The Claimant seeks to recover for its Losses up to the contractual USD 14.4 million indemnity cap, based on the argument that the adjustments to revenue and EBITDA should be grossed up by the same multiples that the Claimant says it used in calculating how much to offer for the shares.[396]

242.    The Claimant relies in making this argument on Section 6.1(a) of the SPA, which provides, in pertinent part:

> [T]hat any Losses sustained by the Purchaser resulting from or arising out of any breach of any representation and warranty in Section 3.2(e) shall be deemed Losses sustained or incurred by the Purchaser Indemnified Parties irrespective of the Purchaser's shareholding percentage in the Company, **to the extent such breach has affected Purchaser's calculation of the Base Purchase Price**, based on reasonable supporting evidence, irrespective of the Purchaser's percentage ownership in the Company.[397]

Section 3.2(e) of the SPA is headed "Financial Statements; No Undisclosed Liabilities."

243.    The Respondents contend that LG H&H is attempting to convert a simple error – the understatement of chargebacks due to information received from CVS after the SPA was

---

[395] Tr. Day 5, pp. 73-80.
[396] CPHB1 ¶ 50.
[397] SPA § 6.1(a) (emphasis added).

signed – into a claim that is not supported by the contract.  They say that "LG is entitled to only a dollar-for-dollar working capital adjustment."[398]

244.    The Tribunal considers that the Claimant is entitled to an indemnification based on the Chargeback Cost Adjustment.  Both experts agree that these chargebacks reduced TCS's reported net revenue and EBITDA below what was represented at the time of closing.  Both Parties accept the figure of USD 1,422,858 for this adjustment calculated by the Claimant's expert, Mr. Hutchins.[399]

245.    The Claimant is also entitled to an indemnification of USD 29,300 for the Capitalized Cost Adjustment, as agreed by both experts.

246.    The Tribunal rejects the Claimant's application for an indemnification of USD 2.677 million based on the Chargeback Cost Reclassification.  The experts put forward by both sides agree that there is no evidence in the record as to why that adjustment was made.  Without such evidence, it is impossible to conclude that what Palm Tree did was improper.  Since this is a claim advanced by the Claimant as to which it bears the burden of proof, this portion of the Claimant's indemnification claim is denied.

247.    The Tribunal declines to apply any multiplier to the indemnification claims that it accepts.  Section 6.1(a) of the SPA entitles the Claimant to indemnification for misstatements in TCS's financial statements "to the extent such breach has affected Purchaser's calculation of the Base Purchase Price, based on reasonable supporting evidence."  The evidence is clear that the Claimant relied on information concerning the net revenue and EBITDA of TCS in calculating the Base Purchase Price, but it is much less clear that LG H&H calculated that price based on multiples of those numbers.  The evidence on that subject goes both ways.

---

[398] RPHB1 ¶ 83.
[399] *Id.*; Tr. Day 5, p. 13; Day 6, p. 102.

a.      Both Sun Moon and Young Lee testified that they used multiples to calculate the Base Purchase Price, and that the use of such multiples in transactions of this sort is common.  Indeed, Mr. Cooper of Palm Tree guessed accurately what multiples LG H&H was using and explained that to Sunna Kim, and the provisions for calculating the option prices for the put and call options use exactly these same multiples.[400]

b.      On the other hand, Mr. Cooper denies that LG H&H ever told him that it was using multiples to calculate the Base Purchase Price, much less the precise multiples being used.  He testified that he was attempting to reach LG H&H's "pain threshold" for doing the deal because LG H&H "wanted to buy [TCS] very badly."  There is no mention of multiples in the Letter of Intent.  And when Sunna Kim attempted to use multiples to justify a higher price, LG H&H said that it was not using them.[401]

248.    More important, the Parties' agreements do not provide for indemnification based on multiples.  The SPA requires that indemnification be based on a breach that has affected the calculation of the Base Purchase Price, but it does not require indemnification in the amount that the breach may have affected that price.  The Claimant has made an indemnification claim for USD 15 million based on alleged discrepancies in the net revenues and EBITDA of TCS totaling USD 4.1 million.  The Tribunal considers that application of such a multiplier would require a clear expression of the intent to apply it in the Parties' agreement.  The phrase from Section 6.1(a) of the SPA relied upon by the Claimant as support for this claim justifies the claim for indemnity, but falls short of applying a multiplier to the discrepancies complained of.

---

[400] S. Moon WS1 ¶¶ 16, 29-30; Y. Lee WS1 ¶¶ 8-9; Tr. Day 3, pp. 67-69; SA Exh. B.
[401] P. Cooper WS ¶ 16; Tr. Day 3, pp. 6-7, 18-19; Exh. D-3; S. Kim WS1 ¶ 22.

249.     The Tribunal accordingly awards the Claimant USD 1,422,858 plus USD 29,300, for a total of USD 1,452,158 on its indemnification claim.  Interest should be added to that amount at the rate specified in Part V.A from 9 June 2022, the date of the closing, until payment is made.

### 3.     Claims for Breach of Warranty

250.     The Claimant asserts two claims for breach of the representations and warranties in Section 3.2 of the SPA.

**Sanrio Claim**

251.     Section 3.2(m) of the SPA represents and warrants that:  "The Company nor, to the Knowledge of Sellers, any other party thereto is in breach or default of any term or provision of a Material Contract."

252.     One of TCS's major partners, the Claimant says, was Sanrio, Inc., "the Japanese brand which owns Hello Kitty and other related cartoon characters" that were the subject of TCS's license agreement with that company.[402]  The Claimant considers the Sanrio license to be a Material Contract.  Since Sanrio is TCS's most important licensor, the Tribunal agrees.

253.     The Claimant says that it has determined that TCS owes Sanrio USD 1,514,241 relating "to payments which the Company owed at the time of the SPA closing on June 9, 2022."[403]  The Claimant seeks an award of 65% of that amount, or USD 984,257, based on the provision of Section 6.1(a) of the SPA allowing it to be compensated in proportion to its shareholding.[404]  The Claimant acknowledges that this claim would come within the cap of USD

---

[402] SOC ¶¶ 272-273.
[403] SOC ¶ 274 (emphasis in original).
[404] SOC ¶ 277.

14.4 million on indemnity claims imposed by the SPA, and asserts this claim only if the indemnification awarded by the Tribunal does not reach that cap.[405]

254.    The Respondents deny that they are in breach of any warranty as to Sanrio and argue that the Claimant has "not come close to stating a claim."[406]

255.    It is undisputed that TCS paid the funds in question to Sanrio based on an audit report sent to TCS by Sanrio after the departure of Sunna Kim.  The audit report asserted that the payment was due for the use of Sanrio's characters on products for which such use had not been approved.[407]  It emerged at the hearing that many of the uses claimed to be unapproved had in fact been approved.[408]  It also emerged that Young Lee, who was then the sole CEO of TCS, had authorized the payment to Sanrio without reading the audit report.  He testified that "I didn't review this audit report, and that was CFO's job, and I was told from CFO that we need to pay them all."[409]  Mr. Young did not contact Sunna Kim to ask whether the audit report was accurate.[410]

256.    The Claimant contends that, "given Sanrio's bargaining power, TCS had no option but to agree to pay it."[411]  That may well be true, but it falls short of establishing that TCS was in breach of the Sanrio contract at the time of the closing, or that Sunna and Insil Kim knew that it was.

---

[405] SOC ¶ 279.
[406] SOD ¶ 237.
[407] The Sanrio audit report is Exh. C-284.
[408] Tr. Day 2, p. 110.
[409] Tr. Day 2, p. 111.
[410] *Id.*
[411] CPHB1 ¶ 64.

90

257.    The Tribunal determines that the Claimant has failed to establish a breach of Section 3.2(m) of the SPA by either Sunna or Insil Kim in relation to the Sanrio audit and contract, and therefore denies this claim.

**Disney Claim**

258.    Another Material Contract of TCS's was its license agreement with Disney Consumer Products, Inc., a subsidiary of the Walt Disney Company, which permitted TCS to use the likenesses of Disney characters on its products.  That agreement required TCS to obtain Disney's consent to any change of control of TCS, but TCS informed LG H&H shortly before the closing that it had not yet received that consent.[412]  Indeed, it was not until April of 2023 that TCS received Disney's agreement to the new majority ownership in return for TCS's agreement to pay an additional USD 211,000 in license fees.[413]

259.    The Claimant contends that the USD 211,000 assessed by Disney represents a "Transaction Expense" under the SPA which should have reduced the purchase price paid by LG H&H for its TCS shares dollar-for-dollar.  Alternatively, the Claimant says that "Respondents' failure to obtain Disney's consent, as a general breach of Respondents' representations and warranties or covenants under the SPA, may be compensated in proportion to Claimant's 65% shareholding, under SPA Section 6.1(a)'s standard, which is USD 137,150."[414]

260.    The Respondents contend that the Claimant was fully aware that TCS's contract with Disney contained a change in control provision.[415]  The Respondents say that the SPA only

---

[412] SOC ¶ 71; Exh. C-20.
[413] SOC ¶¶ 275-276.
[414] SOC ¶ 278.
[415] SOD ¶238.

required them to use "reasonable best efforts" to obtain Disney's consent, and that they satisfied that obligation.[416]

261.   The Respondents point out that the Claimant was aware that Disney's consent was needed and had not been obtained at the time of the closing.[417]  The Closing Letter signed on 9 June 2022 noted the missing Disney consent and provided that:

> Each Seller shall cause the following to occur and deliver to the Purchaser written evidence showing such fulfillment to the Purchaser's satisfaction; provided, that Purchaser and Seller agree that to the extent that any costs involved with obtaining the consents described in sub-paragraphs A, F and H constitute Transaction Expenses in the SPA, the Purchaser and Seller will work in good faith to minimize the costs of such consents to the extent commercially reasonable:
>
> A.  To use reasonable best efforts to give all notices to and obtain all consents or approvals set forth in Sections 3.1(b)(2), 3.2(b) of the Disclosure Schedule, including those required to or from . . . Disney Consumer Products, Inc.[418]

262.   "Transaction Expenses" is defined in Article 1 of the SPA to include change in control fees or any other similar amounts payable to any person as a result of consummation of the Closing.  Sections 2.5(a) and (b) of the SPA require both Parties to include Transaction Expenses on their respective Closing Statements, disputes about which are to be resolved, per Section 2.5(d), by the Independent Referee.  The SPA makes no provision for dealing with late Transaction Expenses, and it is beyond this Tribunal's mandate to deal with matters that the Parties confided to the Independent Referee.[419]

---

[416] SOD ¶ 239.

[417] *Id.*

[418] Exh. C-20.

[419] Procedural Order No. 4 provides, at par. 13, that:  "The Tribunal concludes, and the Parties now agree, that any issue concerning KPMG's determination, and any payment to be made pursuant to that determination, is beyond the scope of this Tribunal's jurisdiction and will not be considered by this Tribunal."

263.    The Claimant argues in the alternative that the absence of the Disney consent amounts to a breach of the Respondents' representations and warranties even if the eventual payment was a Transaction Expense.[420]  But Section 3.2(b) of the SPA carves out obligations listed on the Disclosure Schedule from the representation that all required consents had been obtained, and the Disclosure Schedule lists "License Agreement, dated January 15, 2021, by and between the Company and Disney Consumer Products, Inc." on Schedule 3.2(b).

264.    The Claimant cannot recover on the Disney claim either as a Transaction expense or as a breach of a warranty or representation.  The Claimant's claim based on the payment to Disney is accordingly denied.

## D.    The Total Breach Claim

265.    The Claimant asserts that "Respondents undermined the entire purpose and intent of the SHA by their wrongful interference with Claimant's co-management right and their early defections under false pretenses (concocting purported Good Reason where none in fact exists). These actions were taken in bad faith and amount to the breach of the SHA's implied covenant of good faith and fair dealing under California law."[421]  The Claimant further contends that "Sunna Kim schemed from early on to manufacture an excuse to resign," and that "[h]er aim was to exit early and exercise the Put Option based on resignation for 'Good Reason,' while TCS's EBITDA and Net Revenue remained high, rather than waiting for the natural expiry of her lock-up when she had every reason to expect these metrics might be lower (*e.g.* due to loss of TJ Maxx business, and industry-wide cool-down after a one-time post-COVID shopping boom)."[422]  Indeed, the Claimant contends, "from the day the SHA was signed, Respondents apparently had

---

[420] SOC ¶ 278.
[421] SOC ¶ 208.
[422] CPHB2 ¶ 32.

93

no intention of upholding the 'Co-CEO' arrangement, nor the overall purpose of the Parties' agreement. *Thus, the entirety of the fact pattern in this case goes to Respondents' dissembling, scheming, and ultimately, their bad faith and absolute failure to engage in fair dealing.*"[423]

266.     In support of this claim, the Claimant relies on *Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 290-91 (2019) (CL-3), citing that case for the proposition that "[a] party violates the covenant [of good faith and fair dealing] if it subjectively lacks belief in the validity of its acts or its conduct is objectively unreasonable." The Claimant also cites *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 8 Cal. Rptr. 3d 233 (2004) (CL-8), which quotes *Harm v. Frasher*, (1960) 181 Cal. App. 2d 405, 417 [5 Cal. Rptr. 367], for the proposition that the covenant of good faith and fair dealing "not only imposes upon each contracting party [i] the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also [ii] the duty to do everything that the contract presupposes that he will do to accomplish its purpose."[424]

267.     The Claimant argues that "[i]t does not matter what Respondents thought they were doing, as long as their behavior was objectively unreasonable or violated reasonable expectation of the Parties to the contract," citing *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (1998) (CL-4).[425]

268.     The Respondents agree that "California law implies a covenant of good faith and fair dealing in every contract to prevent a contracting party from depriving the other party of the benefit of the contract," but they contend that "this covenant only applies to protect '*benefits of the agreement actually made*,'" citing *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 349 (2000) (DL-23) (emphasis in original).[426]  The Respondents argue that the covenant "rests upon the existence

---

[423] SOC ¶ 208 (emphasis in original).
[424] *Id.* ¶ 212.
[425] *Id.* ¶ 214.
[426] SOD ¶ 228.

of some specific contractual obligation," citing *Avidity Partners, LLC v. State of California*, 221 Cal. App. 4th 1180, 1204 (2013) (DL-24).  The covenant cannot, the Respondents contend, "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement," citing *Guz*, 24 Cal.4th at 349-50 (DL- 23).[427]

269.    The Respondents stress that the covenant cannot "be implied against express terms" of a contract, citing *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal.4th 342, 374 (1992) (DL-25).[428]  The Respondents argue that LG H&H's theory of liability asks the Tribunal to disregard the "express 'early exit' provisions and essentially rewrite the SHA to create an inalienable right to at least three to five years of Sunna Kim's continued performance as Co-CEO without exception."  They contend that "LG cannot invoke the implied covenant to prohibit the Kim Family from doing what they are expressly permitted to do under the SHA, nor can the covenant impose substantive limits to the Kim Family's bargained-for right to 'early exit' under certain circumstances."[429]

270.    The authorities cited by the Parties do not differ meaningfully concerning the law to be applied.  The cases consistently impose on parties to a contract a duty of good faith and fair dealing, but those cases also confirm that this duty is not a vehicle for modifying the express terms of the contract to which the Parties have agreed.  As the Claimant acknowledges, "[t]he issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily a question of fact."[430]

---

[427] *Id.*
[428] SOD ¶ 229.
[429] *Id.* ¶ 230.
[430] SOC ¶ 220, citing *Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 291 (CL-3).

95

271.     Having examined the factual evidence and having heard the testimony of the witnesses concerned,[431] the Tribunal is not persuaded that Sunna Kim intended from the outset to leave TCS early and thus to frustrate LG H&H's expectation that she would help to train others to keep the business operating at the same high level after her departure.

272.     From the closing in June of 2022 until the end of that year, Sunna Kim gave no sign of wanting to leave TCS.  Her testimony was that "I wanted to stay with LG or with The Crème Shop for three years."[432]  The Tribunal finds that Sunna Kim came to her decision to resign over the course of the period from January of 2023 to July of 2023, motivated primarily by her frustration with her lack of access to the top management of LG H&H after Mr. Cha's departure and by the daily irritation that the presence of Young Lee at TCS seemed to cause her. Those may or may not seem to outside observers as sufficiently weighty reasons to walk away from her position at TCS, but they do not appear to the Tribunal to be rooted in bad faith or a determination to go back on her agreement.

273.     Sunna Kim's employment agreement expressly allowed her to resign at any time, with or without a reason.  The only condition imposed on her resignation without Good Reason before the third anniversary of the sale of a controlling interest in TCS to LG H&H was that she give 90 days' notice of her intention to do so.[433]  Sunna Kim in fact only gave 60 days' notice of her intention to resign, which is the interval prescribed in the section 5(c) of the SKEA dealing with resignation for Good Reason.  TCS would have been entitled to complain that Sunna Kim gave 30 fewer days' notice than her contract required, but it is in a weak position to do so,

---

[431] Tr. Day 2, pp. 59-61 (Hyeyoung Moon); Tr. Day 3, pp. 180-82, 185 (Sunna Kim); Tr. Day 4, pp. 83, 93 (Sunna Kim).
[432] Tr. Day 3, p. 135.
[433] *See* SKEA § 5(e).

because it repeatedly ignored Sunna Kim's offer to delay her departure to assist with the transition.[434]

274.    The Tribunal accordingly concludes that Sunna Kim's resignation was the exercise of a right expressly conferred by her contract with TCS, and that TCS (and the Claimant) cannot complain about her having given 30 fewer days' notice than the SKEA required for a resignation without Good Reason because it ignored her offer to stay longer and ultimately insisted that she leave on 6 October 2023.[435]  Sunna Kim's resignation appears to the Tribunal to have been motivated primarily by frustration and irritation.  It may have been an over-reaction to poor manners and an absence of tact on the part of her Co-CEO and to a lack of sympathy or empathy on the part of LG H&H and its senior representatives.  But the Claimant has not sustained its burden of proof to show that her resignation was motivated by bad faith or an intention to evade her contractual obligations or to injure the Claimant.

275.    The Tribunal accordingly dismisses the Claimant's claims for an alleged total breach and for breach of the implied covenant of good faith and fair dealing.

### E.    The Legal Fee Issue

276.    The Claimant contends that "Sunna Kim embezzled the Company so that it would pay RAK over USD 200,000 for Sunna Kim's personal legal fees – apparently to be used for her Arbitration defense – and took active steps to deliberately conceal her scheme from the Company."[436]  The facts underlying this claim are set forth at paragraphs 144-148 above.

277.    The Respondents contend that RAK made an error in invoicing this amount to TCS, that RAK has offered to return the funds to TCS but that TCS has refused to accept them,

---

[434] S. Kim WS1 ¶ 63; Tr. Day 2, pp. 34-36.
[435] See pars. 139-143 above.
[436] SOC ¶ 181.

and that RAK is holding the funds in a trust account for the benefit of TCS.[437]  The Respondents advance a counterclaim requesting that LG "be enjoined from abusing its majority shareholder control to cause The Crème Shop to refuse to accept the return of the retainer payment from Russ August & Kabat."[438]  For its part, the Claimant does not seek any relief on account of this situation in this arbitration, other than to ask that the Respondents' counterclaim be dismissed in its entirety.[439]

278.    It appears to be uncontested between the Parties that the USD 200,000 in question belongs to TCS.  Neither TCS nor RAK is a party to this arbitration.  The Tribunal thus cannot direct RAK to repay the funds nor can it direct TCS to accept them.  The Tribunal takes the liberty of suggesting to the Claimant that it has made its point and that it should consider allowing the funds to be returned, but the Tribunal does not believe that it would be appropriate for it to make any order on the subject.  The counterclaim requesting such an order is dismissed.

## V.    INTEREST AND COSTS

### A.    Interest

279.    The Tribunal considers that interest at a reasonable rate, compounded annually, should be added to the sums awarded for two reasons.  The first is to compensate the Party to which money is awarded for the approximate time value of that money from the date specified as to each award.  The second is to allow the sums awarded to each side in this arbitration to be brought up to a common date so that the sums due to one Party can be offset against the sums due to the other.

---

[437] ROC ¶¶ 62-68.
[438] Respondents' closing slide 44 from Day Six of the Hearing.
[439] Claimant's counsel's email to the Tribunal of 19 October 2024.

280.    Both sides have asked that interest at a rate to be determined by the Tribunal be added to the sums awarded to it,[440] but neither side has suggested what a reasonable rate would be.  The Tribunal considers that the Parties have effectively agreed that the Tribunal should decide the appropriate rate of interest to be paid on the amounts awarded.

281.    The Tribunal has looked at two commonly used reference rates published by the Federal Reserve Bank of New York, the Overnight Bank Funding Rate ("OBFR")[441] and the Secured Overnight Financing Rate ("SOFR").[442]  The averages for those rates for the periods from June 2022 to the present are as follows:

> OBFR June 2022 – March 2025 average:  4.514%
>
> SOFR June 2022 – March 2025 average:  4.503%

282.    The average of those two average rates is 4.5085%.  That appears to the Tribunal to represent fairly the risk-free cost of funds for the period since the closing of LG H&H's acquisition of 65% of the shares to TCS.

283.    To convert a risk-free rate to a reasonable commercial rate some addition is normally made, since the risk-free rates are interbank rates that are not available to commercial parties.[443]  The Tribunal considers that it would be appropriate to add one percent to the average rate in the preceding paragraph, to arrive at a rate of 5.5085%, and then to simplify the rate by eliminating the outer digits.  The Tribunal accordingly directs that a fair and reasonable rate of interest in these circumstances is 5.5%.  Interest should be compounded annually, as a reasonable proxy for the time value of money.  Interest at that rate, compounded annually, should

---

[440] SOC ¶ 295(h); SOD ¶ 253(d).
[441] https://www.newyorkfed.org/markets/reference-rates/obfr.
[442] https://www.newyorkfed.org/markets/reference-rates/sofr.
[443] Jeffrey M. Colon & Michael S. Knoll, *Prejudgment Interest in International Arbitration*, 4 Transnational Dispute Management, at 17 (2007).

99

be added to all sums awarded, running from the date specified for each sum to the date of payment.

### B.     Costs

284.    Both sides submitted applications for their respective costs of Phase One of this Arbitration on 17 January 2025.

285.    Because this Arbitration is ongoing, and the assessment of which side is the prevailing Party cannot be determined at this stage with certainty, the Tribunal concludes that it should reserve its decision as to the costs of Phase One of this Arbitration for determination at the conclusion of the Arbitration.  There will, however, be no need for the Parties to re-submit their applications as to Phase One.

## VI.    PARTIAL AWARD

286.    For the reasons explained in the foregoing paragraphs, the Tribunal awards and directs as follows with respect to the issues presented in Phase One of this Arbitration:

287.    The Tribunal determines and declares that Sunna Kim resigned from her position as Co-CEO of TCS without Good Reason, effective 6 October 2023.

288.    The Tribunal determines and declares that LG H&H's Call Option Notice dated 29 November 2023 was a valid exercise of its call option under the SA.  Respondents Insil and Sunna Kim are accordingly required to deliver the shares of TCS owned by each of them to LG H&H in exchange for a total payment of USD 66,838,449.48, representing an Option Exercise Price Per Share of USD 191.  Interest is to be added to that sum at the rate of 5.5% per annum, compounded annually, from 28 December 2023 until payment is made.

289.    The Tribunal determines and declares that the Respondents' Put Option Notice dated 5 March 2024 is of no effect.

290.    The Respondents are directed to pay the Claimant the sums of USD 2,115,695 as a working capital shortfall adjustment and USD 2,331,015 as an inventory amount shortfall adjustment as determined by the Independent Referee, with interest on each sum at the rate of 5.5% per annum, compounded annually from 5 September 2023 until payment is made.

291.    The Respondents are directed to pay the Claimant the sum of USD 1,452,158 as indemnification, plus interest on that amount at the rate of 5.5% per annum, compounded annually from 9 June 2022 until payment is made.

292.    The Claimant's claims based on the Sanrio payment, the Disney payment, and the alleged total breach and breach of the implied covenant of good faith and fair dealing are dismissed.

293.    The Respondent's counterclaim for a declaration concerning the retainer paid by TCS to RAK is dismissed.

294.    All other claims asserted in Phase One of this Arbitration are dismissed.

295.    The Tribunal reserves all determinations as to costs until the conclusion of this Arbitration.

## CERTIFICATION

The undersigned arbitrators hereby certify that, for purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in Los Angeles, California, U.S.A. this 21st day of May, 2025.

_____
Richard Chernick

_____
Lawrence S. Schaner

_____
John M. Townsend
President

102