# EXHIBIT B



# AWARD



International Chamber of Commerce (ICC) | Secretariat of ICC International Court of Arbitration     **iccwbo.org/arbitration**

**Paris**
33-43 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28   arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704   ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580   ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504   ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830   ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781   ica12@iccwbo.org

**ICC INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 27869/PDP**

LG H&H CO., LTD.

(Republic of Korea)

**vs/**

**1**. Insil Kim

(U.S.A.)

**2.** Sunna Kim

(U.S.A.)

This document is the original of the Final Award rendered in conformity with the Rules of Arbitration of the International Chamber of Commerce and issued as an electronic document pursuant to the parties' agreement.

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**

Case No. 27869/PDP

**LG H&H CO., LTD**. (Korea),
Claimant,

vs.

**INSIL KIM** and **SUNNA KIM** (U.S.A.),
Respondents.

---

**FINAL AWARD**

---

23 December 2025

| Richard Chernick<br>JAMS<br>515 S. Flower Street<br>Suite 4500<br>Los Angeles, CA 90071, USA<br>rchernick@jamsadr.com | John M. Townsend<br>Hughes Hubbard & Reed LLP<br>1775 I Street, N.W.<br>Suite 600<br>Washington, D.C. 20006, USA<br>john.townsend@hugheshubbard.com | Lawrence S. Schaner<br>Schaner Dispute Resolution LLC<br>77 West Wacker Drive<br>Suite 4500<br>Chicago, IL 60601, USA<br>LSchaner@schanerlegal.com |

**Arbitrators**

# TABLE OF CONTENTS

REPRESENTATION OF THE PARTIES ....................................................................1

TABLE OF ABBREVIATIONS ................................................................................2

DRAMATIS PERSONAE ..........................................................................................3

ENTITIES ...................................................................................................................5

I.    INTRODUCTION .............................................................................................6

II.   PROCEDURAL HISTORY...............................................................................7

      The Agreement to Arbitrate ..............................................................................7
      Governing Law ..................................................................................................8
      The Rules, Initial Case Management Conference and Terms of Reference ......8
      The Tribunal......................................................................................................9
      Application for Directions and Response ........................................................10
      The Claimant's Application for Interim Relief................................................11
      Case Management Timetable...........................................................................12
      Document Exchange ........................................................................................12
      Third-Party Document Production...................................................................12
      Submissions on the Merits ..............................................................................16
      Pre-Hearing Matters........................................................................................17
      The Hearing on the Merits ..............................................................................18
      Post-Hearing Matters ......................................................................................21
      Closing of the Proceedings ..............................................................................22

III.  FACTUAL BACKGROUND...........................................................................23

      A.    The Parties and Involved Persons....................................................23
      B.    The Crème Shop ...............................................................................24
      C.    The Share Purchase Agreement ........................................................25
      D.    Paul Kim's Testimony ......................................................................27
      E.    LPF Agency ......................................................................................29
      F.    Pureunbi and dearcloud.....................................................................33
      G.    TOJI Co.............................................................................................38
      H.    Somi Inc. ...........................................................................................38
      I.    The Respondents' Actions Before Their Departure from The Crème Shop..........40
      J.    The Respondents' Involvement with LPF Agency After Sunna Kim's Resignation from TCS ................................................................46
      K.    The Respondents' Involvement with Pureunbi and dearcloud After Sunna Kim's Resignation from TCS ................................................54
      L.    Effect on TCS of Competition from Pureunbi and dearcloud .............................61

IV.   ISSUES TO BE DECIDED ..............................................................................62

      A.    What is the "Restricted Period" Under the Non-Compete Provision of the SPA?63
      B.    Who are the "Affiliates" Subject to the Non-Compete?........................................65
      C.    Did or Does Pureunbi's "dearcloud" Brand Compete with The Crème Shop? .....68
      D.    Did LPF Agency Compete with The Crème Shop?..............................................69
      E.    Was Sunna or Insil Kim Engaged in the Business of Pureunbi ("dearcloud")? ....71

F.  Was Sunna or Insil Kim Engaged in the Business of LPF Agency? .....................75

G.  Did Sunna Kim Interfere with The Crème Shop's Employees? ...........................76

H.  Did Sunna Kim Interfere with The Crème Shop's Customers or Licensors?........79

I.  Has The Crème Shop Been Injured by Competition from Pureunbi or LPF Agency? ..................................................................................................................81

J.  Will The Crème Shop Be Injured in the Future by Such Competition? ...............87

K.  Was the Crème Shop Injured by Interference with Its Employees? .....................87

L.  Is an Injunction Appropriate? .............................................................................89

M.  If The Crème Shop Was Injured, What Was the Amount of Its Damages? .........92

V.  INTEREST.............................................................................................................99

VI.  COSTS ...................................................................................................................99

VII.  FINAL AWARD...................................................................................................103

# REPRESENTATION OF THE PARTIES
## (Phase Two)

**Legal Representatives of the Claimant**

KIM & CHANG
Seyang Building
39 Sajik-ro-8-gil
Jongno-Gu
Seoul
Korea, 03170

| | |
|---|---|
| Allen C. Kim | allen.kim@kimchang.com |
| Byung-Chol (BC) Yoon | bcyoon@kimchang.com |
| Sup-Joon Byun | sjbyun@kimchang.com |
| Hyun Hoon (Sean) Lee | hyunhoon.lee@kimchang.com |
| Theodore A. Weisman | theodore.weisman@kimchang.com |
| Joonhak Choi | joonhak.choi@kimchang.com |
| Yoon Chae | dongyoon.chae@kimchang.com |

**Legal Representatives of the Respondents**

Representing both Respondents prior to 1 May 2025, and Sunna Kim only after that date:

RUSS, AUGUST & KABAT
12424 Wilshire Blvd., 12th Floor
Los Angeles, California 90025
U.S.A.

| | |
|---|---|
| Larry C. Russ | lruss@raklaw.com |
| Nathan D. Meyer | nmeyer@raklaw.com |
| Timothy M. Baumann | tbaumann@raklaw.com |
| Christine S. Shin | cshin@raklaw.com |
| Erica S. Kim | ekim@raklaw.com |

Representing Insil Kim from 1 May 2025:

LAW OFFICES OF JUSTIN J. SHRENGER, APC
3470 Wilshire Boulevard, Suite 855
Los Angeles, California 90010
U.S.A.

| | |
|---|---|
| Justin J. Shrenger | justin@Shrenger.com |
| Rachel Lin | rachel@Shrenger.com |

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| 3PL | Third Party Logistics |
| CPHB | Claimant's Post-Hearing Brief dated 18 July 2025 |
| CRPHB | Claimant's Phase II Reply Post-Hearing Brief dated 29 August 2025 |
| ER | Expert Report |
| [Name] ER1 | First Expert Report of person named |
| Exh. | Exhibit |
| IBA Rules | *IBA Rules on the Taking of Evidence in International Arbitration* (2020) |
| ICC | International Chamber of Commerce |
| ICC Rules | *Rules of Arbitration* of the ICC in effect as of 1 January 2021 |
| IKEA | Insil Kim's Employment Agreement with TCS dated 9 June 2022 (Exhibit D-2) |
| I. Kim SOD | Respondent Insil Kim's Preliminary Statement of Defense dated 30 April 2025 |
| I. Kim PHB | Closing Brief of Respondent Insil Kim dated 15 August 2025 |
| LG H&H | Claimant LG H&H Co., Limited |
| Partial Award | Partial Award in this arbitration dated 21 May 2025 |
| PO __ | Procedural Order No. __ |
| RFA | Request for Arbitration dated 19 June 2023 |
| SA | Shareholders Agreement dated 9 June 2022 (Exhibit C-2) |
| SKEA | Sunna Kim's Employment Agreement with TCS dated 9 June 2022 (Exh. D-1) |
| SOC | Claimant's Phase II Statement of Claim dated 17 March 2025 |
| S. Kim SOD | Respondent Sunna Kim's Statement of Defense dated 30 April 2025 |
| S. Kim PHB | Respondent Sunna Kim's Post-Hearing Brief dated 15 August 2025 |
| SPA | Share Purchase Agreement dated 20 April 2022 (Exhibit C-1) |
| TCS | The Crème Shop, Inc. |
| TOR | Terms of Reference dated 20 October 2023 |
| Tr. Day __ p. __ | References to transcript of Hearing on the Merits.  Day 1 is 17 June 2025 |
| WS | Witness Statement |
| [Name] WS1 | First Witness Statement of person named |
| [Name] WS2 | Second Witness Statement of person named |
| [Name] WS3 | Third Witness Statement of person named |
| [Name] WS4 | Fourth Witness Statement of person named |

2

## DRAMATIS PERSONAE
### (Positions as of December 2024)

| | |
|---|---|
| Abbas, Oli | Independent social media influencer |
| Contreras, Pauline | Employee at LPF Agency; former employee at The Crème Shop |
| Kaufman, Jaime | Social director, LG H&H USA, Inc. |
| Kim, Hyosun | Legal Department Lead, LG H&H Global |
| Kim, Insil ("Christina") | Respondent; Co-founder and former 15% shareholder of The Crème Shop; mother of Sunna Kim |
| Kim, Lawrence | Co-founder of The Crème Shop; Insil Kim's husband and Sunna Kim's father |
| Kim, Paul | Vice President, LPF Agency; former Head of Sales, The Crème Shop |
| Kim, Sunna ("Olive") | Respondent; former Co-CEO and former 20% shareholder of The Crème Shop |
| Koo, Steven | Finance employee at LPF Agency and/or Pureunbi |
| Kroeger, Adam | Product buyer, Walgreens |
| Larios, Deisy | Employee at LPF Agency; former employee at The Crème Shop |
| Lee, Jaeran | Head of Marketing, The Crème Shop |
| Lee, Jay | President of Pureunbi Corporation |
| Lee, Young Chul ("Young Lee") | Former Co-CEO of TCS nominated by LG H&H |
| Lim, Moon | Executive Vice President, DAUM Commercial Real Estate Services |
| Martin, Jenna | Prospective employee of The Crème Shop and LPF Agency |
| Moon, Hyeyoung | Executive Vice President of LG H&H, CEO of LG H&H USA Inc., Chair of the Board of Directors of The Crème Shop |
| Oh, Peter | Part Owner of Pureunbi Corporation |
| Prior, Heather | Licensing Director, Sanrio |
| Russ, August & Kabat | Law firm representing TCS (pre-dispute) and the Respondents |

3

| | |
|---|---|
| Seo, Seung Hye | Certified Public Accountant; Owner of LPF Agency, LLC and LPF Corp. |
| Shin, Christine | Partner, Russ, August & Kabat |
| Sin, Yuri | Licensing employee, Sanrio |
| Takiguchi, Craig | Chief Operating Officer, Sanrio |
| Villa, Rachaelle | Former junior copywriter at The Crème Shop and friend of Sunna Kim |
| Yang, Helen | Employee at LPF Agency; former employee at The Crème Shop |
| Yoon, Chris | Sunna Kim's husband |

4

**ENTITIES**

| Célavi | Célavi Beauty & Cosmetics |
|---|---|
| Disney | The Walt Disney Company |
| LG H&H | Claimant LG H&H Co., Ltd. |
| LPF Agency | LPF Agency, LLC |
| LPF Corp. | LPF Corp. |
| Longevite Batiment | Longevite Batiment Inc. |
| Pureunbi | Pureunbi Corp. |
| RAK | Russ, August & Kabat |
| Roli | Roli Consultancy |
| Sanrio | Sanrio Company, Ltd. |
| Sceon | Sceon LLC |
| Somi | Somi Inc. |
| Talo | Talo LLC |
| TCS | The Crème Shop, Inc. |
| TOJI | TOJI Co. |
| Ulta Beauty | Ulta Beauty, Inc. |
| Walgreens | Walgreens Boots Alliance, Inc. |

5

**FINAL AWARD**

## I.  INTRODUCTION

1.    This arbitration arises out of the 2022 acquisition by the Claimant from the Respondents of, initially, sixty-five percent (65%) of the shares of The Crème Shop, Inc. ("TCS"), a California corporation which is not a party to this arbitration, the subsequent operation of TCS under the joint ownership and management of the Claimant and the Respondents, and the departure from TCS of the Respondents in 2023.

2.    The Claimant, LG H&H Co., Limited ("LG H&H" or the "Claimant"), is a company incorporated and existing under the laws of the Republic of Korea with its principal place of business at 58 Saemunan-ro, Jongno-gu, Seoul, Republic of Korea.  The Claimant is an affiliate of the multinational conglomerate LG Group.  LG H&H purchased sixty-five percent (65%) of the shares of TCS from the Respondents on 9 June 2022.

3.    The Respondents are Insil ("Christina") Kim and Sunna ("Olive") Kim, both natural persons residing in the United States at 3512 Viewcrest Drive, Burbank, California, who formerly owned 100% of the shares of TCS.  Following the sale of sixty-five (65%) of the shares of TCS to LG H&H, Insil and Sunna Kim owned fifteen percent (15%) and twenty percent (20%), respectively, of the shares of TCS until LG H&H purchased their remaining shares in 2025.

4.    The Parties entered into a series of related agreements by which LG H&H's acquisition of a majority interest in TCS was carried out.  These were:  (a) the "Share Purchase Agreement" (the "SPA," Exhibit C-1) entered into on 20 April 2022, (b) the "Shareholders Agreement" (the "SA," Exhibit C-2) entered into on 9 June 2022, (c) the "Sunna Kim Employment Agreement" (the "SKEA," Exhibit D-1) entered into on 9 June 2022, and (d) the "Insil Kim Employment Agreement" (the "IKEA," Exhibit D-2) entered into on 9 June 2022.

6

5.     During Phase One of this Arbitration, LG H&H contended that, when the acquisition closed on 9 June 2022, TCS's financial statements contained material misrepresentations that caused LG H&H to overpay for its sixty-five percent (65%) shareholding in breach of the SPA's representations and warranties regarding TCS's financial condition.  LG H&H further contended that Sunna Kim resigned as Co-CEO of TCS in October 2023 without "Good Reason," entitling LG H&H to exercise its call option under the SA to acquire the balance of TCS's shares still owned by the Respondents.  The Respondents contended that LG H&H had materially diminished Sunna Kim's management authority as a Co-CEO of TCS in violation of the SKEA.  They further contended that, as a result, Sunna Kim had resigned for "Good Reason" as provided in the SKEA and the Respondents were entitled to exercise their put option under the SA.  The Tribunal resolved these claims in the Partial Award issued on 21 May 2025, which is incorporated into this Final Award. LG H&H has since acquired the Respondents' remaining shares of TCS.

6.     Phase Two of this arbitration involves the Claimant's claims that the Respondents breached the non-compete provisions of the SPA, primarily through their alleged involvement with and funding of a K-Beauty company called Pureunbi Corp., which sold or sells competitive "K-beauty" products branded as "dearcloud."  The Respondents deny that they, or their affiliates, have taken any action that violates the SPA's non-compete provisions.

## II.     PROCEDURAL HISTORY

7.     The full procedural history of this arbitration up to the issuance of the Partial Award on 21 May 2025 is set forth in that Partial Award.

### The Agreement to Arbitrate

8.     Section 8.3 of the SPA provides for the arbitration of disputes arising under it in the following terms:

(a)    The Parties shall attempt in good faith to resolve any dispute, controversy or claim between the Parties that relates to the interpretation, carrying out of obligations, breach, termination or enforcement of this Agreement or in any way arising out of or connected with this Agreement ("Dispute").

(b)    If any Dispute cannot be resolved by the Parties pursuant to Section 8.3(a) or otherwise, such Dispute shall be exclusively referred to and finally settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce. The arbitration proceedings shall take place in Los Angeles, California and shall be conducted in the English language. The number of arbitrators shall be three, and the presiding arbitrator shall be chosen by the two arbitrators nominated by the Parties with input from the parties. If the presiding arbitrator is not chosen by the two arbitrators within 30 days of the date of confirmation of the later of the two party nominated arbitrators, he or she shall be appointed by the ICC International Court of Arbitration. The award of the arbitral tribunal shall be final and binding upon the parties and shall be the sole and exclusive remedy between the parties regarding any claims, counterclaims, issues, or requests for declaratory, accounting, or other relief presented to the arbitral tribunal. The costs of arbitration shall be apportioned by the arbitral tribunal in the award.[1]

**Governing Law**

9.    Section 8.2 of the SPA provides that it, and all rights and obligations of the Parties thereunder, is to be governed by and construed in accordance with the Laws of the State of California.

**The Rules, Initial Case Management Conference and Terms of Reference**

10.    LG H&H commenced these proceedings by filing a Request for Arbitration ("RFA") with the International Court of Arbitration of the International Chamber of Commerce (the "ICC") on 19 June 2023, pursuant to the Rules of Arbitration of the ICC in effect as of 1 January 2021 ("ICC Rules").

---

[1] Exh. C-1, § 8.3.

8

11.      On 16 October 2023, the Parties participated by videoconference in a Case

Management Conference with the Tribunal pursuant to Article 24 of the ICC Rules.  At that

conference, the Parties and the Tribunal discussed a draft of the Terms of Reference.

12.      On 20 October 2023, a final version of the Terms of Reference reflecting the

agreements reached at the conference, subsequent agreements reached between the Parties, and

the Tribunal's rulings concerning the few points on which no agreement was reached was

circulated to Counsel for the Parties for signature.  The Terms of Reference were signed on 20

October 2023.  They were transmitted to the ICC Court at its session of 1 November 2023

pursuant to Article 23(2) of the ICC Rules.  The same Terms of Reference continued to apply

throughout Phase Two of this arbitration.

**The Tribunal**

13.      The Parties agreed for three arbitrators to be named.[2]  On 9 August 2023,

pursuant to Article 13(2) of the ICC Rules, the Secretary General of the ICC Court confirmed

Mr. Lawrence S. Schaner as co-arbitrator upon the nomination of the Claimant and confirmed

Mr. Richard Chernick as co-arbitrator upon the nomination of the Respondents.[3]

14.      On 19 September 2023, pursuant to Article 13(2) of the ICC Rules, the Secretary

General confirmed Mr. John M. Townsend as the President of the Tribunal upon the joint

nomination of the co-arbitrators.[4]  The case file was submitted to the Tribunal on 21 September

2023, pursuant to Article 16 of the ICC Rules.[5]

15.      By emails dated 26 and 29 September 2023, the Parties agreed to the Tribunal's

proposal to appoint an Administrative Secretary to the Tribunal, to serve as provided in the

---

[2] TOR ¶ 6.
[3] TOR ¶¶ 7-8.
[4] TOR ¶ 9.
[5] TOR ¶ 10.

ICC's *Note to Parties and Arbitral Tribunals on the Conduct of the Arbitration under the ICC Rules of Arbitration*. With the agreement of the Parties, Mr. Holden Fitzgerald has acted as the Administrative Secretary to the Tribunal since 9 July 2024.

**Application for Directions and Response**

16. On 27 August 2024, just before the completion of prehearing briefing in Phase One, the Claimant submitted an Application for Directions seeking the Tribunal's leave to introduce a new claim pursuant to Article 23(4) of the ICC Rules. The Claimant alleged that the Respondents were competing with TCS in the cosmetics and beauty industry in breach of the SPA's non-competition covenants, using the same customer relationships, licensor relationships, and know-how that the Claimant had paid for. The Claimant also requested that it be allowed to apply for interim relief in support of its new claim.

17. On 6 September 2024, the Respondents filed their response to the Claimant's Application for Directions. The Respondents alleged that the Claimant's new claim was wholly unfounded and that neither of the Respondents, nor any of their affiliates, had owned, managed, operated, controlled, worked for, or provided services to a competitor to TCS. The Respondents' response was accompanied by the Third Witness Statement of Ms. Sunna Kim dated 6 September 2024 ("S. Kim WS3"); the Third Witness Statement of Ms. Insil Kim dated 6 September 2024 ("I. Kim WS3"); the Third Witness Statement of Mr. Lawrence Kim, the husband of Ms. Insil Kim, father of Ms. Sunna Kim, and pre-acquisition Chairman of TCS, dated 6 September 2024 ("L. Kim WS3"); the Second Witness Statement of Mr. Paul Kim, the Vice President of LPF Agency and former employee of TCS, dated 5 September 2024 ("P. Kim WS2"); the Witness Statement of Mr. Jay Lee, the President of Pureunbi Corp., dated 5 September 2024 ("Jay Lee WS1"); the Witness Statement of Ms. Seung Hye Seo, the sole member and owner of LPF Agency, dated 5 September 2024 ("S. Seo WS1"); the Witness

10

Statement of Mr. Oli Abbas, an independent beauty and lifestyle influencer, dated 6 September 2024 ("Abbas WS1"); and the Witness Statement of Mr. Peter Oh, the owner of Pureunbi Corp., dated 6 September 2024 ("Oh WS1").

18. By letter dated 11 September 2024, the Claimant asserted that the new claim should be heard in a second phase of this arbitration to allow for additional fact development to test the assertions made in the Respondents' witness statements.

19. During the Phase One pre-hearing conference on 19 September 2024, the Tribunal heard argument concerning how and when the Claimant's new claim should be presented.

20. On 23 September 2024, the Tribunal issued Procedural Order No. 4 ("PO 4"). PO 4 bifurcated the Claimant's new claim for consideration during a second phase of the Arbitration while agreeing to hear argument on the Claimant's interim relief application on a reserve day during the Phase One Hearing on the Merits.

**The Claimant's Application for Interim Relief**

21. The Claimant sought interim relief related to its new claim in the form of an order that the Respondents "refrain from participating in or benefitting from, directly or indirectly, the LPF, Pureunbi or dearcloud businesses, or from entering into formal or informal agreements or tacit understanding with any person or entity in relation to these businesses, and to immediately terminate any such agreements or tacit understanding that were formed following the commencement of this Arbitration; and instruct their family members and other Affiliates (as that term is defined in the SPA) to do the same."[6]

---

[6] Claimant's 11 September 2024 Reply on Appl. For Directions ¶ 8(a).

22.    On 18 October 2024, the Tribunal heard the Claimant's arguments in support of its application for interim relief related to the new claim and the Respondents' arguments in opposition to that application.  The substance of the Parties' arguments is discussed in Procedural Order No. 6 ("PO 6").

23.    On 29 October 2024, the Tribunal issued PO 6 which, without prejudice to the ultimate merits of the Claimant's new claim, ruled that the Claimant had failed as of that date to make the showing required to obtain interim relief under both California and international law.

**Case Management Timetable**

24.    On 18 October 2024, at the close of the Phase One Hearing on the Merits held in Los Angeles, California, the Parties agreed on a schedule for document disclosure, briefing, and an evidentiary hearing regarding the Claimant's new claim for breach of the SPA's non-competition covenant in Phase Two of this arbitration.  The agreed-upon timetable is set forth in Procedural Order No. 5 ("PO 5").

**Document Exchange**

25.    From 18 October 2024 through 31 January 2025, the Parties conducted document exchanges related to Phase Two in accordance with paragraph 38 of the Terms of Reference and the timetable in PO 5.

26.    On 27 December 2024, each Party submitted its Redfern Schedules to the Tribunal.  The Tribunal ruled on the objections to document requests in Procedural Order No. 8 dated 6 January 2025 ("PO 8").

**Third-Party Document Production**

27.    Six of the eight witness statements submitted by the Respondents in support of their initial opposition to the Claimant's Application for Directions were from non-parties to this Arbitration.  In PO 5, the Tribunal requested that Counsel for the Claimant and the

12

Respondents work together to seek the cooperation of those third-party witnesses regarding any requests for documents. If, however, a third-party witness did not agree to produce requested documents by 1 December 2024, the Tribunal directed that the requesting party could ask the Tribunal to issue subpoenas to any such witness or witnesses to require their attendance, with documents, at a hearing before a member of the Tribunal.

28.     On 1 December 2024, Counsel for the Claimant informed the Tribunal that, except for third-party witness Mr. Lawrence Kim, the Claimant had not received the third-party witnesses' responses to the Claimant's document requests. The Claimant asked the Tribunal to issue subpoenas addressed to: (i) Mr. Lawrence Kim; (ii) Mr. Paul Kim; (iii) Ms. Seung Hye Seo; (iv) Mr. Jay Lee; (v) Mr. Peter Oh; (vi) Mr. Oli Abbas; (vii) TOJI Co.; (viii) LPF Agency, LLC; and (ix) Pureunbi Corp. ("Pureunbi").

29.     On 5 December 2024, Counsel for the Respondents responded, taking issue with the timing of the Claimant's request for subpoenas and its efforts to confer. The Respondents also argued that neither the Federal Arbitration Act (the "FAA") nor the California Arbitration Act (the "CAA") vested the Tribunal with power to require third parties to appear at a hearing for the purpose of obtaining prehearing document discovery. The Claimant responded, taking issue with the Respondents' interpretation of the FAA and CAA.

30.     On 10 December 2024, following written submissions on the subject from both sides as described in Procedural Order No. 7 ("PO 7"), the Tribunal ruled that the Tribunal has power under the FAA to issue subpoenas directing third-party witnesses to appear at a hearing with documents. The Tribunal, accordingly, agreed in PO 7 to issue the third-party subpoenas requested by the Claimant.

13

31.     On 23 December 2024, pursuant to PO 7, the Tribunal issued subpoenas to nine third-party witnesses as requested by the Claimant.  As discussed by the Tribunal with the Parties at the end of the Phase One Hearing,[7] each subpoena instructed the third-party witness to appear with the documents specified at a hearing to be held before Arbitrator Chernick on 3 February 2025 in Los Angeles, California.

32.     Between 23 December 2024 and 3 February 2025, Lawrence Kim and Oli Abbas reached agreements with the Claimant regarding production of the documents specified in the subpoenas addressed to them.

33.     On 3 February 2025, a hearing was held before Arbitrator Chernick in Los Angeles.  The following third-party witnesses appeared and were represented by the listed counsel:

(a)     Paul Kim, represented by Allyson Thompson of Hart Kienle Pentecost;

(b)     Jay Lee, Pureunbi, LPF Agency, and Seung Hye Seo, represented by the Law Office of Edward Chong, APC and Barry G. Florence of the Law Offices of Barry G. Florence; and

(c)     TOJI Co., with Sunna Kim appearing as the corporate representative, represented by Nate Meyer and Jean Rhee of Russ August & Kabat.

Peter Oh failed to appear at the hearing and did not respond to the subpoena addressed to him.

34.     Leading up to and during the 3 February 2025 hearing, several of the third-party witnesses presented objections to some of the document requests in the subpoenas addressed to them.  The Tribunal addressed and resolved each of the third-party witnesses' objections in Procedural Order No. 9 ("PO 9") dated 6 February 2025.

35.     On 10 February 2025, the Claimant and third-party witnesses Pureunbi and Jay Lee entered a stipulated protective order to facilitate the exchange of documents.  The Tribunal

---

[7] Tr. 18 Oct. 2024, pp.157-162.

14

adopted the stipulated order the same day as Procedural Order No. 10 ("PO 10").  The Tribunal

directed that any additional third-party witness who wished to come within the coverage of PO

10 could do so by providing counsel for the Claimant and the Respondents and the Tribunal

with a copy signed on behalf of that witness.  PO 10 permitted subscribing third-party witnesses

to limit the circulation of documents they produced by designating individual documents as

"Confidential" or "Highly Confidential – Attorneys' Eyes Only."  Third-party witnesses LPF

Agency and Seung Hye Seo subsequently brought themselves within the coverage of PO 10.

36.     On 28 February 2025, the Tribunal issued Procedural Order No. 11 ("PO 11"), to

resolve a dispute between the Claimant and third-party witness Pureunbi regarding the latter's

production of numerous documents marked "Attorneys' Eyes Only" ("AEO").  The Tribunal

determined that Pureunbi had properly designated the documents in question.

37.     On 4 March 2025, the Tribunal issued Procedural Order No. 12 ("PO 12"), to

resolve another dispute between the Claimant and Pureunbi, this time regarding the latter's

clawback of AEO-designated documents and re-production of the same documents with

significant redactions.  The Tribunal determined that the protection afforded by the AEO-

designation was sufficient and that Pureunbi was not entitled to clawback and redact the

disputed documents.

38.     On 17 March 2025, the Tribunal issued Procedural Order No. 13 ("PO 13") to

resolve applications by the Claimant regarding document production (or the lack thereof) by

third-party witnesses, including asking the Tribunal:  (i) to compel the production of certain

documents by third-party witnesses; (ii) to draw adverse inferences against the Respondents

because of various third parties' alleged failures to produce documents; and (iii) to preclude the

Respondents from referring to or relying on certain third-party witnesses' statements.

15

39.     In PO 13, the Tribunal first observed that the FAA does not vest arbitral tribunals with the power to enforce a summons or to compel the production of documents from third parties; those powers are reserved to the courts.  The Tribunal gave a series of directions related to ongoing efforts to recover relevant emails and documents.

40.     Also in PO 13, the Tribunal observed that it could not draw adverse inferences against a party based on the conduct of a non-party.  The Tribunal denied the Claimant's applications for such inferences without prejudice to their renewal with proper evidentiary bases.  The Tribunal noted that such bases must include a showing that the Respondents themselves were complicit in or responsible for any particular third-party witness's document production failures.

41.     As of 6 May 2025, third-party document production remained ongoing, and the Claimant had informed the Tribunal that it intended to continue working with various third-party witnesses and their counsel to reach agreements on the production of responsive documents.[8]

### Submissions on the Merits

42.     On 17 March 2025, the Claimant submitted its Statement of Claim ("SOC") for Phase Two, accompanied by the Fourth Witness Statement of Dr. Hyeyoung Moon, Executive Vice President of LG H&H and Chief Executive Officer of LG H&H USA Inc., dated 17 March 2025 ("H. Moon WS4"); the Witness Statement of Ms. Jaeran Lee, Head of Marketing at TCS, dated 17 March 2025 ("Jaeran Lee WS1"); the Witness Statement of Ms. Jaime Kaufman, a Social Director at LG H&H USA Inc., dated 17 March 2025 ("Kaufman WS1"); and the Expert

---

[8] Procedural Order No. 14 ¶ 24.

Report of Mr. Michal A. Malkiewicz, Vice President, Charles River Associates, dated 17 March 2025 ("Malkiewicz ER1").

43.     On 30 April 2025, Respondent Sunna Kim submitted her Response to the Claimant's Phase Two Statement of Claim ("S. Kim SOD"), accompanied by the Fourth Witness Statement of Ms. Sunna Kim ("S. Kim WS4"), and the Expert Report of Dr. Thomas P. McGahee, Vice President, Analysis Group, Inc. ("McGahee ER") , both dated 30 April 2025.

44.     On 30 April 2025, Respondent Insil Kim submitted a Preliminary Statement of Defense ("I. Kim Prelim. SOD") wherein she requested an extension of time until 26 May 2025 to submit a final Statement of Defense.  On 5 May 2025, Respondent Insil Kim informed the Tribunal that she intended to rely on the Witness Statement of Moon Lim, Executive Vice President at DAUM Commercial Real Estate Services, dated 31 January 2025 ("M. Lim WS1"), and that she did not intend to submit an additional expert report.  On 8 May 2025, after the pre-hearing conference, the Tribunal issued Procedural Order No. 14 ("PO 14"), giving Insil Kim until 16 May 2025 to convert her Preliminary Statement of Defense into a final Statement of Defense.[9]  On 16 May 2025, Respondent Insil Kim submitted the Fourth Witness Statement of Ms. Insil Kim dated 16 May 2025 ("I. Kim WS4"), and the Third Witness Statement of Mr. Lawrence Kim dated 16 May 2025 ("L. Kim WS3").  Insil Kim ultimately did not submit a final Statement of Defense.

**Pre-Hearing Matters**

45.     On 6 May 2025, a Pre-Hearing Conference was held via videoconference. Outstanding procedural matters and various issues regarding the June 2025 Hearing on the Merits were discussed, including the hearing schedule, format, and arrangements.

---

[9] PO 14 ¶ 5.

46. PO 14 recorded the agreements reached and decisions made at the Pre-Hearing Conference. PO 14 also recorded Insil Kim's change of counsel and, as noted above, the Tribunal's decision regarding her request to extend the deadline to file her Final Statement of Defense.

47. In PO 14, the Tribunal also directed that any documents that were to form a part of the record, including documents obtained from non-parties or in other proceedings, must have been given exhibit numbers and shared with the other Parties and the Tribunal no later than 2 June 2025.

48. Counsel for Respondent Insil Kim also agreed to ensure that the agreement(s) identified and referred to as the "3PL Agreement" would be produced, in its original form, to all other Parties and the Tribunal by 9 May 2025.

49. On 15 May 2025, pursuant to the Tribunal's direction in PO 14, counsel for Respondent Sunna Kim confirmed that the following third-party witnesses had agreed to appear voluntarily at the June 2025 Phase Two Hearing on the Merits: (i) Mr. Paul Kim; (ii) Mr. Jay Lee; (iii) Mr. Peter Oh; and (iv) Ms. Seung Hye Seo. On 19 May 2025, counsel for Respondent Insil Kim confirmed that the following third-party witnesses agreed to appear voluntarily at the June 2025 Hearing: (i) Mr. Lawrence Kim; and (ii) Mr. Moon Lim.

50. On 23 May 2025, the Parties submitted a joint Indicative Hearing Timetable for the June 2025 Hearing.

**The Hearing on the Merits**

51. The Phase Two Hearing on the Merits was held at the JAMS Century City office in Los Angeles, California, over four days from 17 through 20 June 2025. All three members of the Tribunal and the Administrative Secretary were present, as was a court reporter.

52. The following persons attended on behalf of each Party:

18

On behalf of the Claimant:

Legal Team

- Allen Kim (Senior Foreign Attorney, Kim & Chang)
- Sup-Joon Byun (Foreign Attorney, Kim & Chang)
- Theodore Weisman (Foreign Attorney, Kim and Chang)
- Keun Young Heo (Attorney, Kim & Chang)
- Dong Yoon Chae (Foreign Attorney, Kim & Chang)

Party Representatives

- Hyosun Kim (Head of Global Legal Department, LG H&H)
- Nara Lee (Senior Counsel, LG H&H)

Interpreter

- Olivia Kim

On behalf of Respondent Sunna Kim:

Legal Team

- Larry Russ (Partner, Russ, August & Kabat)
- Nate Meyer (Partner, Russ, August & Kabat)
- Erika Arambula (Paralegal, Russ, August & Kabat)

Party

- Sunna Kim

Interpreter

- Soomi Ko

On behalf of Respondent Insil Kim:

Legal Team

- Justin Shrenger (Principal, Law Offices of Justin J. Shrenger, APC)

Party

- Insil Kim

Interpreter

- Soomi Ko

19

53.    Each Party began by presenting an opening statement.

54.    The following fact witnesses appeared, were duly sworn, and were examined by the Parties and the Tribunal:

Fact witnesses for the Claimant:

- Jaeran Lee (Head of Marketing at TCS from October 2023 to present).
- Jaime Kaufman (Social Director at LG H&H overseeing the TCS brand from March 2024 to present).
- Dr. Hyeyoung Moon (Former Executive Vice President at LG H&H and Chief Executive Officer of LG H&H USA Inc. from January 2023 to May 2025, and former Chairperson of the Board of Directors of TCS from March 2023 to May 2025).

Fact witnesses for the Respondents:

- Sunna Kim (Former Co-Chief Executive Officer and 20% shareholder of TCS).
- Insil Kim (Co-founder and 15% shareholder of TCS).
- Lawrence Kim (Co-founder of TCS, Insil Kim's husband, and Sunna Kim's father).  Mr. Kim, who was present as a third-party witness, was represented by Justin Shrenger of the Law Offices of Justin J. Shrenger, APC.

Third Party Witnesses

- Seung Hye Seo (Sole member and owner of LPF Agency).  Ms. Seo was represented at the Hearing by Nigel Flores of the Law Offices of Yohan Lee.
- Jay Lee (President and owner of Pureunbi Corp.).  Mr. Lee was represented at the Hearing by Barry Florence of the Law Offices of Barry G. Florence.
- Peter Oh (Former owner of Pureunbi Corp.).  Mr. Oh was represented at the Hearing by Chong Roh of the Law Firm of Roh & Associates.
- Moon Lim (Executive Vice President at DAUM Commercial Real Estate). Mr. Lim was not represented by counsel at the Hearing.
- Paul Kim (Former Vice President at LPF Agency).  Mr. Kim was represented at the Hearing by Allyson Thompson of Hart Kienle Pentecost.

Expert witness for the Claimant:

- Michal A. Malkiewicz (Vice President at Charles River Associates).

Expert witness for the Respondents:

- Thomas P. McGahee, Ph. D. (Vice President at Analysis Group, Inc.).

20

55.     The Tribunal requested, and the Parties agreed to provide, consecutive post-hearing briefing.  The Parties agreed on a post-hearing briefing and costs submission schedule on the final day of the Hearing.

**Post-Hearing Matters**

56.     On 23 June 2025, the Tribunal issued Procedural Order No. 15 ("PO 15"), documenting the agreed upon schedule for the post-hearing briefing and cost submissions.

57.     On 18 July 2025, the Claimant submitted its first post-hearing brief.

58.     On 15 August 2025, both Respondent Sunna Kim and Respondent Insil Kim submitted responsive post-hearing briefs.

59.     On 29 August 2025, the Claimant submitted its reply post-hearing brief.  Along with its reply, the Claimant submitted several pieces of new evidence that it asked the Tribunal to consider, including a declaration of Paul Kim captioned in the ongoing case of *The Crème Shop, Inc. v. Sunna ("Olive") Kim et al.* in the Superior Court of California, County of Los Angeles, and dated 28 August 2025.[10]

60.     On 4 September 2025, Respondent Sunna Kim's counsel requested that it be given fifteen days to determine how to address the introduction of Paul Kim's declaration into these proceedings.  The Claimant responded to this request on 5 September 2025, asserting that Paul Kim's declaration is admissible (as is its other new evidence) and noting that it was amenable to the Respondents promptly submitting a brief response.  The Claimant noted it was prepared to submit the declarations of three additional former TCS employees—Helen Yang, Raysa Cerna, and Pauline Contreras—should the Tribunal invite their submission.  The

---

[10] *See* Exh. C-699 (28 August 2025 Paul Kim Decl.).

Claimant also noted it would not object to the Respondents recalling Paul Kim to testify regarding his new declaration.

61.     On 8 September 2025, the Tribunal issued Procedural Order No. 16 ("PO 16"). In PO 16, the Tribunal invited both Respondent Sunna Kim and Respondent Insil Kim to make a further submission in response to the Claimant's reply by 22 September 2025.  The Tribunal also permitted the Claimant to reply to any further submissions of the Respondents by 6 October 2025.

62.     The Tribunal received a letter dated 22 September 2025 from counsel for Respondent Sunna Kim and a submission also dated 22 September 2025 from counsel for Respondent Insil Kim, both of which opposed the admission of the Paul Kim Declaration but stated that neither Respondent considered an additional hearing to be necessary.  The Tribunal also received a letter from the Claimant dated 3 October 2025, which urged that the Paul Kim Declaration be admitted.

63.     In Procedural Order No. 17 ("PO 17"), issued on 7 October 2025, the Tribunal admitted the Paul Kim Declaration and the other exhibits submitted with it and stated that no further evidentiary hearing was required.  The Tribunal also declined to invite the submission of the Claimant's additional witness statements.

64.     On 31 October 2025, the Parties submitted their respective applications for their costs in Phase Two.

**Closing of the Proceedings**

65.     By letter dated 1 May 2025, the ICC Court set 31 December 2025 as the time limit for the final award.

66.     On 25 November 2025, in accordance with Article 27 of the ICC Rules, the Tribunal declared the proceedings closed as to all matters to be decided in this Final Award.

22

### III.   FACTUAL BACKGROUND

#### A.   The Parties and Involved Persons

67.    The Parties are identified in paragraphs 53 through 56 of the Partial Award dated 21 May 2025.  Further background concerning the dealings among the Parties is provided at paragraphs 57 through 152 of the Partial Award.

68.    Sunna Kim resigned from her positions at The Crème Shop ("TCS") effective 6 October 2023.  Insil Kim's employment with TCS ended on the same day.

69.    Following the Tribunal's determination in the Partial Award that LG H&H's Call Option Notice dated 29 November 2023 was effective, the Parties completed the sale to the Claimant of the Respondents' remaining thirty-five (35%) interest in TCS on 6 August 2025, making LG H&H the sole owner of TCS after that date.[11]

70.    Before his resignation on 9 October 2023, Paul Kim was Head of Sales at TCS.[12] Following his resignation, Paul Kim began working as a Vice President at LPF Agency.[13]

71.    Seung Hye Seo is a certified public accountant ("CPA") serving numerous clients.[14]  Seung Hye Seo, in addition to performing accounting work for her clients, incorporates, invests in, and manages companies—some associated with her clients and others independently.[15]  Seung Hye Seo is a friend of Insil Kim and her husband, Lawrence Kim,[16] has acted as an accountant for companies controlled by the Respondents,[17] and manages money for some of the Kim family's companies.[18]

---

[11] CRPHB ¶ 86.
[12] P. Kim WS1 ¶ 4.
[13] P. Kim WS2 ¶ 4.
[14] Seo WS1 ¶ 4.
[15] Seo WS1 ¶ 5.
[16] Tr. Day 3 6:2-5.
[17] Tr. Day 3 5:22-25.
[18] Tr. Day 3 7:1-9.

72.      Peter Oh is a real estate agent who also, until 18 October 2024,[19] says that he owned Pureunbi Corporation ("Pureunbi") along with Jay Lee.[20] Peter Oh is a friend of Respondent Sunna Kim and had handled real estate transactions for TCS during the period when it was managed by Sunna Kim.[21]

73.      Jay Lee says that he is the President of Pureunbi.[22]  He has more than 34 years of experience in the cosmetics and beauty industry through his family's ownership of Célavi.[23] Jay Lee has known Insil Kim for many years.[24]  Sunna Kim states that she has only known Jay Lee since the end of 2023.[25]

74.      The Claimant asserts that, along with the entities described below, Paul Kim, Seung Hye Seo, Jay Lee, Peter Oh, Lawrence Kim, and Chris Yoon (Sunna Kim's husband) are "Affiliates" of the Respondents, as that term is defined in the SPA.[26]  The Respondents contend that, other than Lawrence Kim and Chris Yoon, who are married to Insil Kim and Sunna Kim respectively, these individuals are all independent third parties.[27]

**B.      The Crème Shop**

75.      Following Sunna Kim's resignation as TCS's Co-CEO on 6 October 2023, Dr. Hyeyoung Moon acted as the CEO of TCS until her own resignation on 31 May 2025.[28]  TCS is led currently by an interim general manager, Woo Young Jung.[29]

---

[19] *But see* Tr. Day 3 121:4-11 (Peter Oh testifying that he left Pureunbi two months after it was formed in November 2023).
[20] Oh WS1 ¶¶ 4-6; Tr. Day 3 99:17-19.
[21] Oh WS1 ¶ 5; S. Kim WS3 ¶ 5.
[22] J. Lee WS1 ¶ 4.
[23] J. Lee WS1 ¶ 5; Tr. Day 3 72:15-21.
[24] Tr. Day 3 87:14-88:1; S. Kim WS4 ¶ 13.
[25] Tr. Day 2 103:23-24.
[26] SOC ¶ 17.
[27] S. Kim SOD ¶ 9.
[28] Tr. Day 2 6:8-11, 7:16-24.
[29] Tr. Day 2 50:11-15.

24

76.     As of 6 August 2025, TCS is a wholly owned subsidiary of LG H&H.[30]

77.     Since Sunna Kim's resignation on 6 October 2023, TCS's performance has suffered.  In 2024, TCS's gross profits fell by 11.7% and net revenue was down over $13 million compared to 2023.[31]  In the first half of 2025, TCS significantly underperformed relative to financial expectations.[32]

78.     While the Claimant acknowledges that TCS's comparatively poor financial performance is in part attributable to Sunna Kim's departure, it alleges that her activities in competition with TCS and in breach of the non-compete provisions of the SPA contributed to and aggravated the decline in TCS's performance.[33]  The Respondents attribute TCS's poor results to LG H&H's mismanagement of the company after Sunna Kim's departure.[34]

**C.     The Share Purchase Agreement**

79.     The Share Purchase Agreement ("SPA") contains a non-competition covenant.[35] Section 4.7 of the SPA, titled "Non-Compete," reads in relevant part:

> (a)     Each Seller shall not, and shall cause her Affiliates not to, during the period commencing on the Closing Date and ending on the third anniversary of the date such Seller no longer owns any interest in the Company (the "Restricted Period"), without the prior written consent of the Purchaser, (i) as a partner, stockholder, proprietor, director, manager, member, executive, employee, consultant, joint venturer, investor or in any other capacity, engage in, or own, manage, operate or control, or participate in the ownership, management, operation or control of, any Person that engages ("engage in"), in any business which is directly or indirectly competitive with the business of the Company as then conducted or planned to be conducted as of the date such Seller no longer owns any interest in the Company (a "Competitor"), (ii) enter the employ of, or render any services to, any Competitor, (iii) acquire a direct, material financial interest in a Competitor, or (iv)

---

[30] CRPHB ¶ 86.
[31] Malkiewicz ER1 ¶ 51; McGahee ER1 Schedule 2.
[32] Tr. Day 2 6:12-23.
[33] H. Moon WS4 ¶¶ 3-6.
[34] I. Kim PHR ¶¶ 11-12; S. Kim SOD ¶ 67.
[35] Exh. C-1 at § 4.7.

interfere with business relationships (whether formed before or after the date hereof) between the Company, and distributors, customers, suppliers, partners, members or investor of the Company; provided, that, each Seller may acquire up to ten percent (10%) of any class of securities of any Competitor so long as such Person holds such securities as a passive investment and does not (x) take an active part in the management or direction of such company or (y) act as a Representative therefor or in any way render services thereto. . . .

(b)     During the Restricted Period, each Seller shall not, directly or indirectly, recruit, hire or otherwise solicit for employment of any director, officer or employee of the Company, or request or induce any director, officer or employee of the Company to terminate his or her employment with the Company; provided, however, that the foregoing restriction shall not be applicable to the solicitation or hiring of any such director, officer or employee (i) whose engagement or employment with the Company has been terminated, or (ii) who has otherwise resigned from the Company for more than (1) year prior to such solicitation or hiring; . . .

…

(d)     Each Seller agrees that the remedies at law for any breach or threat of breach of this Section 4.7 may be inadequate, and that the damages flowing from such breach may not be readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged and agreed that the Company or the Purchaser will be entitled to seek specific performance and injunctive and other equitable relief in case of any breach or attempted or threatened breach of this Section 4.7 by each Seller, or her Affiliates, successors and assigns and may seek any order restraining any threatened or further breach. Nothing in this Section 4.7 shall be deemed to limit the Company's or the Purchaser's remedies at law or in equity for any breach by any Seller, or her Affiliates, successors and assigns of any of the provisions of this Agreement that may be pursued or availed of by the Company or the Purchaser.[36]

The SPA's definition of "Affiliate" is quoted at paragraph 166 below.

---

[36] Exh. C-1 at § 4.7 (Share Purchase Agreement).

26

### D.    Paul Kim's Testimony

80.    Paul Kim was the Head of Sales at TCS until he resigned on 9 October 2023.[37] Following his resignation, he was paid briefly by an entity called Roli Consultancy and then worked at LPF Agency, where he was Vice President, from early 2024 until 3 January 2025.[38]

81.    Paul Kim submitted two witness statements in this arbitration, the first (Paul Kim WS1) dated 1 February 2024 and the second (Paul Kim WS2) dated 5 September 2024.  He testified at the Phase One hearing on 16 October 2024 and at the Phase Two hearing on 20 June 2025.[39]  He also appeared as a third-party witness in response to a subpoena at the hearing before Arbitrator Chernick on 3 February 2025.[40]

82.    On 29 August 2025, as an exhibit to its Phase Two post-hearing reply brief, the Claimant submitted as Exhibit C-699 a document headed "Declaration of Paul Jun Young Kim" and dated 28 August 2025, bearing the caption of *The Crème Shop, Inc. v. Sunna ("Olive") Kim et al.*, No. 23STCV27922 (Super. Ct. Cal. Cnty. Los Angeles) ("Paul Kim Declaration").  The Claimant described the origin of the Paul Kim Declaration as follows:

> After the Phase 2 hearing held in June, for the pending Los Angeles Superior Court action, Paul Kim has searched through his personal files, including his Google Drive, and produced several key documents—including the "LPF Planning Document" (C-702) about which Claimant's counsel questioned both Paul Kim and Olive Kim extensively at the hearing—that Respondents have deliberately withheld and attempted to destroy.  In the Los Angeles action, on August 28, 2025, Paul Kim executed and notarized under penalty of perjury his declaration—introduced herein as a new exhibit C-699—authenticating such "smoking gun" evidence and laying out the foundation based on his personal knowledge for their materiality to Respondents' breach of the non-compete provisions of the SPA.[41]

---

[37] Paul Kim WS1 ¶ 4.
[38] Paul Kim WS2 ¶ 4; Tr. Day 4 9:15-17.
[39] 16 October 2024 Tr. 144-165; Tr. Day 4 3-69.
[40] PO No. 9 ¶ 4.
[41] CRPHB ¶1 (footnotes omitted).  What was shown to Paul Kim at the Phase Two hearing was a one-page email from Paul Kim to Sunna Kim dated 29 August 2023 (Exh. C-543), with no attachment, showing as its subject "Spreadsheet shared with you: 'LPF Planning.'"  See Tr. Day 4 49.  The spreadsheet itself was not introduced into the record until it was submitted as Exhibit C-702 with the Paul Kim Declaration.

27

83.     Respondent Sunna Kim objects that "allowing Paul Kim's Declaration to be used for any purpose" is "prejudicial at this stage of the proceeding."  She comments that, although this "very suspect after-the-fact Declaration" is "captioned in case No. 23STCV27922 and dated August 28, 2025, it has not, as of this writing, actually been filed in that case."  She argues that, "[a]ccording to this new Declaration, Paul Kim was lying or not telling the entire truth and now accuses virtually every witness of lying, from [Sunna] Kim, to her parents, to Ms. [Seung Hye] Seo to Sun Je ["Jay"] Lee."  She contends that it "stands to reason" that Paul Kim "is getting something in return," and that promising him anything "in connection with his changed testimony" would be "a violation of California State Bar Rule 3.4(d)."  Although she urges the Tribunal to "reject the Paul Kim declaration entirely," she does "not think it is necessary" to hold an additional hearing.[42]

84.     Respondent Insil Kim agrees with Sunna Kim that the Claimant's contention that the Paul Kim Declaration "had been filed in a California State Court" is "not true; the document has not been filed in any State Court proceeding, and was only recently presented in another pending arbitration matter."  She argues that the Declaration is untimely and inadmissible, and that the "existence of this paid perjury is not enough as a matter of law to reopen this trial."[43]

85.     Sunna Kim "does not dispute authenticity" as to the exhibits to the Paul Kim Declaration, but states that "these exhibits break no new ground."  The LPF Planning document (Exh. C-702), which is one of those exhibits, is, she says, "from August 29, 2023 per its text and

---

[42] RAK letter to the Tribunal, 22 September 2025, pp. 1-3, 5.
[43] Supplemental Submission of Respondent Insil Kim, 22 September 2025, pp. 1, 3, 4.

the transmittal e-mail (Ex. I), before Olive Kim consulted with counsel, and thus not

inconsistent with her earlier testimony on this."[44]

86.     The Claimant responds to these objections as follows:

> Everything in Paul Kim's declaration amounts to rebuttal of Respondents'
> case and allegations, and the declaration does not contain any new
> argument.  Accordingly, the submission of such new evidence—e.g., C-
> 699, Paul Kim's declaration that he decided to write only days before
> Claimant's filing, as we understand, after several in-person (and one
> virtual) meetings he had with his counsel, Allyson Thompson, and TCS's
> counsel, Littler Mendelson (in which process Kim & Chang lawyers were
> not involved at all)—was not previously available, and, thus, its
> submission for the Tribunal's consideration is entirely proper and
> justified.[45]

> And there is absolutely no foundation for Respondents' assertion that Paul
> Kim was promised anything in exchange for his declaration—he was not.
> Rather, as previously explained, Paul Kim was compelled by his
> conscience to come clean about what he knows about Respondents'
> conduct and his dealings with them.[46]

87.     We will have occasion to return to the contradictions between Paul Kim's earlier

witness statements and hearing testimony and the Paul Kim Declaration in the course of this

Award.

**E.     LPF Agency**

88.     Seung Hye Seo incorporated LPF Corp. on 8 August 2023.[47]  RAK arranged for

the incorporation of a separate Delaware entity, LPF Agency, LLC, on 27 October 2023.[48]

These two entities outwardly appear to have operated as one and the same,[49] but the ownership

---

[44] RAK letter to the Tribunal, 22 September 2025, p. 4.  The LPF Planning Document is Exhibit C-702; the
transmittal email is Exhibit C-543.
[45] Email from counsel for the Claimant to the Tribunal, 5 September 2025.
[46] Letter from counsel for the Claimant to the Tribunal, 3 October 2025.
[47] Exh. C-369 (LPF Corp. Articles of Incorporation).
[48] Exh. C-560 (LPF Agency, LLC's Incorporation Information); Exh. C-524 (11 January 2024 RAK Invoice).
[49] *See, e.g.,* P. Kim WS2 ¶ 4 ("I started working at LPF Agency[.]"); Tr. Day 4 16:12-24 (Paul Kim testifying that it
was his understanding that "we operated under LPF Agency.  So my emails, business card, and how I presented
myself on my resume and to our business partners was as LPF Agency.  I think the entity was LPF Corp.").

of each and the relationship between them was never made clear.[50]  For the purposes of this

award, the two LPF entities are assumed to operate as one and will be referred to together as

"LPF Agency" throughout.  LPF Agency depicted itself as a consulting firm that provided

marketing and branding services for companies, although its only clients appear to have been

TOJI Co. ("TOJI") and Pureunbi.[51]

89.    Seung Hye Seo testified that she was the sole member and owner of LPF

Agency.[52]  The Claimant asserts that the Respondents were the true owners of LPF Agency.[53]

The Respondents contend that, while Sunna Kim at one point considered taking an ownership or

management role with LPF Agency, she ultimately determined not to do so in September or

October 2023.[54]  Paul Kim, who was a key LPF Agency employee, stated for the first time in

the Paul Kim Declaration that, while he understood that Seung Hye Seo was the owner of LPF

Agency, the business was directed by Sunna Kim.[55]  Paul Kim alleges in his Declaration that

Sunna Kim and her husband, Chris Yoon, used aliases to mask their involvement in LPF

Agency's daily operations.[56]

90.    On 29 August 2023, while both were still working at TCS, Paul Kim sent Sunna

Kim an email attaching a document titled "LPF – Planning."[57]  Paul Kim's Declaration refers to

this document (Exhibit I to his Declaration; submitted by the Claimant as Exhibit C-702) as the

---

[50] *See, e.g.,* Tr. Day 3 13:16-14:11 (Seung Hye Seo testifying first that she is the owner only of LPF Corp. and then testifying that she is the owner of both LPF Corp. and LPF Agency); Tr. Day 3 26:8-14 (Seung Hye Seo testifying that she incorporated LPF Corp., that LPF Corp. was the underlying entity behind the LPF Agency operation, but that LPF Agency, LLC "was entirely Paul [Kim]"); *see also* 3 February 2025 Hr'g Tr. 49:1-3 (Seung Hye Seo testifying that "all [she] did was to invest money, and Paul Kim said he would do everything, so [she] entrusted him with everything" at LPF Agency); Tr. Day 4 17:7-23 (Paul Kim testifying that he understood LPF Corp. was doing business as LPF Agency); Tr. Day 2 109:3-12.
[51] P. Kim WS2 ¶ 5.
[52] Seo WS1 ¶ 9 ("I am the sole member and owner of LPF Agency, LLC."); Tr. Day 3 14:9-11.
[53] CPHB ¶ 42.
[54] S. Kim WS4 ¶ 11; Tr. Day 1 179:24-180:2.
[55] Exh. C-699 at ¶ 62 (Paul Kim Declaration); *see also* Exh. C-702 (LPF Agency Planning Document).
[56] Exh. C-699 at ¶¶ 23-28.
[57] Exh. C-543 (29 August 2023 Email from Paul Kim to Sunna Kim).

30

"LPF-Planning document."  He asserts that he and Sunna Kim created this document and that it was meant to set out the actions necessary to form and begin operating LPF Agency, Pureunbi, and TOJI.[58]  Within the LPF-Planning document, Sunna Kim is identified as the "Owner" of various operative tasks, and both Sunna Kim and Insil Kim are listed as "Executives" on an organization chart.[59]  Sunna Kim testified that she did not open emails and that she had never seen the attachment.[60]

91.    LPF Agency was financed primarily through loans shown on its balance sheet as coming from a "Shareholder."[61]  The Claimant alleges that one or both of the Respondents were the "Shareholder" behind LPF Agency's finances.[62]  To support this allegation, the Claimant points to LPF Agency's general ledger from 30 November 2024, wherein a "Loan from Shar[eholder]" is documented in the amount of $27,590.30, and the name of the source of these funds is shown as "KIM."[63]  Seung Hye Seo testified that LPF Agency did not have a shareholder named Kim and that she was the source of all funds loaned to LPF Agency.[64]  LPF Agency also reported $1,000 worth of capital stock, which Seung Hye Seo asserts constituted her equity investment.[65]

92.    LPF Agency employed several former TCS employees, including Paul Kim, Helen Yang, Rachaelle Villa, Deisy Larios, and Pauline Contreras.[66]  Paul Kim alleges in his Declaration that Sunna Kim had instructed him to send offer letters to each of these TCS

---

[58] Exh. C-699 at ¶¶ 28-30 (Paul Kim Declaration); Exh. C-702 (LPF Agency Planning Document).
[59] Exh. C-702 (LPF Agency Planning Document).
[60] Tr. Day 1 188:2-23.  The LPF-Planning document itself (C-702) had not yet been put into the record at the time of the Phase Two hearing.  It was introduced along with the Paul Kim Declaration.
[61] Exh. C-613 (LPF Corp. Balance Sheet as of 30 November 2024).
[62] CPHB ¶ 42.
[63] Exh. C-614 (LPF Corp. General Ledger as of 30 November 2024).
[64] Tr. Day 3 17:6-8, 17:19-22.
[65] Tr. Day 3 14:22-16:4.
[66] Seo WS1 ¶ 9; Exh. C-570 (LPF Corp. Payroll History Report).

31

employees soliciting them to leave TCS to work for LPF Agency.[67]  Seung Hye Seo testified that LPF Agency's employees were paid out of the $3 million that Sceon LLC had borrowed from Insil and Lawrence Kim in January 2023.[68]  Paul Kim also alleges that Sunna Kim identified and arranged for physical sites where these LPF Agency employees worked.[69]

93.    Paul Kim says that, throughout its existence, LPF Agency only represented two companies—Pureunbi and TOJI.[70]  The Claimant alleges that LPF Agency is a competitor to TCS because it sold over $1.5 million worth of products to Ulta Beauty in 2024.[71]  These sales, it says, were separate and apart from any sales of products that Pureunbi made to Ulta Beauty in the same period.[72]

94.    On 27 December 2024, Paul Kim emailed an undisclosed list of recipients explaining that LPF Agency would be altering its structure to split its team amongst the different brands that the company worked with.[73]  On 30 December 2024, the Claimant served LPF Agency with a subpoena issued by the Tribunal in this Arbitration, calling for it to attend the 3 February 2025 hearing for the purpose of document production.[74]  Seung Hye Seo dissolved the California entity, LPF Corp., on 31 December 2024.[75]  The status of the Delaware entity, LPF Agency, LLC, remains unclear.  Paul Kim resigned from LPF Agency on 3 January 2025.[76]

---

[67] Exh. C-699 at ¶ 15 (Paul Kim Declaration).
[68] Tr. Day 3 26:15-27:20.
[69] Exh. C-699 at ¶¶ 36-39 (Paul Kim Declaration).
[70] Exh. C-699 at ¶ 49 (Paul Kim Declaration).
[71] CPHB ¶ 28; Exh. C-614 (LPF Corp. General Ledger); Tr. Day 3 55:6-13, 56:13-21.
[72] Tr. Day 3 56:3-21.
[73] Exh. C-659 (27 December 2024 Email from Paul Kim).
[74] Tr. Day 3 29:18-30:5.
[75] Exh. H-41 (LPF Corp. Certificate of Dissolution); S. Kim SOD ¶ 31.
[76] 3 February 2025 Hr'g Tr. 9:3-4.

95.    Paul Kim asserts in his Declaration that Sunna Kim informed him around the end

of 2024 that no information from LPF Agency computers would be produced in this Arbitration

and took other steps to prevent LPF Agency from producing responsive documents.[77]  Sunna

Kim's counsel states that "[Sunna] Kim denies spoliation or having instructed anyone to

spoliate evidence."[78]

### F.    Pureunbi and dearcloud

96.    Pureunbi was incorporated by Peter Oh, using the services of Seung Hye Seo, on

14 November 2023.[79]  Pureunbi's articles of incorporation list the address of Seung Hye Seo's

accounting business as its principal and mailing addresses.[80]

97.    Peter Oh and Jay Lee assert that they ran Pureunbi as a partnership until Peter

Oh's resignation on 18 October 2024.[81]  During that time, Jay Lee states that he was more

involved than Peter Oh in the day-to-day operations of Pureunbi;[82] Peter Oh's role was intended

to be drumming up business through connections with cosmetic companies in Asia.[83]  Paul Kim

signed brand licensing agreements for Pureunbi as a Vice President.[84]

98.    The Claimant asserts that the Respondents were, and to the extent it is still

operating are, the true owners and operators of Pureunbi.[85]  The Respondents assert that they

have had no interest in, or other involvement with, Pureunbi.[86]  Paul Kim's Declaration asserts

that, while Jay Lee was Pureunbi's owner "on 'paper,'" it was the LPF Agency team—including

---

[77] Exh. C-699 at ¶¶ 56, 60.
[78] RAK letter to the Tribunal, 22 September 2025, p. 4.
[79] Exh. C-241 (Pureunbi's Articles of Incorporation); Seo WS1 ¶ 7.
[80] Exh. C-241 (Pureunbi's Articles of Incorporation); Tr. Day 3 30:12-21.
[81] Tr. Day 3 99:17-19; *but see* Tr. Day 3 121:3-11 (Peter Oh testifying that "after two months I realized that I wasn't able to bring significant LOIs or MOUs to the table, so I decided to walk away").
[82] Tr. Day 3 117:17-20.
[83] Tr. Day 3 118:6-9.
[84] Exh. C-380 at 23 (Futurity Brands and Pureunbi Merchandising License Agreement).
[85] CPHB ¶¶ 40-41.
[86] S. Kim WS4 ¶ 21; Jay Lee WS1 ¶ 4; Tr. Day 1 174:1-12, 179:20-23; Tr. Day 3 71:5-8.

Sunna Kim—who "handled product development, marketing and sales on behalf of Pureunbi

Corp./Dearcloud."[87]

99.     Pureunbi was financed primarily through loans from two corporate entities

owned and controlled by Seung Hye Seo—Sceon LLC and Longevite Batiment.[88]  Together,

these two entities loaned Pureunbi over $2.77 million.[89]  Pureunbi maintained $1,000 worth of

capital stock, although it remains unclear who held Pureunbi's shares.[90]  Jay Lee testified that

he had invested approximately $300,000 in Pureunbi,[91] although no documentation supporting

this assertion was submitted to the Tribunal.

100.     The Claimant alleges that the Respondents were the source of funds for the loans

to Pureunbi from Sceon LLC and Longevite Batiment.[92]  On 4 January 2023, Insil Kim wrote a

check for $3 million to Sceon LLC.[93] Sceon LLC executed a promissory note to Insil Kim dated

6 January 2023, documenting the terms of a loan for $3 million which Sceon LLC was to repay

within 6 months.[94]  To date, Insil Kim has not been repaid.[95]  Insil and Lawrence Kim also

loaned Longevite Batiment approximately $2 to $2.5 million as a line of credit.[96]  To date, Insil

and Lawrence Kim's loan to Longevite Batiment has also not been repaid.[97]

---

[87] Exh. C-699 at ¶¶ 39, 46-47 (Paul Kim Declaration).
[88] Exh. C-348 (Pureunbi's Balance Sheet as of 31 December 2024); Tr. Day 2 178:18-179:3; Tr. Day 3 9:6-11, 41:16-18.
[89] Exh. C-348 (Pureunbi Balance Sheet as of 31 December 2024).
[90] Exh. C-348 (Pureunbi's Balance Sheet as of 31 December 2024); Tr. Day 3 111:13-22 (Jay Lee testifying that he is unaware of how the shares or equity of Pureunbi are distributed and that he thinks of himself as Pureunbi's owner because he is "the person who is actually working there, and working there as a CEO"); Tr. Day 3 120:13-23 (Peter Oh testifying that he did not know what happened to Pureunbi's shares and that he "was never issued any shares or anything" in Pureunbi).
[91] Tr. Day 3 89:21-90:18.
[92] SOC ¶ 66.
[93] Exh. C-484 (4 January 2023 Check from Insil Kim to Sceon LLC); Tr. Day 2 171:8-14.
[94] Exh. D-229 (6 January 2023 Promissory Note).
[95] Tr. Day 2 172:18-20; Tr. Day 3 35:15-36:9.
[96] Tr. Day 3 41:5-10, 45:11-18, 170:18-171:9; I. Kim WS4 ¶ 5; Exh. D-231 (Insil Kim Checking Transaction Request Form).
[97] Tr. Day 3 65:13-16.

101.    Seung Hye Seo testified to using Sceon LLC and Longevite Batiment to wire money to Pureunbi and LPF Agency,[98] among other entities.[99]  Seung Hye Seo said that Insil Kim was aware of these transactions,[100] but also testified that she had put approximately $100,000 of her own funds into Sceon LLC.[101]  Insil Kim maintains that she never instructed Seung Hye Seo to transfer money to Pureunbi.[102]

102.    Pureunbi owned and operated the dearcloud brand, a Korean beauty product brand that utilized licensing and social media marketing strategies similar to those of TCS.[103] Pureunbi also developed a high-end brand of cosmetics called Winsome[104] and another brand called PB&Jay.[105]

103.    dearcloud described itself as an Asian American and/or Pacific Islanders "team of beauty industry experts who joined forces to create intentional, research[]-backed wellness essentials composed of today's best-loved (and most effective) ingredients."[106]  dearcloud's products were sourced from South Korea and it advertised that its team had over thirty-five years of contract manufacturing experience within the Korean beauty industry.[107]  dearcloud also used the same customs and importing broker as TCS—Fleta CT Co.—with whom it was connected through Chris Yoon, Sunna Kim's husband.[108]

---

[98] Tr. Day 3 41:8-12, 44:18-22, 47:11-23; Exh. C-486 (5 April 2024 Check from Sceon LLC to Roli Consultancy); Exh. C-496 (24 April 2024 Check from Sceon LLC to TOJI); Exh. C-485 (5 April 2024 Check from Sceon LLC to Pureunbi); Exh. C-487 (25 April 2024 Check from Sceon LLC to Pureunbi); Exh. C-488 (26 April 2024 Check from Sceon LLC to Pureunbi); Exh. C-502 (13 June 2024 Check from Longevite Batiment to Pureunbi); C-504 (14 June 2024 Check from Longevite Batiment to Pureunbi).

[99] Tr. Day 3 47:11-23.

[100] I. Kim WS4 ¶ 5.

[101] Tr. Day 3 38:4-15.

[102] Tr. Day 2 176:5-8, 177:24-178:2, 214:10-21, 215:21-24; Tr. Day 3 57:25-58:2, 61:13-62:4, 176:12-177:1.

[103] Exh. C-239 (DEARCLOUD Trademark Status); Kaufman WS1 ¶¶ 13, 17.

[104] Exh. D-158 (Winsome Trademark Application); Tr. Day 4 45:14-15.

[105] Tr. Day 3 70:12-16.

[106] SOC ¶ 82.

[107] SOC ¶ 83.

[108] Exh. C-267 (Fleta C T Co. Import Records); Jay Lee WS1 ¶ 8.

35

104.     Pureunbi was a client of LPF Agency, although Paul Kim's Declaration states that he never saw any documentation of the relationship.[109]  Paul Kim testified that, through the LPF Agency connection, Sunna Kim provided feedback on dearcloud artwork and design ideas and assisted Paul Kim in making connections in the beauty industry.[110]  Paul Kim's Declaration asserts that Sunna Kim had told him that her lawyers at RAK had advised her that offering advice and helping out Pureunbi would not violate her non-compete obligation under the SPA.[111]

105.     The Claimant alleges that Pureunbi, through its operation of the dearcloud brand, was a "copycat" competitor to TCS, diverting TCS's business opportunities and producing near-identical products to TCS.[112]  Neither of the Respondents contests that Pureunbi, through its operation of the dearcloud brand, was a competitor to TCS.[113]

106.     On 31 May 2025, Jay Lee filed to dissolve Pureunbi,[114] citing its inability to continue operating in the face of this arbitration and other ongoing litigation.[115]  Before its dissolution, Pureunbi had generated approximately $4.2 million in sales through its brands, including dearcloud, but was ultimately operating at a loss.[116]  The Parties' experts agree that Pureunbi generated $886,152 in revenue in 2024 attributed to sales of dearcloud products.[117]  Jay Lee testified that dearcloud's sales in the first half of 2025 were approximately $2 million.[118]

---

[109] Tr. Day 4 30:16-21; *see* Exh. C-699 at ¶ 41 (Paul Kim Declaration).
[110] Tr. Day 4 34:1-21, 66:14-25.
[111] Exh. C-699 at ¶¶ 46-47 (Paul Kim Declaration).
[112] CPHB ¶ 27; Jaeran Lee WS1 ¶ 13; Kaufman WS1 ¶ 13.
[113] Respondents' Response to Application to Compel Production of Documents ¶ 9.
[114] Exh. D-235 (Pureunbi Certificate of Dissolution).
[115] Tr. Day 3 102:16-103:16.
[116] Tr. Day 3 69:25-70:22, 105:10-17.
[117] *See* Exh. C-395 (2024 Pureunbi Profit & Loss Sheet); Malkiewicz ER1 ¶ 68; McGahee ER1 ¶ 9(a).
[118] Tr. Day 3 105:18-25.

107.    Jay Lee testified that, as of 19 June 2025, he had not notified suppliers, retailers, or licensors that dearcloud had ceased operations and that he would make the decision of whether to sell or "kill" the dearcloud brand by July 2025.[119]  The Claimant alleges that Pureunbi's formal dissolution has not marked the end of the dearcloud brand's competition with TCS.  It contends that dearcloud's website remains live, that it continues to sell products through Amazon.com,[120] that Pureunbi continues to accept beauty product imports from its vendors,[121] that in June 2025 dearcloud posted on Instagram that it would be "posting soon,"[122] that in August 2025 dearcloud posted a Sales Representative job on a job board classified website,[123] and that dearcloud inventory at retailers continues to be available for sale at its regular prices.[124]

108.    Sunna Kim's counsel state that they have contacted counsel for Pureunbi and understand that Pureunbi is "engaged in an orderly dissolution and liquidation," that "[t]hey have been working to eliminate inventory," and that they "are nearly done."  Although Sunna Kim's counsel state that they understand that "Pureunbi is not continuing as a business and dearcloud is not continuing as a brand, other than the orderly dissolution of the company and its assets, which is nearly complete," they provided no documentary support for these understandings.[125]

---

[119] Tr. Day 3 108:12-23, 111:23-6.
[120] Exh. D-237 (dearcloud's Website as of June 2025); Exh. C-692 (Amazon Marketplace New Product Launch Database).
[121] Exh. C-684 (Import Genius Records).
[122] Exh. C-666 (dearcloud Instagram Comment from June 2025).
[123] Exh. C-689 (Indeed.com dearcloud Sales Representative Posting); Exh. C-690 (Indeed.com dearcloud Profile).
[124] Tr. Day 1 102:20-4; Tr. Day 4 95:13-25; Exh. C-695 (20 August 2025 Photos of dearcloud Product for sale at Ulta Beauty retail location); Exh. C-687 (Ulta Beauty website as of 29 August 2025 Exhibiting dearcloud Product).
[125] RAK letter to the Tribunal, 22 September 2025, p. 5.

### G.    TOJI Co.

109.    TOJI Co. ("TOJI") was incorporated by Seung Hye Seo on 8 August 2023 on Sunna Kim's behalf.[126]  TOJI's articles of incorporation list the address of Seung Hye Seo's accounting business as its principal and mailing addresses.[127]  A Delaware entity, TOJI Brands, LLC, was incorporated on 27 October 2023.[128]  The relationship between TOJI Co. and TOJI Brands, LLC is unclear.

110.    Sunna Kim owns and operates TOJI.[129]  TOJI sells beverages, including coffee, and related accessories and goods through the brands Okitoki and Clöud Café.[130]

111.    TOJI was said to be a client of LPF Agency, although Paul Kim says that he never saw formal documentation of that relationship.[131]  Paul Kim signed licensing agreements for TOJI as both Vice President and President.[132]

112.    The Claimant alleges that Sunna Kim established TOJI as a "façade" for her competing K-Beauty business.[133]  Sunna Kim asserts that TOJI was and is her sole current business venture and that its only business relationship with Pureunbi was that TOJI stored its products in Pureunbi's warehouse.[134]

### H.    Somi Inc.

113.    Somi Inc. was a placeholder name used by Sunna Kim and Paul Kim in licensor deal memos in 2023.[135]  Paul Kim testified that Somi Inc. was meant to be a "deal memo for

---

[126] Exh. C-225 (TOJI's Articles of Incorporation); Tr. Day 1 197:1-13.
[127] Exh. C-225 (TOJI's Articles of Incorporation).
[128] Exh. C-375 (Delaware Records Search for TOJI Brands, LLC).
[129] Tr. Day 1 197:5-6.
[130] S. Kim WS3 ¶ 9; Tr. Day 4 45:8-12.
[131] Tr. Day 4 30:16-21; *but see* Exh. C-699 at ¶ 41 (Paul Kim Declaration).
[132] Exh. C-322 at 12 (R&B Licensing and TOJI License Agreement); Exh. C-323 (Amended R&B Licensing and TOJI License Agreement).
[133] SOC ¶ 25.
[134] S. Kim WS4 ¶¶ 19-20.
[135] Tr. Day 4 31:18-21.

beauty products."[136] He identified Somi Inc. as a "sister brand" to TCS in email correspondence from September 2023.[137] He said that it was then anticipated that Somi Inc. would do business as Cloudberry.[138] Sunna Kim testified that Somi Inc. was Paul Kim's creation and she only supplied him with the idea for its name.[139] Paul Kim testified that he did not create Somi Inc.,[140] asserting instead that Sunna Kim created Somi Inc. to sell beauty products and stating in his Declaration that Sunna Kim had named the company after her daughter.[141]

114.    Somi Inc. was never incorporated and the entity never sold products.[142] Paul Kim sent numerous NDAs for Somi Inc. to licensors during September 2023 on Sunna Kim's behalf—before either he or Sunna Kim had resigned from TCS.[143] On 21 November 2023, Paul Kim emailed a licensor with whom he was negotiating for a license on behalf of Somi Inc. stating that he was "updat[ing] the brand names to what we've officially registered in California," and that Somi Inc. should be updated to Pureunbi Corp., and Cloudberry should be updated to dearcloud.[144]

115.    Paul Kim's Declaration asserts that Somi Inc. was the precursor to Pureunbi, and that the brand name Cloudberry was the precursor to dearcloud.[145] It adds that, in October 2023, RAK informed Paul Kim that Cloudberry could not be trademarked because it was the

---

[136] Tr. Day 4 32:25-33:1.
[137] Exh. C-257 (11 September 2023 Email from Paul Kim to VIZ Media); Exh. C-699 at ¶ 13 (Paul Kim Declaration).
[138] Exh. C-699 at ¶ 32 (Paul Kim Declaration).
[139] Tr. Day 1 181:9-20; Tr. Day 2 56:8-57:22.
[140] Tr. Day 4 32:6-14.
[141] Exh. C-699 at ¶ 12 (Paul Kim Declaration).
[142] Tr. Day 4 32:2-4, 65:23-66:6.
[143] Tr. Day 4 42:1-4; *see, e.g.,* Exh. C-255 (11 September 2023 NDA between Somi Inc. and VIZ Media LLC); Exh. C-507 (11 September 2023 Email from Paul Kim to Ari Gamshad attaching Somi Inc. NDA); Exh. C-258 (13 September 2023 NDA between Somi Inc. and Sanrio).
[144] Exh. C-507 at 19 (21 November 2023 Email from Paul Kim to Ari Gamshad).
[145] Exh. C-699 at ¶¶ 8(e), 18, 21, 32 (Paul Kim Declaration).

name of a fruit, so he suggested the new names Pureunbi and dearcloud to Sunna Kim, which she then approved.[146]

116.    The Respondents own another entity called Somi Sunday LLC, which was incorporated in early 2024 but does not maintain any active business.[147]

**I.        The Respondents' Actions Before Their Departure from The Crème Shop**

117.    Sunna Kim's submission of her "Good Reason" notices to LG H&H and TCS on 21 July and 7 August 2023, those companies' responses, and the Parties' subsequent actions leading up to Sunna Kim's resignation from TCS on 6 October 2023, are described in detail in paragraphs 127 through 143 of the Partial Award.  Before Sunna Kim's resignation from TCS on 6 October 2023, she worked as TCS's Co-CEO.[148]

118.    The Claimant alleges that Sunna Kim began planning her departure from TCS as early as March 2023, and that the Respondents' actions from that point forward were taken "considering [Sunna Kim's] next steps, following her planned premature departure from TCS."[149]  Sunna Kim contends that, while she did consult with legal and other advisers about exiting TCS before she submitted her "Good Reason" notices, she did not take any action to start a new company before 21 July 2023, and she has never competed with TCS.[150]

119.    The Claimant alleges that Sunna Kim took steps from March 2023 through October 2023 to lay the foundations for business ventures to compete with TCS, all while continuing to work for TCS.  The Claimant points to the following:

---

[146] Exh. C-699 at ¶¶ 33-34 (Paul Kim Declaration).
[147] S. Kim WS3 ¶ 11; Tr. Day 2 57:20-58:9.
[148] S. Kim WS1 ¶ 4.
[149] SOC ¶¶ 19-20.
[150] S. Kim SOD ¶ 7.

(a)    Sunna Kim and Paul Kim attended a 13 June 2023 licensing exposition where the two met with licensors of various cartoon characters and brands.[151]  The Claimant alleges that Sunna Kim and Paul Kim coopted their contacts and conversations at this licensing exposition to divert licensor business away from TCS and to Sunna Kim's projected new business ventures in the beauty space.[152]  Sunna Kim maintains that it was her regular practice at TCS to attend yearly licensing expositions in June, and that she would often take follow-up meetings with contacts made at those expositions.[153]  Paul Kim's Declaration now asserts that these follow-up meetings were meant to further the interests of LPF Agency, TOJI, and Somi Inc. (the predecessor in name to Pureunbi and dearcloud).[154]

(b)    Sunna Kim created (but withheld as privileged) a document titled "CONFIDENTIAL_2023.08.01_Olive_Business.docx" which she shared with Christine Shin at RAK on 1 August 2023.[155]

(c)    Paul Kim's email correspondence with Ulta Beauty in late August 2023 regarding unidentified, confidential new product launches in the beauty category.[156]  Sunna Kim explains that these emails were about TCS's development of a bath line.[157]

(d)    Sunna Kim and Paul Kim entered into multiple non-disclosure agreements ("NDA") with licensors on behalf of TOJI and Somi Inc. during August and

---

[151] Exh. C-357 (Paul Kim's 20 June 2023 Notes from the 13 June 2023 Licensing Exposition).
[152] SOC ¶ 21.
[153] S. Kim WS4 ¶ 3; S. Kim SOD ¶ 10.
[154] Exh. C-699 at ¶¶ 16-17 (Paul Kim Declaration).
[155] SOC ¶ 23.
[156] SOC ¶ 26; C-363.
[157] S. Kim SOD ¶ 11.

41

September 2023.[158]  Sunna Kim maintains that she was not involved with any Somi Inc. NDA.[159]  Sunna Kim also explains that TOJI never did business with these licensors nor did it pursue licenses with them with any seriousness.[160]  Paul Kim's Declaration now asserts that he entered into these agreements, on behalf of both Somi Inc. and TOJI, pursuant to Sunna Kim's instructions.[161]

(e)   Sunna Kim and Paul Kim's meetings and email exchanges with Sanrio during September 2023, wherein Sunna Kim and Paul Kim presented new opportunities facilitated through two "new entities"—TOJI and LPF Agency.[162]  TOJI sought to secure a license for products within the wellness and specialty beverage categories while Somi Inc. sought a license for products in the prestige bath/skincare category.[163]  Sunna Kim maintains that, while she was present at these meetings, she was only there to represent and pitch on behalf of her company, TOJI.[164]

120.   Concurrently, the Claimant alleges, Sunna Kim was establishing LPF Agency as her own business.  To support this assertion, the Claimant points to the following facts:

(a)   Seung Hye Seo incorporated both TOJI and LPF Corp. on 8 August 2023.[165]  The Respondents point out that in Korean culture the eighth day of the eighth

---

[158] *See, e.g.,* Exh. C-253 (28 August 2023 NDA between TOJI and Bandai); Exh. C-255 (11 September 2023 NDA between Somi Inc. and VIZ Media LLC); Exh. C-507 (11 September 2023 Email from Paul Kim to Ari Gamshad attaching Somi Inc. NDA); Exh. C-258 (13 September 2023 NDA between Somi Inc. and Sanrio); Exh. C-259 (13 September 2023 NDA between TOJI Co. and Sanrio); Tr. Day 4 42:1-8.
[159] Tr. Day 2 55:4-13.
[160] S. Kim WS4 ¶ 6.
[161] Exh. C-699 at ¶ 12 (Paul Kim Declaration).
[162] Exh. C-509 (20 September 2023 Sanrio Meeting Notes); Exh. C-511 (20 September 2023 LPF Agency Presentation Deck); Tr. Day 2 66:23-69:9.
[163] Exh. C-509 (20 September 2023 Sanrio Meeting Notes)
[164] Tr. Day 1 175:6-176:13; Tr. Day 2 65:16-66:18, 152:18-153:9.
[165] SOC ¶ 24.

month is an auspicious day representing luck and making money which made it a preferred day to start a business.[166]

(b)  Paul Kim emailed Sunna Kim the LPF-Planning document on 29 August 2023, while both still worked at TCS.[167]  The LPF-Planning document is a spreadsheet containing a timeline, an organization chart, and tabs headed "Licensing,' "TODO", "Assortments," "NDA," and "Buyer Meetings," with considerable detail under some of the tabs.[168]  For example, in the "Assortment" tab, under "Cloudberry Spa & Wellness" is a list of products that reads:

Jumbo Loofah - Duo
Exfoliating Towels
Brushes
Mirrors
Warmers
Cosmetics Bags/ Pouches
Brushes
Beauty Storage
Bandages
Candles
Essential Oils
Fragrances
Serum
Hair Clips
Razor Sets
Satin Pillowcase
Hair Turban
Nail File
Tongue Scraper
Body Sticker
Tattoos
Ice Bags
SPF
Glitter Multi-stick [169]

---

[166] S. Kim SOD ¶ 14; Tr. Day 3 58:25-59:13.
[167] Exh. C-543 (29 August 2023 Email from Paul Kim to Sunna Kim); Exh. C-702.
[168] Exh. C-702.
[169] Exh. C-702.

"Cloudberry" was the placeholder for what became Pureunbi's "dearcloud" brand.[170]

(c)    Paul Kim's Declaration asserts that he and Sunna Kim created the LPF-Panning document and that it was meant to set out the actions necessary to form and begin operating LPF Agency, Pureunbi, and TOJI.[171]

(d)    Sunna Kim altered an Outlook Calendar invitation to a prospective employee to reflect a recruiting call for a position with LPF Agency instead of TCS.[172]  Sunna Kim explains that the individual being interviewed would have been a "poor fit" at TCS because she wanted to work remotely.[173]  Paul Kim, in his Declaration, asserts that Sunna Kim directed him to meet with this prospective employee on behalf of LPF Agency.[174]

(e)    Sunna Kim registered the internet domain name www.lpfagency.com on the same day that she registered www.tojibrands.com.[175]  Registering these internet domains was listed in the "TODO" tab of the LPF-Planning document.[176]  Sunna Kim admits that she may have assisted Seung Hye Seo in setting up a domain name for LPF Agency but that she does not recall doing so.[177]

(f)    Sunna Kim had an LPF Agency email address and Paul Kim stated in his Declaration that Sunna Kim provided him with his LPF Agency email address.[178]

---

[170] Exh. C-507; Exh. C-699 at ¶¶ 8(e), 18, 21, 32 (Paul Kim Declaration).

[171] Exh. C-699 at ¶¶ 28-30 (Paul Kim Declaration); Exh. C-702 (LPF Agency Planning Document).

[172] SOC ¶ 34; *compare* Exh. C-263 (17 August 2023 TCS Calendar Invitation to Jenna Martin) *with* Exh. C-264 (8 September 2023 LPF Agency Calendar Invitation to Jenna Martin).

[173] S. Kim SOD ¶ 23.

[174] Exh. C-699 at ¶ 15 (Paul Kim Declaration).

[175] SOC ¶ 35; Exh. C-370 (WHOIS Domain Search for "lpfagency.com"); Exh. C-371 (WHOIS Domain Search for "tojibrands.com").

[176] C-702.

[177] S. Kim WS4 ¶ 10.

[178] S. Kim WS4 ¶ 9; Tr. Day 4 51:5-20; Exh. C-699 at ¶ 12 (Paul Kim Declaration).

Sunna Kim asserts that she received her own address while considering whether to take an active role in LPF Agency.[179]

(g)    On 19 September 2023, Sunna Kim, her husband Chris Yoon, Paul Kim and others were scheduled to attend a "NetSuite/Oracle x LPF Agency Walk Through" meeting.[180] Sunna Kim maintains that, until September or early October 2023, she was considering taking an ownership or management role with LPF Agency but that she ultimately determined not to do so.[181]

121.    Paul Kim alleges in his Declaration that his and Sunna Kim's actions taken before Sunna Kim's departure from TCS were done to advance the Respondents' interests in TOJI, LPF Agency, and what would become the dearcloud brand, through which Sunna Kim intended to compete with TCS.[182]

122.    The Claimant contends that Sunna Kim, having taken these steps, was ready to begin operating a competing K-Beauty business immediately after her resignation from TCS on 6 October 2023.[183] Sunna Kim maintains that she has and has had no connection to any competing venture and that she was entitled to take steps to begin her new beverage and consumables business, TOJI.[184]

123.    The Claimant also alleges that Sunna Kim acted to frustrate TCS's future performance before her departure from the Company, including:

(a)    The Claimant alleges that Sunna Kim deleted "much of TCS's influencer contact list," hampering TCS's ability to seed products with influencers and disrupting

---

[179] S. Kim WS4 ¶ 9.
[180] SOC ¶ 36; Exh. C-324 (19 September 2023 NetSuite/Oracle x LPF Walk Through Invitation).
[181] S. Kim WS4 ¶¶ 8, 11.
[182] Exh. C-699 at ¶¶ 13, 16-17 (Paul Kim Declaration).
[183] SOC ¶ 38.
[184] S. Kim WS4 ¶¶ 11, 14, 19, 21-23.

its social media marketing strategy.[185]  Sunna Kim denies that she deleted any
influencer contacts.[186]

(b)    Paul Kim asserts in his Declaration that Sunna Kim instructed him and other
TCS employees to save retail contact information and design and marketing
materials they had worked on while at TCS to then capitalize on those materials
after leaving TCS for LPF Agency.[187]

(c)    At a meeting in September 2023, Sunna Kim asked Sanrio to extend its existing
licensing agreement with TCS by one quarter in order to complete an audit.  Paul
Kim's Declaration asserts that Sunna Kim intended for this to result in TCS's
licensing agreement with Sanrio not being renewed for another full year.[188]

(d)    Dr. Hyeyoung Moon testified that Sunna Kim failed to develop new product
lines for major retailers in 2023.[189]  Sunna Kim contradicted that testimony and
said that she left TCS in possession of more than a year's worth of new product
designs, which (she argues) explains why TCS began to underperform only in
the second or third quarter of 2024.[190]

**J.     The Respondents' Involvement with LPF Agency After Sunna Kim's
        Resignation from TCS**

124.    The Claimant alleges that, after Sunna Kim's resignation from TCS on 6 October
2023, she began operating her competing businesses immediately.[191]  Indeed, the Claimant
alleges, Sunna Kim needed to capitalize on her skills and market contacts which would

---

[185] Kaufman WS1 ¶ 18; Tr. Day 1 161:24-162:15.
[186] Tr. Day 1 174:13-19.
[187] Exh. C-699 at ¶¶ 50-51 (Paul Kim Declaration).
[188] Exh. C-699 at ¶ 22 (Paul Kim Declaration).
[189] Tr. Day 2 47:1-14.
[190] Tr. Day 2 141:13-142:2.
[191] SOC ¶ 44.

otherwise have "grown stale" if she had complied with her non-compete obligations.[192] Accordingly, the Claimant alleges, Sunna Kim owned and operated LPF Agency from its inception and intended to compete with TCS through it.[193]

125.    Sunna Kim states that she considered taking an active role with LPF Agency in August and September 2023, but that, by the time she resigned from TCS on Friday, 6 October 2023, she had made the decision not to assume any role with LPF Agency out of concern for "keeping her distance from any participation in the cosmetics business."[194]  During the period when she was considering joining LPF Agency, Sunna Kim says, she received an LPF Agency email address, assisted Seung Hye Seo in registering LPF Agency's domain name, and connected a potential employee to LPF Agency.[195]  After this, she says, her connections to LPF Agency were limited to her company TOJI being an LPF Agency client and that she was friends with multiple LPF Agency employees.[196]

126.    On Monday, 9 October 2023, three days after Sunna Kim's departure from TCS, Paul Kim, Helen Yang, Rachaelle Villa, Deisy Larios, and Pauline Contreras, all resigned from TCS.[197]  Paul Kim's Declaration asserts that Sunna Kim offered him a job at LPF Agency in early October 2023.[198]  Paul Kim's Declaration also asserts that Sunna Kim instructed him to solicit each of these other employees to abandon TCS to work for LPF Agency.[199]  The Respondents maintain that they did not solicit any TCS employees to resign, but that instead all

---

[192] SOC ¶ 46.
[193] SOC ¶ 41.
[194] S. Kim WS4 ¶¶ 8, 11; S. Kim SOD ¶ 25.
[195] S. Kim WS4 ¶¶ 9-10.
[196] S. Kim WS4 ¶ 11.
[197] SOC ¶ 40.
[198] Exh. C-699 at ¶ 14 (Paul Kim Declaration).
[199] Exh. C-699 at ¶ 15 (Paul Kim Declaration).

of these employees resigned from TCS of their own volition.[200]  At some point after their resignations, each of these individuals came to work for LPF Agency.[201]

127.    Following Paul Kim's resignation from TCS, Sunna Kim connected Paul Kim with an entity called Roli Consultancy, which paid Paul Kim a salary from October 2023 until early 2024, when he was formally employed by LPF Agency.[202]  Paul Kim's Declaration states that Sunna Kim directed that Paul Kim be designated as the CEO, CFO, and Secretary of Roli Consultancy,[203] although he testified that he was unaware of these designations.[204]  Paul Kim's Declaration states that, while he was employed by Roli Consultancy, Chris Yoon (Sunna Kim's husband) and Insil Kim occasionally directed him to sign various checks on behalf of Roli Consultancy.[205]  Sunna Kim testified that she was unfamiliar with Roli Consultancy and the relationship Paul Kim and others had with it.[206]

128.    On 24 October 2023, Sunna Kim and Paul Kim pitched the Pureunbi, LPF Agency, and TOJI brands to Sanrio.[207]  Sunna Kim maintains that Paul Kim presented the portions of the pitch related to Pureunbi's (or its predecessor in name, Somi Inc.'s) cosmetic products, while she was there only to present the coffee, candy, and gummy products sold by TOJI.[208]  The Claimant alleges that this meeting, and other meetings with Futurity Brands, Miffy, Bandai Namco Entertainment, VIZ Media, and Artestar, constituted attempts by Sunna

---

[200] Respondents' Phase 1 SOD ¶ 160; S. Kim WS4 ¶ 12; Tr. Day 2 101:20-25.
[201] Exh. C-570 (LPF Corp. Payroll History Report).
[202] Tr. Day 4 9:23-10:4, 29:18-24, 62:3-22.
[203] Exh. C-558 (Roli Consultancy Statement of Information); Exh. C-699 at ¶ 52 (Paul Kim Declaration).
[204] Tr. Day 4 12:12-18, 13:2-7.
[205] Tr. Day 4 13:17-15:6; Exh. C-699 at ¶ 52 (Paul Kim Declaration).
[206] Tr. Day 2 111:20-113:20.
[207] Exh. C-515 (24 October 2023 Email from Yuri Sin to Paul Kim); Tr. Day 4 43:6-21; Exh. C-514 (14 December 2023 LPF Agency Pitch Deck); Exh. C-699 at ¶ 16-22 (Paul Kim Declaration).
[208] Tr. Day 2 79:18-80:7.

Kim to promote LPF Agency and Pureunbi (or its predecessor in name, Somi Inc.) and to
interfere with TCS's relationships with licensors and retailers.[209]

129.    The Claimant attributes numerous acts of Paul Kim at LPF Agency to Sunna
Kim, alleging that Paul Kim was Sunna Kim's "primary agent" and that Sunna Kim was calling
the shots and thus engaging in competition with TCS through LPF Agency.[210]  Sunna Kim
asserts that Paul Kim's work with LPF Agency, other than work done on behalf of her company
TOJI, was solely directed by Seung Hye Seo.[211]

130.    It is on this point that Paul Kim's evidence is the most contradictory.  At the
Phase Two hearing on 20 June 2025, he testified as follows:

> Q. Did Sunna Kim ever instruct you in your work for Pureunbi?
> A. Not that I remember.
> Q. To your knowledge, did Sunna Kim have any role in the operations of
> Pureunbi?
> A. Not to my knowledge.
> Q. What about her parents?
> A. Not to my knowledge.
> Q. To your knowledge, was Sunna Kim an owner of Pureunbi?
> A. Not to my knowledge.
> Q. What about her parents?
> A. Not to my knowledge.
> Q. To your knowledge, was Sunna Kim an owner of LPF?
> A. Not to my knowledge.
> Q. What about her parents?
> A. Not to my knowledge.[212]
>
> * * *
>
> THE PRESIDENT: You were Vice President of LPF, is that right?
> A. Yes.
> THE PRESIDENT: Who did you report to?
> A. Mrs[. Seung Hye] Seo.

---

[209] CPHB ¶¶ 58-59.  The Claimant takes particular issue with Paul Kim's characterization of TCS's management
after Sunna Kim's departure, wherein he describes his concerns to Sanrio that TCS's then-current management
consists of "mainly middle-aged corporate guys from the Korean HQ with no knowledge/experience in beauty."
Exh. C-575 (13 February 2024 Email from Paul Kim to Craig Takiguchi).
[210] SOC ¶¶ 48-50
[211] S. Kim PHR ¶ 22; Tr. Day 4 33:17-25.
[212] Tr. Day 4 4:2-19.

49

THE PRESIDENT: Did you get direction from anybody else about the business of LPF?
A.  Yes. From her brands, it was from Olive Kim.[213]

* * *

THE PRESIDENT: Did she give you any direction concerning dearcloud or Pureunbi?
A.      Not that I remember.[214]

131.    In his Declaration of 28 August 2025, however, Paul Kim alleges that any discussion or presentation he made on behalf of Pureunbi and/or LPF Agency was done at Sunna Kim's instruction and was subject to her approval.[215]  His Declaration states:

> Apart from coming into the Lpf Corp. offices (located at 3470 Wilshire Blvd., Suite 1022, Los Angeles, CA 90010) once a week, Ms. [Seung Hye] Seo did nothing to operate Lpf Corp. or any of the other New Formed Businesses.  Rather, the Newly Formed Businesses have always been directed by Olive Kim.  While I was given the title of VP, I worked under the overall direction of Olive Kim.[216]
>
> Ms. Seo knew that I had very little control over the business dealings of Lpf Corp. or any other businesses being run by the Kim Family, namely Olive Kim. . . .  Again, Ms. Seo knows that it was Olive Kim who was controlling the operations of Lpf Corp., and its two clients, Pureunbi and Toji. . . .  While I was not involved in the corporate formalities of creating Lpf Corp., and I don't know what interests Ms. Seo received for her work on helping to form Lpf Corp., Olive Kim was directing and participating in the operations of Lpf Corp. and Toji and Pureunbi Corp.[217]

132.    On November 10, 2023, Sunna Kim sent an email to herself attaching the California State Certificates of Good Standing for both TOJI and LPF Corp.[218]  Sunna Kim testified that this email was likely the result of her needing the Certificate of Good Standing for

---

[213] Tr. Day 4 33:17-25.
[214] Tr. Day 4 34:12-14.
[215] Exh. C-699 at ¶¶ 11, 16-22 (Paul Kim Declaration).
[216] Exh. C-699 at ¶ 62 (Paul Kim Declaration).  Paul Kim's Declaration defines the "Newly Formed Businesses" as "Lpf Corp., Somi Sunday LLC (sometimes, also referred to as Somi Inc.), Roli Consultancy, Toji Co., and Pureunbi Corp." *Id.* at ¶ 5.
[217] Exh. C-699 at ¶ 63 (Paul Kim Declaration).
[218] Exh. C-376 (11 November 2023 Email from Sunna Kim to her TOJI email address).

TOJI and that the LPF Corp. Certificate happened to be an attachment to the same original email.[219]

133.    At a meeting with Adam Kroeger of Walgreens in late 2023, Sunna Kim says that she introduced Paul Kim and LPF Agency as her broker and discussed getting TOJI products into Walgreens.[220]  Paul Kim asserts in his Declaration that during this meeting Sunna Kim sought to have Walgreens carry dearcloud products.[221]  Dr. Hyeyoung Moon also testified that, during a meeting she had with Adam Kroeger, he informed her that Sunna Kim and Paul Kim had pitched the dearcloud brand to Walgreens' skincare buyer.[222]  Sunna Kim asserts that Dr. Moon's testimony was false.[223]

134.    On 14 December 2023, after an introduction from Sunna Kim, Paul Kim sent Sanrio an email, with a copy to Sunna Kim, attaching a pitch deck for LPF Agency introducing the brands LPF Agency represented.[224]  The pitch deck presents LPF Agency as a "brand incubator" and "all-inclusive business agency designed to establish and service exclusive consumer brands," says that LPF was "[f]ounded in 2023 by the winning core team at The Crème Shop," and introduces Sunna Kim's dogs as the company's mascots.[225]  Paul Kim's Declaration asserts that this pitch deck, and all others developed by him and others at LPF Agency, was reviewed, edited, and approved by Sunna Kim.[226]  Sunna Kim says that she played no role in creating this pitch deck or presenting any portions of it unrelated to TOJI, and that all communications she had related to or with Sanrio were aimed at obtaining a license for TOJI.[227]

---

[219] Tr. Day 1 203:2-12.
[220] Tr. Day 2 93:25-94:22; Exh. C-521 (November 2023 Email Chain between Walgreens and Paul Kim).
[221] Exh. C-699 at ¶ 21 (Paul Kim Declaration).
[222] Tr. Day 2 17:1-10, 35:18-36:16.
[223] Tr. Day 2 139:17-140:17.
[224] Exh. C-513 (14 December 2023 Emails between Sunna Kim, Craig Takiguchi, and Paul Kim).
[225] Exh. C-514 at 1-4 (14 December 2023 LPF Agency Pitch Deck); Tr. Day 2 76:5-13.
[226] Exh. C-699 at ¶¶ 17-19 (Paul Kim Declaration).
[227] Tr. Day 2 76:17-21, 79:18-80:7, 92:2-9.

135.    On 9 February 2024, Insil Kim approved an LPF Agency Reimbursement Form submitted by Paul Kim which included charges for team lunches, movie nights, monthly phone and internet bills, other service bills, and the purchase of beauty accessory samples.[228]  Insil Kim testified that these expenses were related to the Respondents' marketing of TOJI products and that she did not generally control LPF Agency's finances.[229]

136.    LPF Agency employees used Sunna Kim's personal Visa card to pay for expenses that the Claimant alleges were tied to the operation of the dearcloud brand.[230]  Sunna Kim referred to this credit card as the "green card,"[231] which LPF Agency employees also reference in multiple communications regarding payments to vendors and suppliers.[232]  The Respondents maintain that Sunna Kim's personal credit card was only available to LPF Agency employees for purchases related to operating the TOJI brand.[233]  Paul Kim's Declaration says that LPF Agency's employees often paid for LPF Agency's, Pureunbi's, and TOJI's expenses with their own credit cards and were then reimbursed.[234]  It says that Insil Kim later provided LPF Agency employees with "silver credit cards" to pay for LPF Agency and Pureunbi expenses.[235]

137.    In April or May 2024, LPF Agency prepared a pitch deck for the dearcloud, Okitoki, Clöud Café, and Winsome brands.[236]  In this pitch deck, LPF Agency mixed pictures of

---

[228] Exh. C-518 (9 February 2024 LPF Agency Reimbursement Form); Tr. Day 2 195:19-196:11; *see also* Exh. C-517 (10 March 2024 LPF Agency Reimbursement Form).

[229] Tr. Day 2 196:23-197:18; I. Kim PHB ¶ 67.

[230] Tr. Day 2 117:4-11; Exh. C-601 (24 October 2024 Email from Amy Cha to finance@lpfagency.com); Exh. C-578 (19 June 2024 Email from Paul Kim to Steven Koo).

[231] Tr. Day 2 119:19-21.

[232] Exh. C-600 (18 October 2024 Email from Helen Yang); Exh. C-579 (2 July 2024 Email from Helen Yang); Exh. C-591 (30 August 2024 Emails between Paul Kim and Steven Koo).

[233] Tr. Day 2 117:9-13, 119:6-11; S. Kim PHB ¶ 37.

[234] Exh. C-699 at ¶ 53 (Paul Kim Declaration).

[235] Exh. C-699 at ¶ 53 (Paul Kim Declaration); Tr. Day 2 120:7-11.

[236] 3 February 2025 Hr'g Tr. 28:3-4.

TCS's products and marketing materials that the LPF Agency team claimed responsibility for having developed with pictures of dearcloud's own product line.  One slide described TCS's "New Strategy w/ New Management" as "Off-Price."[237]  The pitch deck noted that the presentation itself was the property of LPF Agency, TOJI, and Pureunbi.[238]  The Claimant alleges that this pitch deck demonstrates that Pureunbi and TOJI were not merely two clients of LPF Agency's, among others, but instead that the three businesses—LPF Agency, TOJI, and Pureunbi—operated as one entity under the Respondents' common control.[239]

138.    In addition, the Claimant alleges that the lack of familiarity with LPF Agency's business shown by Seung Hye Seo—LPF Agency's purported owner—is itself evidence that the Respondents were secretly managing and directing LPF Agency's competition with TCS.[240] The Claimant points to the facts that Seung Hye Seo could only recall the names of two of LPF Agency's seventeen employees,[241] that she admitted that LPF Agency was entirely run by Paul Kim,[242] and that she was unable to distinguish between LPF Corp.—the California entity—and LPF Agency, LLC—the Delaware entity.[243]  The Claimant also points to the discrepancy between Seung Hye Seo's testimony that she personally put more than $2 million into LPF Agency and the LPF Corp. entity's general ledger, which reflects equity of just $1,000.[244]  In his Declaration, Paul Kim asserts he never observed Seung Hye Seo directing any of LPF Agency's operations.[245]

---

[237] Exh. C-310 at 10 (LPF Agency PowerPoint Presentation).
[238] Exh. C-310 (LPF Agency PowerPoint Presentation).
[239] SOC ¶ 58.
[240] CPHB ¶ 37.
[241] Tr. Day 3 28:4-13.
[242] 3 February 2025 Hr'g Tr. 45:7-16.
[243] Tr. Day 3 26:8-14.
[244] *Compare* Tr. Day 3 14:20-24 *with* Exh. C-614 (LPF Corp. General Ledger).
[245] Exh. C-699 at ¶¶ 40, 62 (Paul Kim Declaration).

K.    **The Respondents' Involvement with Pureunbi and dearcloud After Sunna
Kim's Resignation from TCS**

139.    In late 2023, Jay Lee approached Sunna Kim to request her assistance with

Pureunbi.[246]  Sunna Kim asserts that she declined this request, but recommended Paul Kim and

LPF Agency's services to Jay Lee.[247]

**Trade Show Attendance**

140.    On 15 February 2024, Paul Kim asked Jay Lee for Pureunbi's retailer

identification information in order to arrange for attendance at a trade show after a "discuss[ion]

with the Kims yesterday."[248]  The Claimant contends that this is a reference to the Respondents

and demonstrates their control over both Paul Kim and Pureunbi.[249]  The Respondents contend

that Paul Kim attended this trade show on behalf of multiple clients, including TOJI, and that

this email represented Paul Kim's attempt to get different clients to pay for different aspects of

his attendance at the trade show.[250]  Jay Lee testified that the Kims had needed a retail license

and asked if he could help so he obtained a license for them from a friend.[251]

**Banking Transactions**

141.    In April, May and again in August of 2024, Steven Koo, who signed himself

sometimes as "Accountant" and sometimes as "Finance Manager & Executive Secretary" at

LPF Agency,[252] emailed PCB Bank requesting information about checks signed by Pureunbi.[253]

PCB Bank's representative responded to the first of these that Koo needed to "please CC the

---

[246] Tr. Day 2 104:16-105:18; Tr. Day 3 71:14-20.
[247] S. Kim WS3 ¶ 6; Tr. Day 3 71:21-23.
[248] Exh. C-328 (15 February 2024 Email from Paul Kim to Jay Lee).
[249] SOC ¶ 55.
[250] S. Kim SOD ¶ 44.
[251] Tr. Day 3 104:14-23.
[252] Exhs. C-499, C-500, C-505; *see* Tr. Day 2 118:6-13.
[253] *See also* Exh. C-500 (1 May 2024 Email from Steven Koo to PCB Bank Copying Insil Kim); Exh. C-505 (26
August 2024 Email from Steven Koo to PCB Bank Copying Insil Kim).

Madame Insil Kim or CPA Seung Hye Seo when sending emails."[254] Insil Kim also received and responded to emails directly from PCB Bank regarding wire payments made by Pureunbi.[255] Insil Kim maintains that she was often copied on emails related to the funds that Seung Hye Seo was managing for her.[256] Paul Kim asserts in his Declaration that, while Insil Kim was not involved in the day-to-day operations of Pureunbi, she did often deal with Jay Lee and Steven Koo regarding Pureunbi's finances.[257]

142.    In another email exchange from June 2024, Steven Koo sent an email to Insil Kim and the "payroll" and "accounting" email addresses at "@seoncompany.com" (Mrs. Seo's accounting firm), asking that funds be sent to a vendor.[258] The response from the "accounting" address was:

> We have not been able to even apply for the remittance yet due to insufficient funds in the PUREUNBI account at the moment. We are waiting for Ms. Insil Kim's response.

The same sender later added that, "Ms. Insil Kim has already submitted a wire application for $36193.50."[259] The Claimant alleges that these emails demonstrate Insil Kim's financial control over Pureunbi.[260]

143.    In apparent reference to these emails, Insil Kim testified at the Phase Two hearing as follows:

> Q. Have you ever participated in any way in Pureunbi's business?
> A. No.
> Q. Have you ever personally directed that money be transferred to Pureunbi?

---

[254] Exh. C-499 (26 April 2024 Emails between Steven Koo and PCB Bank).
[255] Exh. C-494 (21 March 2024 Email from PCB Bank to Insil Kim); Exh. C-495 (22 March 2024 Email from Insil Kim to PCB Bank).
[256] I. Kim WS4 ¶ 11; Tr. Day 2 181:13-23.
[257] Exh. C-699 at ¶ 40 (Paul Kim Declaration).
[258] Exh. C-504 (June 2024 Emails between Steven Koo and accounting@seoncompany.com).
[259] *Id*.
[260] CPHB ¶¶ 43-44.

A. No, I have not.

\* \* \*

Q. Do you have access to any of Pureunbi's bank accounts?
A. No.

\* \* \*

Q. So, you do recognize that there are documents that show that you transferred money on Pureunbi's behalf, correct, to vendors thereof?
A. Yes, I saw that.
Q. At the time you made those transfers, were you aware what business Pureunbi was in?
A. No, I did not.[261]

### Warehouse Rental

144.    In early 2024, Jay Lee began looking for a warehouse to lease for Pureunbi.[262] Lawrence Kim introduced Jay Lee to Moon Lim, a commercial real estate broker, to assist in locating an appropriate warehouse space.[263]  During May 2024, Moon Lim negotiated a lease on Pureunbi's behalf for a warehouse in Pico Rivera, California.[264]  In emails exchanged with the landlord's representative, Moon Lim described Pureunbi as a "cosmetic importer" and provided a schedule of real estate owned by Pureunbi's "major investor . . . [who has] decades of experience running cosmetic businesses."[265]  The schedule of properties attached included properties at 738 S. Normandie Avenue and 689 S. Catalina Street, Los Angeles, and 525 W. La Palma Avenue, Anaheim, California.[266]  Some percentage of each property was owned by Insil Kim and her husband, Lawrence Kim.[267]

---

[261] I. Kim PHR ¶ 74; Tr. Day 2 214:7-12, 214:19-21, 216:3-10.
[262] Tr. Day 3 81:22-82:5.
[263] Tr. Day 3 75:1-76:5, 167:15-20; M. Lim WS1 ¶ 5.
[264] Tr. Day 3 127:10-16.
[265] Exh. C-377 at 4 (9 May 2024 Email from Moon Lim to Kevin Romano).
[266] Exh. C-377 at 4 (9 May 2024 Email from Moon Lim to Kevin Romano).
[267] Tr. Day 2 204:25-205:12; Exh. C-252 (Excel File Exhibiting Theol LLC Holdings).

145.     In later emails, Moon Lim explained that the guarantor had decided to provide a personal guaranty and again attached a schedule of the properties listed above.[268] On a 14 May 2024 non-binding counter-proposal for a lease of the warehouse space, Moon Lim listed Insil Kim as a guarantor of the lease in her individual capacity.[269] Moon Lim explained that he had mistakenly believed Lawrence Kim was an investor in Pureunbi and so included this information erroneously of his own volition, without the direction or approval of the Respondents or Lawrence Kim.[270] Insil Kim denies that she ever agreed to provide a personal guaranty in connection with Pureunbi's lease of this property and testified that she is unaware why her name would have ever appeared in these lease-related documents.[271]

146.     Also in early 2024, Insil Kim informed Jay Lee that TOJI needed warehouse space.[272] On 25 July 2024, Pureunbi and Talo LLC, an entity owned by Insil and Lawrence Kim,[273] entered into a third-party logistics agreement ("3PL Agreement").[274] Under the 3PL Agreement, Talo LLC was to pay Pureunbi $15,000 per month for 36 months for services including the receipt, storage, and shipment of TOJI products.[275] Jay Lee testified that he believed these discussions and the 3PL Agreement only involved Lawrence Kim, not Insil or Sunna Kim.[276]

147.     On 29 July 2024, Pureunbi and Bristol Kirshner Investment Company executed a lease agreement for the Pico Rivera warehouse.[277] Under the terms of the lease agreement,

---

[268] Exh. C-377 at 2 (14 May 2024 Email from Moon Lim to Kevin Romano).
[269] Exh. C-379 (14 May 2024 Non-binding Lease Counterproposal).
[270] Tr. Day 3 129:6-130:16, 132:7-133:6, 137:8-138:13.
[271] Tr. Day 2 204:1-13.
[272] Tr. Day 3 82:10-17; Exh. C-632 at 5 (Joint Statement Filed by Pureunbi and Jay Lee in Different Action).
[273] Tr. Day 2 129:20-130:4.
[274] Exh. D-232 (3PL Agreement between Talo LLC and Pureunbi).
[275] Exh. D-232 (3PL Agreement between Talo LLC and Pureunbi); Tr. Day 3 77:2-9.
[276] Tr. Day 3 83:9-10, 84:21-85:1, 86:4-6.
[277] Exh. C-483 (Pureunbi's Pico Rivera Warehouse Lease).

there was no guarantor and Pureunbi was to pay the landlord of the warehouse a deposit of $466,197.78.[278]  On 2 August 2024, Talo LLC, the entity owned by Insil and Lawrence Kim, wired $466,197.78 to Bristol Kirshner Investment Company—the amount due upon execution of Pureunbi's warehouse lease.[279]  Insil Kim asserts that this payment was made pursuant to the 3PL Agreement.[280]

### Trademark Applications

148.    In July 2024, Pureunbi filed trademark applications for both dearcloud and Winsome.  The application for the dearcloud mark was filed by Lucem Law,[281] while the application for the Winsome mark was filed by RAK.[282]  The Claimant alleges that Pureunbi's use of the same law firms that Sunna Kim used regularly while she was TCS's Co-CEO is indicative of her being behind Pureunbi's business.[283]  Sunna Kim asserts that Pureunbi's use of the same vendors as TCS is indicative of nothing more than former TCS staff being involved in Pureunbi's operations through LPF Agency.[284]  Paul Kim's Declaration asserts that Sunna Kim instructed him to work and communicate with RAK regarding legal matters related to LPF Agency, Pureunbi, and TOJI.[285]

### Website

149.    As of 26 August 2024, the Terms of Use on dearcloud's website stated that it was "owned and operated by TOJI Brands."[286]  Paul Kim explained that LPF Agency, which managed dearcloud's website, had inadvertently included language referencing TOJI because

---

[278] Exh. C-483 (Pureunbi's Pico Rivera Warehouse Lease); Tr. Day 3 138:21-139:3.
[279] Exh. C-482 at 6 (2 August 2024 Wire Receipt from Talo LLC); Tr. Day 3 78:23-79:1.
[280] Tr. Day 2 208:7-20.
[281] Exh. D-239 (dearcloud Trademark Status).
[282] Exh. D-245 (Winsome Trademark Status).
[283] CPHB ¶ 33.
[284] S. Kim PHB ¶ 38.
[285] Exh. C-699 at ¶ 57 (Paul Kim Declaration).
[286] Exh. C-228 (dearcloud's Terms of Use as of 26 August 2024).

both the TOJI website and the dearcloud website had been created by the same staff.[287]  The

Claimant alleges that this was not a "clerical error," but instead is indicative of the fact that

Sunna Kim owns and operates dearcloud.[288] The Respondents maintain this was an inadvertent

error on LPF Agency's part that was promptly fixed upon the Claimant bringing it to light.[289]

### Communications

150.    On 29 October 2024, Ulta Beauty emailed Sunna Kim and Paul Kim about an

upcoming product opportunity, saying "[w]e would love to include Dearcloud in this advent

calendar for 2025!"[290]  Paul Kim responded to this email on 1 November 2024, noting that he

was removing Sunna Kim from the email chain because "she's not part of dearcloud ([Sunna]

owns brands in the coffee/gummy wellness space)."[291]

151.    In similar email correspondence with Ulta Beauty in October 2024, Helen Yang

of LPF Agency requested that Sunna Kim be removed from the back and forth about dearcloud

products because she was not part of the dearcloud brand.[292]  Sunna Kim testified that Ulta

Beauty would send mass emails to people on their contact lists regarding upcoming submissions

and category resets, so her inclusion on these email chains does not reflect any involvement on

her part with Pureunbi or dearcloud.[293]

152.    The Claimant also points to numerous communications regarding Pureunbi

containing a reference to a *daepyonim*, the Korean term for Chief Executive Officer.[294]

---

[287] P. Kim WS2 ¶¶ 10-11.

[288] SOC ¶ 51.

[289] S. Kim SOD ¶ 45; Exh. C-425 (29 August 2024 Email from Eugene Shin (LPF) to Sunna Kim).

[290] Exh. C-516 (29 October 2024 Email from Ulta Beauty to Sunna Kim).

[291] Exh. D-233 (1 November 2024 Email from Paul Kim to Ulta Beauty).

[292] Exh. C-602 (21 October 2024 Email from Helen Yang to Ulta Beauty).

[293] Tr. Day 2 128:15-18.

[294] *See, e.g.,* Exh. C-528 (23 September 2024 Email from Kate Chung to Juheui Ko); Exh. C-526 (11 November 2024 Email Chain between Jay Lee and finance@pureunbi.com); Exh. C-504 at 1 (26 June 2024 Email from accounting@seoncompany.com); Tr. Day 3 50:23-51:18.

Notably, the Claimant points to a November 2024 email chain between Jay Lee and finance@pureunbi.com wherein Jay Lee instructed the recipient to "report [a remittance issue] to the CEO and hand it over to the CPA," to which the finance@pureunbi.com account responded referring to Jay Lee as "President."[295]  The Claimant alleges that the use of *daepyonim* (or "CEO") in these communications refers to Insil Kim,[296] while the Respondents deny that these references are to Insil Kim and point to Seung Hye Seo's testimony that she is usually referred to as the *daepyonim*.[297]

### Dealings with Licensors

153.    Dr. Hyeyoung Moon testified that in early 2024 she spoke on behalf of TCS with Craig Takiguchi and Heather Prior of Sanrio, who informed her that Sunna Kim had approached Sanrio's licensing team seeking a license for beauty products in the same categories for which TCS held licenses.[298]  Sunna Kim maintains that all of her conversations with Sanrio were aimed at gaining licenses for TOJI's beverage and wellness products and that any meetings she attended jointly with Paul Kim consisted of Paul Kim pitching for LPF Agency or Pureunbi while Sunna Kim pitched for TOJI.[299]  Paul Kim's Declaration now alleges that any discussion or presentation he made on behalf of Pureunbi and/or LPF Agency was done at Sunna Kim's instruction and subject to her approval.[300]

### Roles of Jay Lee and Peter Oh

154.    In addition to pointing to the various ways in which the Respondents were involved with or connected to Pureunbi, the Claimant contends that Jay Lee and Peter Oh have

---

[295] Exh. C-526 (11 November 2024 Email Chain between Jay Lee and finance@pureunbi.com).
[296] CPHB ¶¶ 45-46.
[297] Tr. Day 2 191:16-20, 214:25-215:20; Tr. Day 3 52:9-17, 62:5-11; S. Kim PHB ¶ 53.
[298] H. Moon WS4 ¶ 10; Tr. Day 2 39:7-42:9.
[299] Tr. Day 2 17:11-19; Exh. C-575 (February 2024 Emails between Paul Kim and Craig Takiguchi).
[300] Exh. C-699 at ¶¶ 11, 16-22 (Paul Kim Declaration).

misrepresented themselves as having been Pureunbi's owners and operators in order to conceal the Respondents' ownership and operation of Pureunbi.[301]  The Claimant advances this argument based on the testimony of Jay Lee and Peter Oh that they did not receive any stock or equity in Pureunbi,[302] that Jay Lee has limited English proficiency,[303] and that neither Jay Lee nor Peter Oh invested significant, if any, capital in Pureunbi.[304]  The Claimant also considers Jay Lee's work history significant, reasoning that, although Lee had previously worked for five to six years at another K-beauty company, Célavi, he had only limited experience negotiating licensing agreements, which the Claimant considers to have been a central piece of dearcloud's business strategy.[305]

### L.    Effect on TCS of Competition from Pureunbi and dearcloud

155.    Both sides accept that Pureunbi, through the dearcloud brand, was in competition with TCS.[306]  The Claimant also asserts, and the Respondents do not contest, that LPF Agency competed with TCS to the extent that it promoted the sale of dearcloud products.[307]  The Respondents assert that Pureunbi's dissolution precludes any future competition between TCS and dearcloud.[308]

156.    The Claimant alleges that dearcloud replicated TCS's business model of "introducing multiple new products with various licensors at alarmingly fast speeds."[309]  The Claimant asserts that dearcloud has established a relationship with Miffy, with which TCS also

---

[301] CPHB ¶ 40.
[302] Tr. Day 3 90:10-13, 111:13-18, 120:18-23.
[303] Tr. Day 3 81:1-3.
[304] Tr. Day 3 90:4-13, 118:16-25.
[305] Tr. Day 3 88:3-7, 90:21-91:5, 92:5-7.
[306] CPHB ¶ 27; Respondents' Response to Application to Compel Production ¶ 9.
[307] CPHB ¶ 28; Exh. C-614 (LPF Corp. General Ledger); Tr. Day 3 55:6-13, 56:13-21.
[308] S. Kim PHR ¶ 124.
[309] Kaufman WS1 ¶ 13 (emphasis in original).

has a licensing relationship,[310] that dearcloud has diverted licensing opportunities from TCS with Supreme and Paul Frank,[311] and that dearcloud has attempted to enter licensing agreements with Sanrio -- TCS's most important licensor -- and others.[312]  To exhibit dearcloud's effect, the Claimant points to the fact that in August 2024 TCS sought to develop an exclusive launch of its Miffy-branded products with Ulta Beauty.[313]  Miffy, in response, told TCS to move forward with a launch at a retailer other than Ulta Beauty because dearcloud had already secured a six month exclusivity deal with Ulta Beauty for its own Miffy-branded products.[314]

157.    dearcloud's products have increasingly appeared in the same retailers as TCS's, including Ulta Beauty, Urban Outfitters, and Walgreens, which the Claimant alleges has resulted in TCS experiencing decreased retail sales.[315]  At the same time, however, TCS's sales to all of its retailers—including those that do not carry dearcloud products—have declined since 2023, suggesting that competition from dearcloud is not the only cause of the decline in TCS's sales.[316]

## IV.    ISSUES TO BE DECIDED

158.    The Parties' principal pre-hearing submissions in Phase Two of this arbitration consisted of the Claimant's Statement of Claim ("SOC") dated 17 March 2025, accompanied by witness statements and an expert report, Respondent Sunna Kim's Response to the Claimant's Phase Two Statement of Claim ("S. Kim SOD") dated 30 April 2025, accompanied by a witness

---

[310] SOC ¶ 114-122; Tr. Day 1 116:22-117:2
[311] SOC ¶¶ 124-132; Tr. Day 1 127:16-129:1.
[312] SOC ¶¶ 94, 102-109, 124-129.
[313] Tr. Day 1 134:15-21.
[314] Exh. C-658 at 9-10 (September 2025 Emails between Paul Kim and Jackie Demaio (Miffy)); Tr. Day 1 136:14-137:2, 156:8-24.
[315] Exh. C-405 (Pureunbi's Customer List).
[316] Tr. Day 2 31:17-32:18, 44:18-45:7; S. Kim PHB ¶ 103.

statement and an expert report, and Respondent Insil Kim's Preliminary Statement of Defense ("I. Kim Prelim. SOD") dated 30 April 2025, accompanied by witness statements.[317]

159.    Following the hearing, the Claimant submitted its first post-hearing brief on 18 July 2025, both Respondent Sunna Kim and Respondent Insil Kim submitted responsive post-hearing briefs on 15 August 2025, and the Claimant submitted its reply post-hearing brief 29 August 2025, accompanied by the Paul Kim Declaration.  On 22 September 2025, the Respondents and on 3 October 2025 the Claimant made further submissions concerning the Paul Kim Declaration

160.    This portion of the Award addresses the issues in contention between the Parties that emerge from these written submissions, as further developed by the Parties at the Phase Two hearing on the merits.  As the Claimant, LG H&H bears the burden of proof, by a preponderance of the evidence, on each of these issues.

**A.    What is the "Restricted Period" Under the Non-Compete Provision of the SPA?**

161.    The Parties disagree about the period during which the non-competition provisions of the SPA will continue to apply to the Respondents (the "Restricted Period").  The SPA provides that the "Restricted Period" was to "commenc[e] on the Closing Date and end[] on the third anniversary of the date such Seller no longer owns any interest in the Company."[318]

162.    Both Parties agree that the "Closing Date" on which the Restricted Period commenced was 9 June 2022.  The Respondents contend that the end date should be three years from 29 November 2023, the date on which the Claimant gave notice that it was exercising its

---

[317] As noted at par. 44 above, Insil Kim did not submit any revision of her Preliminary Statement of Defense.
[318] SPA §4.7(a); see par. 79 above.

call option.  The Claimant contends that the three-year period only began to run when it actually acquired the Respondents' shares of TCS.[319]

163.    The Tribunal's Partial Award determined and declared that LG H&H's Call Option Notice was a valid exercise of its call option under the SA.[320]  The Claimant reported in its Phase II Reply Post-Hearing Brief that the "Call Option sale transaction closed on August 6, 2025, pursuant to which Claimant paid the net call option purchase price (inclusive of interest) of $69,806,388.48 to Olive Kim and Insil Kim and acquired the ownership of the remaining shares of TCS owned by them."[321]

164.    The Tribunal finds that the Claimant's contention that the three-year extension of the Restricted Period commenced on 6 August 2025, the date on which neither of the Respondents any longer owned shares in TCS, is more consistent with the wording of the SPA than the Respondents' contention that the period should have begun to run when notice of the exercise of the call option was given.  The Respondents continued to own their shares of TCS for more than a year and a half after the Claimant exercised the call option.  It was only after the purchase closed in August of 2025 that the "Seller[s] no longer own[ed] any interest in the Company."[322]

165.    The Restricted Period will accordingly continue for three years, from 6 August 2025 until 6 August 2028.

---

[319] S. Kim PHR ¶ 138; CRPHB ¶ 86.
[320] Partial Award ¶ 288.
[321] CRPHB ¶ 86; Exh. C-703.
[322] SPA §4.7(a).

B.      **Who are the "Affiliates" Subject to the Non-Compete?**

166.    The SPA provides that "Each Seller" shall "cause her Affiliates," during the

Restricted Period, to observe the terms of the non-competition provisions of Section 4.7 of that

agreement.  "Affiliate" is defined in the SPA:

> Affiliate means, with respect to any specified Person, any other Person
> that directly, or indirectly through one or more intermediaries, controls, is
> controlled by or is under common control with, such specified Person.
> As used in this definition, "control" (including the terms "controlled by"
> and "under common control with") means the possession, directly or
> indirectly, of the power to direct or cause the direction of the affairs or
> management of a Person, whether through the ownership of voting
> securities, as trustee, personal representative or executor, by contract or
> otherwise.  For the purpose of this Agreement, "Affiliate" of the Sellers
> shall include the immediate family members of I. Kim and S. Kim, and
> any Person controlled by any such family members (including T&L).[323]

"Person" is defined to mean both natural persons and entities:

> "Persons" means any individual, partnership, limited liability company,
> corporation, association, joint stock company, trust, entity, joint venture,
> labor organization, unincorporated organization, or Governmental
> Authority.[324]

**Natural Persons**

167.    The "immediate family members" of Insil Kim and Sunna Kim are their

respective husbands, Lawrence Kim and Chris Yoon.  The Respondents concede that each of

them is an Affiliate within the meaning of Section 4.7 and is thus subject to the non-compete

agreement.[325]

168.    The Claimant asserts and the Respondents deny that Paul Kim, Seung Hye Seo,

Jay Lee, and Peter Oh are also Affiliates.[326]  This disagreement requires the Tribunal to

---

[323] Exh. C-1 at Definitions (Share Purchase Agreement).  "T&L" is defined as Theresa & Lawrence, Inc.
[324] Exh. C-1 at 8.
[325] S. Kim SOD ¶ 9.
[326] SOC ¶ 17; S. Kim SOD ¶ 9.

determine whether these individuals, or any of them, was or is "controlled by" Insil or Sunna Kim; that is, whether either of the Respondents, "directly or indirectly, [had] the power to direct or cause the direction of the affairs or management of" any of these Persons.[327]

169.    The Tribunal is not persuaded that any of Seung Hye Seo, Jay Lee, or Peter Oh can properly be considered Affiliates of Sunna Kim or Insil Kim.  The Claimant is correct in contending that each of the three had a close relationship with one or both of the Respondents and participated in business dealings with one or both of them.[328]  Nevertheless, each of the three also had a business of his or her own that does not appear to have been dependent on the Kim family for direction or support.  While all three cooperated with one or both of the Respondents in some matters -- closely at times – the Tribunal considers that there is insufficient evidence that either Respondent directed their affairs or otherwise controlled them to meet the Claimant's burden of establishing that they were "Affiliates" as defined in the SPA.[329]

170.    Paul Kim presents a closer question.  From the time he left TCS in October of 2023 until the end of 2024, Sunna Kim appears to have arranged for his employment, first by Roli Consultancy and then by LPF Agency.[330]  Sunna Kim contends that she directed Paul Kim's work at LPF only insofar as it related to TOJI, her coffee and gummy company, and Paul Kim agreed with her in his pre-hearing and hearing testimony.[331]  Paul Kim adopted a different line in his 28 August 2025 Declaration, however.[332]  In that Declaration, Paul Kim says that

[327] SPA, Exh. C-1, Definitions. The term "Person" is defined in the SPA to include "any individual."  SPA Art. 1.1.
[328] SOC ¶ 17.
[329] The SPA's definition of "Affilliate" is reproduced at par. 166 above.
[330] See par. 127 above.
[331] See pars. 125, 130 above.
[332] See par. 131 above; Exh. C-699.

"Olive Kim was directing and participating in the operations of Lpf Corp. and Toji and Pureunbi Corp."[333]

171.    The Tribunal considers that there is sufficient evidence, independent of Paul Kim's Declaration, that Paul Kim was directed by Sunna Kim at least from the time he left TCS on 9 October 2023 to the time he left LPF Agency at the beginning of January 2025 to consider him her Affiliate during that period.  The "Lpf Planning document" (Exh. C-702), described in more detail at paragraph 120(b) above, submitted with the Paul Kim Declaration makes it reasonable to begin the period during which Paul Kim should be considered Sunna Kim's Affiliate earlier, commencing on the date of that document, 29 August 2023.[334]  Paul Kim's continuing close relationship with Sunna Kim during the time he worked with LPF Agency persuades the Tribunal that he should be considered her "Affiliate" from the beginning of his time with LPF Agency until he left it in January 2025.

172.    From the date of Paul Kim's Declaration two years later (28 August 2025) he can no longer be considered Sunna Kim's Affiliate.  None of his actions between January and August 2025 appears to be relevant.

**Entities**

173.    From the time that Paul Kim became an employee of LPF Agency until he left that company at the beginning of January 2025, LPF Agency should also be considered an Affiliate of Sunna Kim's.  The evidence is clear that Paul Kim was responsible for running the operations of LPF Agency during that time.  Seung Hye Seo testified that "[a]s far as LPF Agency, I don't even really know.  That was entirely Paul."[335]  Paul Kim's Declaration states

---

[333] Exh. C-699 at ¶ 63 (Paul Kim Declaration).
[334] The date appears on the email transmitting Exhibit C-702, which is Exhibit C-543.
[335] Tr. Day 3 26:13-14.

that "Olive Kim knew the most about the operations and capabilities of Lpf Corp. and Somi, the two businesses that later became clear to me were formed to directly compete with TCS."[336] Just as Paul Kim may be considered Sunna Kim's Affiliate during the period when he was taking direction from her, so may LPF Agency, which was taking direction from him.

174.    TOJI, as a company wholly owned by Sunna Kim,[337] should also be considered her Affiliate.  Roli Consultancy's ownership is less clear, but it appears to have been subject to the direction of Sunna Kim and Chris Yoon,[338] so it should also be considered an Affiliate of Sunna Kim's.

### C.    Did or Does Pureunbi's "dearcloud" Brand Compete with The Crème Shop?

175.    The Claimant contends[339] and the Respondents concede[340] that Pureunbi's "dearcloud" products competed with TCS's products in the "K-beauty" market.  The Claimant contends that dearcloud products continue to compete with TCS's products in that market.[341] The Respondents concede that Pureunbi "has actually competed with TCS."[342] The Respondents contend, however, that Pureunbi is no longer selling products and that any remaining presence of its products in the market is simply the result of their having been in the pipeline when Pureunbi ceased doing business.[343]

---

[336] Exh. C-699 at ¶ 18 (Paul Kim's Declaration)
[337] Tr. Day 1 197:5-6.
[338] Exh. C-699 at ¶ 52 (Paul Kim's Declaration); Tr. Day 4 13:17-15:6.
[339] CPHB ¶ 27; Jaeran Lee WS1 ¶ 13; Kaufman WS1 ¶ 13.
[340] Respondents' Response to Application to Compel Production of Documents ¶ 9.
[341] CRPHB ¶ 13.
[342] Respondents' Response to Application to Compel Production of Documents ¶ 9.
[343] RAK letter to the Tribunal, 22 September 2025, p. 5.

176.    The Tribunal considers it to be conceded and also established by the evidence that Pureunbi's dearcloud products competed with TCS's products during 2024 and through 31 May 2025.[344]

177.    After 31 May 2025, the Respondents contend that Pureunbi is "no longer in business," and that projecting future profits "does not track reality, particularly in light of dearcloud's dissolution and shutdown."[345]

178.    However, the Claimant has submitted evidence that dearcloud products continued to be sold as of its most recent submission in August 2025.  Exhibits C-695 and C-696 are photographs of dearcloud products on store shelves on 20 August 2025, with the latter showing TCS products on the same set of shelves.  Exhibit C-687 consists of screenshots from the website of Ulta, a leading retailer of beauty products, showing 33 dearcloud products still being offered for sale in August 2025.  And Exhibit C-692 is a screenshot from the website of Amazon Seller Central showing a July 2025 launch date for a new dearcloud product.  The Claimant points out that none of these offerings shows any sign of the distress pricing that one would expect to find if this entire line of products had been discontinued.[346]

179.    The Tribunal concludes that the Claimant has established that there is at least a reasonable possibility that dearcloud products continued to be sold in competition with the products of TCS after 31 May 2025.

### D.    Did LPF Agency Compete with The Crème Shop?

180.    The Claimant asserts that:

> LPF Corp. is also a "Competitor" as defined in Section 4.7(a) because, at the very least, it is indirectly competitive with the business of TCS.  First,

---

[344] Respondents' Response to Application to Compel Production of Documents ¶ 9; Tr. Day 3 108:9-11 (Pureunbi dissolved May 2025).  *See also* CPHB ¶ 27; Jaeran Lee WS1 ¶ 13; Kaufman WS1 ¶ 13.
[345] S. Kim PHB ¶ 124.
[346] *See* CRPHB ¶ 13.

> LPF actually sold cosmetic products to Ulta Beauty in a sales amount over USD 1.5 million in 2024, as shown in the General Ledgers of LPF, and as admitted by Ms. Seo, these LPF sales were "separate sales from Pureunbi's sales" and were not duplicative of Pureunbi's sales. Moreover, Pureunbi was actually operated and managed through LPF Corp.[347]

Alternatively, the Claimant says, "LPF Corp. is an 'Affiliate' as defined in the SPA."[348]

181.    Sunna Kim conceded that, at a meeting that she and Paul Kim attended with Walgreens' broker, she "introduced LPF as my broker,"[349] but she denied having any other connection with LPF Agency or LPF Corp.  Indeed, asked about those two entities, she testified that "I didn't know there were two until recently."[350]

182.    It appears to the Tribunal that LPF Agency did not make or sell products of its own in competition with TCS, but that it did organize and manage the sales of Pureunbi products during the time that LPF Agency was doing business in 2024.[351]  The record is less clear as to whether LPF Agency was selling other products that were competitive with those of TCS, but there is some evidence that it was.  When Mrs. Seo was asked, with reference to Exhibits C-395 and C-569, "[w]ere those sales for Pureunbi or for LPF," she answered: "That would be LPF's."[352]

183.    The plan for LPF Agency to engage in such conduct appears from the "LPF Planning document," Exhibit C-702, submitted with the Claimant's Reply Post-Hearing Brief. For example, under "Licensor Contacts," that document notes as to Miffy that:

> They have cosmetic collabs in other countries, but not in the USA.

---

[347] CPHB ¶ 28 (citing Tr. Day 4 56:13-20).  "Competitor" is defined in Section 4.7(a) of the SPA as "any business which is directly or indirectly competitive with the business" of TCS.

[348] *Id.  See* par. 173 above.

[349] Tr. Day 2 94:9-10.

[350] Tr. Day 2 109:11-12.  As noted at par. 88 above, no one in this arbitration has succeeded in explaining the difference between LPF Agency and LPF Corp., and the Tribunal consequently considers that any difference there may be between the two entities, if indeed there are two entities, must be inconsequential.

[351] Tr. Day 3 56:13-15 ("Q: So was LPF selling Pureunbi products?  A:  Yes.").

[352] Tr. Day 3 56:16-18.

70

They are interested in doing beauty domestically in the USA.[353] However, when shown at the hearing the cover email transmitting the "LPF Planning document" (Exh. C-543; Exh. C-702 had not yet been introduced), Sunna Kim said "I don't open emails.  I have never seen this document before."[354]

184.    LPF Agency's promotion of dearcloud products to companies that were also TCS's customers or licensors also appears from Paul Kim's meeting with Walgreens in November 2023[355] and his presentation to Sanrio in December 2023.[356]

185.    The Tribunal concludes that, between November 2023 and December 2024, LPF Agency engaged in conduct as Sunna Kim's Affiliate – specifically, helping Pureunbi and its dearcloud brand to compete with TCS – that was inconsistent with the prohibition of Section 4.7(a) of the SPA to "render any services" to "any Competitor."  In addition, the direct sales to which Mrs. Seo testified establish that LPF Agency was itself a Competitor to TCS.

### E.    Was Sunna or Insil Kim Engaged in the Business of Pureunbi ("dearcloud")?

186.    The Claimant contends that Sunna Kim "rendered services to" Pureunbi in breach of Section 4.7(a) of the SPA,[357] and that Insil and Lawrence Kim breached the prohibition in that section against acquiring "a direct, material financial interest in a Competitor."[358]  We look first at the allegations concerning Sunna Kim and then at those concerning Insil Kim.

---

[353] Exh. C-702.
[354] Tr. Day 1 188:12-13.
[355] Exh. C-521; see par. 133 above.
[356] Exh. C-514; see par. 134 above.
[357] CPHB ¶ 48.
[358] CPHB ¶ 49.

**Sunna Kim**

187.    The Respondents contend that, after seeking advice from her counsel, "Olive [Kim] stepped back from having anything to do with promoting any cosmetics brand for Paul's benefit."[359]  Sunna Kim argues that she "took steps to make sure that Sanrio and Ulta knew that she was not associated with Pureunbi," and that "[c]ommenting on Paul's product graphics is not remotely equivalent to assisting Pureunbi in violation of Section 4.7 of the SPA."[360]

188.    The Tribunal concluded in Section IV.B of this Award that LPF Agency was an Affiliate of Sunna Kim's and in Section IV.D that LPF Agency's promotion of the Pureunbi brand and products put it in breach of the provision of the SPA forbidding Affiliates of the Respondents to "render any services" to "any Competitor."  Sunna Kim's affiliation with LPF was thus sufficient by itself to put her breach of Section 4.7 of the SPA.

189.    More significantly, Sunna Kim provided advice to Paul Kim and LPF Agency about launching the dearcloud brand for Pureunbi and participated in meetings with customers and licensors at which Paul Kim promoted dearcloud products.[361]  The Tribunal considers that Sunna Kim's presence and participation in those meetings, even if she intended to be there only on behalf of her non-competing TOJI products, both helped Paul Kim get in the door and lent him and the competitive products he was pitching the benefit of the respect and credibility that Sunna Kim commanded in the K-Beauty market.

190.    While the Tribunal cannot conclude that Sunna Kim was personally engaged in the business of Pureunbi, it does find that both directly and through her Affiliates LPF Agency and Paul Kim she rendered services to Pureunbi and its dearcloud products, as described in the

---

[359] S. Kim PHB ¶ 29.
[360] *Id*. ¶¶ 30, 32.
[361] Exh. C-515 (24 October 2023 Email from Yuri Sin to Paul Kim); Exh. C-509 (20 September 2023 Sanrio Meeting Notes); Exh. C-699 at ¶ 16-22 (Paul Kim Declaration); Tr. Day 2 65:16-67:10.

preceding paragraphs.  That is sufficient, at a minimum, to put her in breach of the prohibition in Section 4.7(a) of the SPA against "render[ing] any services to, any Competitor."

**Insil Kim**

191.    The connection between Insil Kim and Pureunbi, in contrast, appears to have been financial.  The question in her case is whether she breached the provisions of Section 4.7(a) that forbid the Respondents to "participate in" the "management, operation, or control" of or to "acquire a direct, material financial interest in a Competitor."

192.    Pureunbi was a Competitor as that term is defined in Section 4.7(a).  Its balance sheet reflects $2.8 million in loans from Mrs. Seo's companies Sceon and Longevite Batiment, compared to only $1,000 in equity.[362]  It seems incontestable that whoever was the source of the $2.8 million of financing had a "direct, material financial interest" in Pureunbi.

193.    Insil Kim conceded that she had transferred $3 million to Sceon LLC to be invested by Mrs. Seo for the benefit of herself and her husband Lawrence Kim.[363]  Insil Kim testified that she wrote a check for $3 million to Sceon LLC in January of 2023 in return for a promissory note that has not yet been fully repaid.[364]  She said that she "gave the money to Seung Hye Seo, and thereafter I do not know where those people spent that money."[365]

194.    Mrs. Seo's testimony was contradictory.  She testified that Lawrence Kim had loaned $3 million to Sceon in January of 2023, as evidenced by a promissory note of that date for $3 million showing Sceon LLC as the Borrower and Insil Kim as the Lender.[366]  She testified that it was those funds that her companies Sceon and Longevite Batiment had used to

---

[362] Exh. C-348 (Pureunbi Balance Sheet as of 31 December 2024).
[363] Tr. Day 2 171:4-173:22.
[364] Tr. Day 2 171:4-175:6.  A copy of the check is Exh. C-484.
[365] Tr. Day 2 171:11-13.
[366] Exh. D-229 (6 January 2023 Promissory Note).

make loans to Pureunbi.[367]  However, when asked on re-direct, "[d]id Insil Kim or Larry Kim ever give you money for the purpose of investing in Pureunbi," Mrs. Seo answered:  "No."[368]

195.     Insil Kim also had some sort of role in overseeing Pureunbi's banking transactions.  Exhibit C-494 is an email from Eun Park at PCB Bank to Insil Kim dated 21 March 2024 reporting that a payment had been made by Pureunbi to a vendor in Korea, and Exhibit C-495 is Insil Kim's response thanking her.  Insil Kim testified that she did not know why Eun Park had sent her the email; she said, "I receive these kind of things from time to time."[369]

196.     When shown another email from Steven Koo of Pureunbi to "Insil Kim Daepyonim"[370] requesting that a wire for $36,193 be sent to one of Pureunbi's vendors in China, Insil Kim acknowledged that she remembered that Steven Koo had asked her to send the funds but said she did not know that it was going to a Chinese vendor.[371]  She said that "My husband called urgently and asked me to send the money there," but she did not remember why he had asked her to send it.[372]  She said that "I have not met anyone that works for Pureunbi."[373]

197.     Insil Kim's name was listed as a "guarantor" on a lease term sheet for a warehouse to be leased by Pureunbi in 2024.[374]  However, Moon Lim, the real estate agent who prepared that term sheet, testified that he had inserted Insil Kim's name in error on the basis of previous real estate transactions that he had handled for Lawrence Kim, and that the lessor ultimately did not require a guarantor on the lease.[375]

---

[367] Tr. Day 3 35:1-38:3, 41:8-42:25, 44:2-46:6.
[368] Tr. Day 3 61:13-16.
[369] Tr. Day 2 179:7-181:23.
[370] *Daepyonim* means CEO in Korean.
[371] Exh. C-504; Tr. Day 2 183:15-186:1.
[372] Tr. Day 2 185:12-186:1.
[373] Tr. Day 2 192:14-15.
[374] Exh. C-379 (14 May 2024 Lease Term Sheet).
[375] Tr. Day 3 130:6-138:13.

198.    The Tribunal's impression of Insil Kim is that she is a savvy and competent businesswoman.  It seems unlikely to the Tribunal that she would have entrusted $3 million to someone else to invest without having a very good idea of where that money was being invested.  Nevertheless, even if Insil Kim's testimony was accurate that she did not know where Mrs. Seo had invested the funds that Insil and Lawrence Kim had entrusted her with, having a financial interest in a "Competitor," if she did, would be a violation of the terms of the non-compete agreement in the SPA whether or not Insil Kim knew that she had such an investment.

199.    Insil Kim's involvement in Pureunbi's banking transactions amounted by itself to participating in the operations of a Competitor in violation of Section 4.7(a) of the SPA, even if Insil Kim was, as she claims, unaware of the kind of business in which Pureunbi was involved.[376] That involvement  also tends to confirm that Insil Kim had a financial interest in Pureunbi.

200.    The Tribunal concludes that the loan to Pureunbi of funds of Insil Kim and Lawrence Kim (as an Affiliate of Insil Kim's) gave them a financial interest in Pureunbi. Together with Insil Kim's involvement in Pureunbi's financing and banking transactions, that was sufficient to put Insil Kim in breach of Section 4.7(a) of the SPA.

**F.    Was Sunna or Insil Kim Engaged in the Business of LPF Agency?**

201.    The Tribunal has already explained in Part IV.B above that it considers LPF Agency to have been an Affiliate of Sunna Kim's for purposes of the non-compete provisions of the SPA.  Largely for the same reasons, it concludes that Sunna Kim was engaged in LPF Agency's business.  Even aside from Paul Kim's belated statement in his Declaration that

---

[376] When asked "At the time you made those transfers, were you aware what business Pureunbi was in," Insil Kim responded, "No, I did not."  Tr. Day 2, p. 216.

Sunna and Insil Kim "served in directing the operations" of LPF,[377] the evidence is clear that Sunna Kim: (a) gave advice to Paul Kim about how to conduct that business; (b) helped make introductions and arrange meetings at which Paul Kim pitched Pureunbi's products as LPF's representative; (c) seems to have had a role in the creation of LPF Agency and registering its domain name; (d) assigned LPF email addresses; and (e) allowed LPF's employees to make charges to her credit card.[378]

202.   The Tribunal therefore concludes that Sunna Kim was engaged, directly and through her Affiliates, in a business that was "directly or indirectly competitive with the business of" TCS, in breach of Section 4.7(a) of the SPA.

203.   Insil Kim's connection with LPF Agency, like her connection with Pureunbi, was largely financial.  Mrs. Seo testified that the funds that her companies Sceon and Longevite Batiment had borrowed from Lawrence Kim were invested in part in real estate and that another "portion was invested in marketing company LPF."[379]

204.   The Tribunal accordingly concludes that Insil Kim, or her Affiliate Lawrence Kim, had a financial interest in a Competitor, LPF Agency, in breach of Section 4.7(a) of the SPA.

**G.      Did Sunna Kim Interfere with The Crème Shop's Employees?**

205.   The Claimant contends that "Sunna Kim most likely directly or indirectly recruited, hired, or solicited for LPF's or Pureunbi's employment—or at least requested or

---

[377] Exh. C-699 ¶8(a).
[378] *See, e.g.,* Tr. Day 4 66:14-25; S. Kim WS4 ¶¶ 9-10; Tr. Day 4 66:14-25; Tr. Day 2 93:25-94:22; Exh. C-521 (November 2023 Email Chain between Walgreens and Paul Kim); Exh. C-515 (24 October 2023 Email from Yuri Sin to Paul Kim); Tr. Day 4 43:6-21; Exh. C-543 (29 August 2023 Email from Paul Kim to Sunna Kim); Exh. C-702; Exh. C-370 (WHOIS Domain Search for "lpfagency.com"); S. Kim WS4 ¶ 9; Tr. Day 4 51:5-20; Exh. C-600 (18 October 2024 Email from Helen Yang); Tr. Day 2 119:19-21.
[379] Tr. Day 3 57:9-24.

induced to terminate employment with TCS—several former TCS employees."[380]  This, the Claimant contends, amounted to a breach of Section 4.7(b) of the SPA, which forbids the Respondents, "directly or indirectly, [to] recruit, hire or otherwise solicit for employment of any director, officer or employee of the Company."[381]

206.    In support of this contention, the Claimant asserts that "[m]any TCS employees left TCS, for example, just one business day after Sunna's departure from TCS, including Helen Yang, Rachaelle Villa, Deisy Larios, and Pauline Contreras, who later joined LPF."  The Claimant argues that "it is inconceivable that these former TCS employees left without prior consultation or inducement from Sunna or Paul Kim."[382]

207.    It is undisputed that Paul Kim resigned from TCS on 9 October 2023, the Monday after Sunna Kim's departure on Friday, 6 October 2023, and that the other TCS employees named in the preceding paragraph resigned the same day or within a few days thereafter.[383]

208.    With respect to Paul Kim, the Tribunal is unable to conclude that Sunna Kim induced him to terminate his employment with TCS.  Paul Kim had resigned once before from TCS because he "found it very difficult to work with Mr. [Young] Lee generally."[384]  He testified that, "[a]fter a particularly difficult meeting with Mr. Lee on August 21 . . . , I tendered my resignation and filed a grievance against Mr. Lee."[385]  At that time, Paul Kim said, "Olive Kim talked to me and convinced me to stay on at The Crème Shop."[386]  Sunna Kim thus had

---

[380] CPHB ¶ 71.
[381] *Id*.
[382] CPHB ¶ 72.
[383] P. Kim WS1 ¶ 14; SOC ¶ 40.
[384] P. Kim WS1 ¶ 12.
[385] *Id*. ¶ 13; 16 October 2024 Hr'g Tr. 151-152 ("Q: So based on those two meetings, you concluded that it's difficult to work with Mr Lee to such extent you decide to resign from the company; is that correct? A. Yes.").
[386] P. Kim WS1 ¶ 13.

apparently persuaded Paul Kim to stay with TCS in August 2023.  Paul Kim's departure from TCS six weeks later might thus have occurred with or without any inducement on the part of Sunna Kim.

209.     It is apparent from the "LPF Planning document" (Exh. C-702) that Paul Kim contemplated recruiting the TCS employees named in that document to work for what became LPF Agency as early as 29 August 2023.[387]  That document (under the "Org Chart" tab) contemplated specific titles for Helen Yang (Sales Coordinator), Rachaelle Villa (E-Comm Manager), Deisy Larios (Design Team Department Lead), and Pauline Contreras (Senior Designer).[388]  However, Sunna Kim denied having seen the LPF Planning document.[389]

210.     Paul Kim says in his Declaration that, in early October 2023, he "was instructed by Olive Kim to send out offer letters to certain key employees of TCS, each of whom would end up leaving TCS with Olive Kim and myself over the course of a few days in early October 2023."[390]  In response, Sunna Kim "disputes Paul Kim's new recounting of this time period."[391] While not conclusive, there is evidence in addition to Paul Kim's Declaration suggesting that Sunna Kim was involved in recruiting employees away from TCS in August to October 2023, including the provisions of the LPF Planning document concerning the salaries they were to be paid by LPF Agency.

211.     Whether or not Paul Kim's description of Sunna Kim's role in recruiting the former TCS employees is accurate, Paul Kim admits to having recruited them himself.[392]  Since the Tribunal has already concluded in Part IV.B of this Award that Paul Kim should be

---

[387] Exh. C-543 (29 August 2023 Email from Paul Kim to Sunna Kim).
[388] Exh. C-702 (LPF Planning Document).
[389] Tr. Day 1 188:2-23.  The spreadsheet itself (C-702) had not yet been put into the record at the time of the Phase Two hearing; instead, Sunna Kim's testimony related to the email transmitting it (Exh. C-543).
[390] Exh. C-699 at ¶ 15 (Paul Kim's Declaration).
[391] RAK letter of 22 September 2025, p. 3.
[392] Exh. C-699 at ¶ 15 (Paul Kim's Declaration).

considered Sunna Kim's Affiliate after 29 August 2023, Paul Kim's efforts to recruit TCS employees in October 2023, which seem unlikely to have been successful if those employees had not understood Sunna Kim to be behind them, are attributable to Sunna Kim for purposes of the non-compete provisions of the SPA and thus amount to a breach by her of Section 4.7(b).

**H.    Did Sunna Kim Interfere with The Crème Shop's Customers or Licensors?**

212.    The Claimant contends that Sunna Kim breached her obligations under Section 4.7(a) of the SPA by "interfer[ing] with business relationships (whether formed before or after the date hereof) between the Company, and distributors, customers, suppliers, partners, members or investor of the Company."[393]  They complain in particular about her participating in efforts by Paul Kim (wearing his LPF Agency hat) to promote the Cloudberry (which became dearcloud) products of Somi (which became Pureunbi).[394]

213.    For example, Exhibit C-511 is a PowerPoint prepared by LPF Agency for a presentation to Sanrio, one of TCS's licensors.  The presentation is dated 20 September 2023, at a time when both Sunna Kim and Paul Kim were still employed by TCS, although after Sunna Kim had given notice.[395]  The cover slide identifies "our brands" as TOJI, which was or became Sunna Kim's coffee, tea, and gummy company, and "SOMi," which was the name used briefly for what became Pureunbi.[396]  SOMi was described on slide 16 of 17 as "[a]dvanced K-beauty for the next generation,"  explicitly positioning SOMi as a competitor of TCS.[397]  Sunna Kim admitted to being present at this presentation, but insisted that "I discussed TOJI."[398]

---

[393] CPHB § III.E.
[394] CPHB ¶¶ 60-62, 65-66.
[395] Exh. C-11 (Sunna Kim's 7 August 2023 Good Reason Notice).
[396] Exh. C-507 at 19 (21 November 2023 Email from Paul Kim to Ari Gamshad); Tr. Day 4 32:6-14.
[397] Exh. C-511 at 16.
[398] Tr. Day 2 65:4-68:3.

214.    Paul Kim and Sunna Kim made another LPF Agency presentation to Sanrio on 24 October 2024, after both had left TCS.  The slides for that presentation (Exh. C-514) identify Okitoki (Sunna Kim's gummy brand), clöud café (Sunna Kim's coffee and tea brand), Winsome (described as Pureunbi's "Lifestyle Brand"), and dearcloud as the brands presented.  The third slide describes LPF Agency as "[f]ounded in 2023 by the winning core team at The Crème Shop."  The same slide describes LPF Agency as "Female-Founded," which would seem to exclude Paul Kim as a founder.[399]  Sunna Kim admitted to being present at this meeting, although possibly not for "the entire time."[400]  The Pureunbi brands were apparently unsuccessful in their efforts to secure a license from Sanrio.  Sunna Kim commented (and the Tribunal is inclined to agree) that, "I think, if I had pitched it as me being behind this – or these multiple – half-dozen cosmetic brands – if I had pitched it as that, then they would have gotten the license."[401]

215.    Sunna Kim was well known to the personnel of Sanrio from her dealings with that licensor while she was at TCS.  The Tribunal observed in Section IV.E above that Sunna Kim's mere participation in meetings such as this meeting with Sanrio, even if she intended to be there only on behalf of her non-competing TOJI products, both helped Paul Kim to get in the door and lent him and the competitive products he was pitching the benefit of the respect and credibility that Sunna Kim commanded in the K-Beauty market with licensors such as Sanrio.  Sanrio was one of TCS's most important licensors,[402] and Sunna Kim's presence at LPF Agency's meetings with Sanrio must inevitably have created some confusion about whether she was at the meeting as a representative of TCS (the capacity in which she had previously dealt

---

[399] Exh. C-514 at 4.
[400] Tr. Day 2 88:11-17.
[401] Tr. Day 2 89:19-24.
[402] H. Moon WS4 ¶10.

with Sanrio), or of the entirely unknown SOMi (which was competing with TCS), or of the new start-up coffee and tea company TOJI.[403] That sort of confusion inevitably interfered with TCS's relationship with that licensor.

216.   Sunna Kim's mere presence at the meetings with Sanrio was thus sufficient to put her in breach of Section 4.7(a) of the SPA.  There is evidence that she attended similar meetings with other customers of TCS, such as Ulta Beauty and Walgreens,[404] so the Sanrio meetings were not isolated incidents.  Her appearances shortly after leaving TCS at meetings at which pitches were made to sell products that competed with TCS's products must have created confusion in the minds of these other customers,[405] interfering with their relationships with TCS as well, even if Sunna Kim sat silent during those pitches.

217.   And in any event, Paul Kim and LPF Agency were Sunna Kim's Affiliates at the time of these meetings, so their efforts at these meetings to promote Pureunbi's brands in competition with those of TCS are chargeable to Sunna Kim and thus also put her in breach of Section 4.7(a) of the SPA.

## I.  Has The Crème Shop Been Injured by Competition from Pureunbi or LPF Agency?

218.   The Claimant asserts that TCS suffered from two different categories of conduct by the Respondents.  The first is "Respondents' own breach through Pureunbi."[406]  The second is "Respondents' enlisting of co-conspirators and disclosing trade secrets and dissipating other intangible assets of TCS," principally its goodwill.[407]

---

[403] *See, e.g.,* Exh. C-575 (18 February 2024 Email from Craig Takiguchi to Paul Kim).
[404] CPHB ¶¶ 69-70 (citing Exhs. C-363, C-516 and Tr. Day 2 93:25-95:2).
[405] *See, e.g.,* Exh. C-516 (29 October 2024 Email from Ulta Beauty to Sunna Kim and Paul Kim).
[406] CPHB ¶ 76.
[407] *Id.*

219.    The Claimant alleges that dearcloud's presence in the market has contributed to market saturation and a dilution of the uniqueness of TCS's character collaboration business model, which it describes as its primary differentiator from other beauty brands.[408]  The Claimant alleges that TCS and dearcloud share the same customer demographic, and that those customers are more likely to find and purchase products in major retailers rather than the brand's own website, such that dearcloud's encroachment into TCS's retail partners "threatens to undermine the very foundation of TCS's brand identity and competitive advantage."[409]  The Respondents counter there is nothing unique about TCS's products or business model and point to numerous other K-Beauty companies that entered the market in 2024 with similar approaches.[410]

220.    The Claimant alleges that dearcloud is using TCS's brokers and manufacturers for the design and manufacturing of its products, and that TCS's product designs were being leaked to dearcloud through this connection.[411]  The Claimant's witness who advanced this claim, Jaeran Lee, nevertheless conceded that her concern that TCS's product designs were being leaked is speculative.[412]

221.    The Claimant alleges that dearcloud has seriously hindered TCS's social media marketing strategy by imitating its "influencer-forward" strategy for marketing its products, so that TCS now appears within the market to be an inferior copy of dearcloud.[413]  The Respondents assert that, to the extent that TCS's social media marketing strategy has suffered, the cause was TCS's new management's "lack of social media and influencer savvy."[414]

---

[408] Jaeran Lee WS1 ¶ 18; Tr. Day 1 154:10-23; Tr. Day 2 46:3-22.
[409] Jaeran Lee WS1 ¶ 18; SOC ¶ 95.
[410] Tr. Day 2 28:9-29:10; S. Kim PHB ¶¶ 14, 102, 107.
[411] SOC ¶¶ 133-135; Jaeran Lee WS1 ¶ 16; Tr. Day 1 123:22-124:11, 125:17-126:10.
[412] Tr. Day 1 126:20-25.
[413] Kaufman WS1 ¶ 23; SOC ¶¶ 142-143; Exh. C-310 at 6-7 (LPF Agency PowerPoint Presentation).
[414] S. Kim PHB ¶ 14.

222.   Compared to 2023, TCS's gross profits fell by 11.7% and its net revenue declined by over $13 million in 2024.[415]   Schedule 1B to the Expert Report of Mr. Malkiewicz, the Claimant's damages expert, shows that TCS's net profits fell from $46,416,051 in 2023 to $36,723,031 in 2024.   Since his Schedule 1A shows gross profits, rather than net profits, for TCS in 2021 and 2022, it is impossible to compare the profits numbers over four years from his report, but the expert report of Mr. McGahee, the Respondents' damages expert, provides a comparison of TCS's net revenue and gross profit numbers over the period 2019-February 2025.[416]

### Summary of TCS's Annual Net Revenues and Gross Profits
### January 2019 – February 2025[49]

|  | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan. – Feb. 2025 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $21,213,654 | $23,592,607 | $38,097,121 | $55,742,088 | $104,586,004 | $90,850,407 | $9,049,947 |
| COGS | $10,335,000 | $11,125,000 | $17,991,000 | $23,059,847 | $44,080,956 | $37,436,662 | $4,226,122 |
| Gross Profit | $10,878,654 | $12,467,607 | $20,106,121 | $32,682,241 | $60,505,048 | $53,413,745 | $4,823,825 |
| Gross Profit (%) | 51.3% | 52.8% | 52.8% | 58.6% | 57.9% | 58.8% | 53.3% |

223.   The significant number that emerges from both reports is the drop in profits (whether net or gross) from 2023 to 2024.   2023 was TCS's best year, and Sunna Kim was at the helm for the first nine months and testified that she left the company with at least enough new ideas to see it through the end of the year.[417]   The Claimant attributes TCS's comparatively poor financial performance in 2024 primarily to Sunna Kim's breach of the SPA's non-competition covenant.[418]   The Claimant's expert witness, Mr. Malkiewicz, testified that "TCS's

---

[415] Malkiewicz ER1 ¶ 51; McGahee ER Schedule 2.
[416] McGahee ER ¶ 18.
[417] Tr. Day 2 141:13-142:2.
[418] H. Moon WS4 ¶¶ 3-6.

sales and net profits have fallen since the entry of dearcloud [into the market], with a slight uptick in Q4 2024 consistent with cyclicality."[419]  He says in his Expert Report:

> In 2024, TCS' gross profits fell by 11.7%.  I understand this was in part due to Sunna Kim's departure as CEO of TCS and the solicitation of other TCS employees, which limited TCS's new product development from the second half of 2023.[420]

224.    Mr. Malkiewicz identified three categories of damages that he believes the Claimant to have suffered:

(a)    Past Lost Profits:  The "profits that TCS would have earned absent poaching of employees and competition from dearcloud [compared to] TCS's actual financial results" from July 2024 through January 2025.

(b)    Future Lost Profits:  The profits that TCS would have made but for competition from dearcloud from February 2025 through December 2026.

(c)    Wrongful Head Start Damages:  The "likely amount of head start benefit that Respondents received by breaching the non-compete and non-solicit clauses in the SPA."[421]

225.    The Respondents generally deny that competition from Pureunbi and dearcloud has had any significant impact on TCS and attribute the decline in TCS's 2024 performance to the Claimant's mismanagement of TCS since Sunna Kim's departure.[422]  They argue that any effect that competition from Pureunbi may have had has been small, and deny in any event that the Respondents have been responsible for that competition.[423]  They contend that "TCS' reduction in sales in 2024 and 2025 had nothing to do with dearcloud and everything to do with TCS' decisions after Olive Kim's departure."[424]

---

[419] Hearing Demonstratives of Michal A. Malkiewicz, unnumbered slide headed "Past TCS Sales and Net Profit."
[420] Malkiewicz ER ¶ 51.
[421] Malkiewicz ER ¶¶ 16, 60-66.
[422] I. Kim PHB ¶¶ 11-12; S. Kim SOD ¶ 67; Tr. Day 2 146:4-13.
[423] S. Kim PHB ¶¶ 8(f), 11, 86; Tr. Day 1 127:19-25.
[424] S. Kim PHB ¶ 14.

226.    Under California law, the "only prerequisite to recovery of lost profits is proximate causation," and therefore a claimant of lost profits must establish their value with "reasonable certainty."[425]  Under this standard, a claimant must "demonstrate 'a reasonable probability that profits would have been earned except for the defendant's conduct' and 'has the burden to produce the best evidence available in the circumstances to attempt to establish a claim for loss of profits.'"[426]

227.    The Tribunal concludes that TCS was in fact injured by the competition from Pureunbi.  The Tribunal considers that this injury to TCS took two forms.  The first was sales that can reasonably be shown to have been diverted from TCS to Pureunbi as a result of Pureunbi's competition with TCS or LPF Agency's promotion of Pureunbi's products.

228.    The second form of injury was the diminution in the value of the goodwill of TCS that had formed an important element of what the Claimant had purchased when it acquired, first, two-thirds of the shares of TCS from the Respondents and later the remaining shares.  This injury to TCS's goodwill resulted principally from the risk of confusion of TCS's customers, such as Walmart and Ulta Beauty, and the licensors of characters used by TCS to sell its products, such as Sanrio's Hello Kitty, as to whether Sunna Kim's respected creative and marketing talents were or were not behind Pureunbi's products.

229.    While the Tribunal considers that TCS was injured by diminution in the value of its goodwill, it has received no evidence that would permit it to quantify this aspect of TCS's injury.  Indeed, Mr. Malkiewicz states that:

> Although goodwill impairment is an accounting-rules driven
> determination, because in this case it is caused and driven by
> Respondents['] breach of the non-compete and non-solicit provisions in

---

[425] *Elations Sys., Inc. v. Fenn Bridge LLC*, 286 Cal. Rptr. 3d 762, 768 (Cal. Ct. App. 2021) (quoting *Brandon & Tibbs v. George Kevorkian Acct. Corp.*, 277 Cal. Rptr. 40, 48 (Cal. Ct. App. 1990)) (DL-105).
[426] *Id.* (quoting *S.C. Anderson, Inc. v. Bank of Am.*, 30 Cal. Rptr. 2d 286, 289 (Cal. Ct. App. 1994)).

> the SPA, from an economic perspective, such goodwill impairment would
> be consistent theoretically, directionally, and in its magnitude with my
> overall damages estimation.[427]

Although Mr. Malkiewicz goes on to say that "[i]n Schedule 15C, I show this damages

calculation at a variety of percent adjustments values,"[428] his Schedule 15C, titled "Lost Profits

Damages Estimates at Various Haircuts," is merely a set of rows of various percentages of

"Loss of Licensed Revenue Business" and "Loss of Unlicensed Revenue Business" and dollar

figures for total damages for various time periods that makes no effort to put a specific value on

the goodwill impairment of which the Claimant complains. He also notes that "the extent that

LG H&H and its independent accountants do in fact write-off [the] majority of the goodwill

associated with the purchase of TCS" would be relevant,[429] but provides no information as to

whether they have done so.

230.    The Tribunal has found Insil Kim and Lawrence Kim's providing of financing to

LPF Agency and Pureunbi through the medium of Mrs. Seo and her companies, as well as Insil

Kim's ongoing entanglement in the financial affairs of Pureunbi and LPF Agency to have been

in breach of Insil Kim's obligations under Section 4.7 of the SPA. However, the Claimant has

failed to quantify any injury to TCS proximately caused by this breach in addition to the injury

caused by the competition from Pureunbi's dearcloud products.

231.    The Tribunal will return to the difficult task of determining the amount of the

Claimant's damages actually caused by the Respondents' breaches of the SPA in Section IV.M

of this Award.

---

[427] Malkiewicz ER ¶ 65.
[428] *Id*.
[429] *Id*.

**J.    Will The Crème Shop Be Injured in the Future by Such Competition?**

232.    There is conflicting evidence before the Tribunal concerning whether either Pureunbi or LPF Agency is still doing business and whether dearcloud products are still being sold.

233.    The Respondents contend the Claimant's "*future* damage model does not track reality," in view of "dearcloud's dissolution and shutdown."[430]  No profits can be lost in the future, the Respondents argue, to "a company that is no longer in business."[431]

234.    However, the Tribunal determined in Section IV.C above that the Claimant has established at least a reasonable possibility that dearcloud products were still being sold in competition with TCS's products as of August of 2025, notwithstanding the alleged dissolutions of Pureunbi and LPF Agency.  That finding is sufficient to support the conclusion that TCS is likely to be injured in the future unless such competition is restrained.

**K.    Was the Crème Shop Injured by Interference with Its Employees?**

235.    While it is true that Paul Kim and at least four other employees (Helen Yang, Rachaelle Villa, Deisy Larios, and Pauline Contreras) left TCS in October 2023 and joined LPF Agency shortly thereafter, neither Party made any effort to quantify the relationship between the departures of any of these employees and the drops in TCS's gross or net profits from 2023 to 2024.  The Tribunal thus has only its general impression of the relationships between TCS's success and these employees to go on.

236.    The impression formed by the Tribunal over both the Phase One and the Phase Two hearings was that the key factor in TCS's success through 2023 and the decline that commenced in 2024 was the presence or absence of Sunna Kim.  The evidence was compelling

---

[430] S. Kim PHB ¶ 124.
[431] *Id*.

that Sunna Kim's creativity, marketing savvy, and ability to make use of social media and influencers was the key driver of TCS's success while she was there.[432]  But the Respondent has no cause of action for the departure of Sunna Kim from TCS.  Her Employment Agreement expressly contemplated that she could resign from TCS with or without Good Reason.[433]  She has already been substantially penalized for resigning without Good Reason, in that she and Insil Kim lost for that reason the very substantial difference between the Call Option price and the Put Option price for the one-third of TCS's shares that they still held at the date of their departures from TCS.[434]

237.    Paul Kim's departure cost TCS the services of its Head of Sales, who seems to have been good at his job and to have worked well with Sunna Kim.  But the Tribunal has no data on which to base a quantification of the relationship between Paul Kim's departure and the drop in TCS's revenues and profits.  And in any event the Tribunal found in Section IV.G above that Claimant has not sustained its burden of establishing that Sunna Kim was responsible for Paul Kim's departure.

238.    Sunna Kim bears some responsibility for the departures from TCS of Helen Yang, Rachaelle Villa, Deisy Larios, and Pauline Contreras.   In addition to whatever role she played directly (see Section IV.G), Paul Kim admits to having recruited these employees to join LPF Agency and, as determined in Section IV.B, Paul Kim was Sunna Kim's Affiliate for purposes of the restrictions on soliciting employees in Section 4.7(b) of the SPA.  Sunna Kim is thus in breach of the SPA.

---

[432] *See, e.g.,* S. Kim WS1 ¶¶ 4-8; S. Kim WS2 ¶¶ 14, 21-22, 27; 15 October 2024 Hr'g Tr. 59:3-22.
[433] Partial Award ¶ 85.
[434] Partial Award ¶¶ 151-152, 288-289.

239.    The Tribunal accordingly finds that the roles played by Sunna Kim and by Paul Kim, as her Affiliate, in procuring the departure from TCS of the four employees named in the preceding paragraph support entry (as described in the next section of this Award) of an injunction against further similar breaches of the SPA.  But the Claimant has failed to show the causal relation between this breach and the damages claimed, as required by California law, and the Tribunal thus has no basis for quantifying the damages, if any, caused by this breach.[435]

## L.    Is an Injunction Appropriate?

240.    The Parties agreed in Section 4.7(d) of the SPA "that the remedies at law for any breach or threat of breach of Section 4.7 may be inadequate," and that "the damages flowing from such a breach may not be readily susceptible to being measured in monetary terms." Accordingly, they agreed that the Claimant would be entitled to seek injunctive relief in case of any breach or attempted or threatened breach of Section 4.7 by either or both of the Respondents or their Affiliates and may seek an order restraining any threatened or further breach.

241.    The Claimant now seeks such an order.[436]  The Claimant contends that: (1) competition from Pureunbi's dearcloud products, and Sunna and Insil Kim's involvement with those products, constitutes an irreparable harm to TCS; (2) the continuing nature of the dearcloud brand's competition makes pecuniary compensation inadequate; (3) the balance of harms is in its favor, because the result of an injunction would simply be to enforce the SPA's

---

[435] *See Brandon & Tibbs v. George Kevorkian Accountancy Corp.* 226 Cal.App.3d 442, 457 (1990) ("The only prerequisite to recovery of lost profits is proximate causation: the lost profits must be the natural and direct consequences of the breach"), quoted in *Elation Systems, Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958 (2021) (DL-105), at 965.
[436] SOC ¶ 239.E; CPHB ¶ 109.E.

non-competition clause; and (4) holding a party to its end of a contractual bargain is necessary and in the public interest.[437]

242.    The Claimant's expert, Mr. Malkiewicz, considers that TCS faces the risk of irreparable harm because:

> The economic impact of the competitive dynamics between TCS and dearcloud is challenging to quantify due to the early-stage nature of dearcloud's business and its ongoing expansion.  dearcloud is still in the process of diversifying its product offerings and establishing strategic partnerships with other established brands.  Given that dearcloud's business model and market strategy are still evolving, the full extent of its competitive impact on TCS cannot be determined with precision.  Additionally, the harm to TCS's brand reputation presents a significant challenge for quantification.  Reputation effects are typically long-term and can affect consumer perception and behavior in ways that are not immediately reflected in a company's financial performance.  As a result, while the direct financial and economic consequences of these dynamics are difficult to measure, there is a clear risk of sustained and possibly irreversible economic harm to TCS, as its competitive advantage and market position could be permanently undermined by these ongoing developments.[438]

243.    Respondent Sunna Kim does not oppose the Claimant's request for a permanent injunction, stating that she "is quite willing to stipulate to an injunction against herself."[439] Respondent Insil Kim did not address the issue of whether a permanent injunction should issue.

244.    Under California law, granting permanent injunctive relief in favor of a party is appropriate where "(1) the party has suffered irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships between the plaintiff and defendant indicate that equitable relief is warranted; and (4) the public interest will not be disserved by issuing the permanent injunction."[440]

---

[437] *See* SOC ¶¶ 224-238.
[438] Malkiewicz ER ¶78.
[439] S. Kim SOD ¶ 115.
[440] *United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*, 2012 WL 3861946, at *9 (S.D. Cal. Sept. 5, 2012) (CL-123), citing *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1137 n.11 (9th Cir. 2006).

245. The Tribunal has found in Sections IV.E, IV.F, IV.G, and IV.H of this Award that one or both of the Respondents breached certain of their obligations under Section 4.7 of the SPA and found in Section IV.C that there is some risk of those breaches continuing. As noted above, those breaches caused an injury to TCS and the Claimant. The Tribunal considers that damages are not a fully adequate remedy for an ongoing breach of contract, that equitable relief is consequently warranted and would not disserve the public interest, and that in any case the Respondents consented to the granting of such relief in the SPA.

246. The Tribunal accordingly considers it appropriate to enter an order in accordance with Section 4.7(d) of the SPA requiring the Respondents to observe their obligations under Section 4.7 during what remains of the Restricted Period.

247. Respondents Sunna Kim and Insil Kim are accordingly directed not to engage in or permit their Affiliates to engage in any of the following conduct, from the date of this Award until 6 August 2028, without the prior written consent of the Claimant and other than as permitted in the various provisos to Sections 4.7(a) and (b) of the SPA:

(a) To engage in, or own, manage, operate or control, or participate in the ownership, management, operation or control of, any Person that engages, in any business which is directly or indirectly competitive with the business of TCS as it was conducted in August 2025, including but not limited to any cosmetics business using the dearcloud brand;

(b) To enter the employ of, or render any services to, any Competitor of TCS;

(c) To acquire a direct, material financial interest in a Competitor of TCS;

(d) To interfere with business relationships (whether formed before or after the date hereof) between TCS and distributors, customers, suppliers, partners, members or investors of TCS;

(e) Directly or indirectly to recruit, hire or otherwise solicit for employment any director, officer or employee of TCS, or to request or induce any director, officer or employee of TCS to terminate his or her employment with TCS.

The capitalized terms in this paragraph shall have the meanings given to them in the SPA.

91

**M.      If The Crème Shop Was Injured, What Was the Amount of Its Damages?**

248.     The Claimant argues that the "measurements for damages should be multidimensional and additive," and that the Respondents' breach requires "a measurement *beyond the mere diversion of sales*."[441]

249.     Mr. Malkiewicz, the Claimant's expert witness, quantifies the three types of damages that he asserts competition from Pureunbi, dearcloud, and LPF Agency has caused TCS to suffer as of April 2025:

> (a)      First, he assesses "past lost profit damages" as $6,211,148.[442]
>
> (b)      Second, he considers that, by December 2026, TCS will have suffered additional "future lost profit damages" of $26,925,654.[443]
>
> (c)      In addition, he calculates that TCS has suffered $17,444,134 in "head start" damages compared to what dearcloud could have achieved if it had been launched after the end of the non-compete period in 2028.[444]

250.     Mr. Malkiewicz testified that, to arrive at his past lost profit damages, his first step was to analyze "TCS sales data, by retailer and by product, to focus my models only on retailers and products first where I have seen evidence of dearcloud actually competing."[445]  He then developed a forecast based on TCS's 2023 sales, projecting its sales through April of 2025 to "Ulta from Q3 2024," to "Urban Outfitters starting in Q4 2024" and to "T.J. Maxx starting at Q1 2025, because those are the quarters in which we know for a fact that dearcloud actually started selling products in" those retailers.[446]  In arriving at his $6.2 million result, he "ignore[d] any impact on TCS's business in retailers other than these three."[447]

---

[441] *Id*. ¶ 77 (emphasis in original).
[442] Malkiewicz Hearing Demonstratives (slides not numbered); Tr. Day 4 88:25-89:9.
[443] Malkiewicz Hearing Demonstratives (slides not numbered); Tr. Day 4 92:6-93:18.
[444] Malkiewicz Hearing Demonstratives (slides not numbered); Tr. Day 4 97:8-100:15.
[445] Tr. Day 4 82:19-23.
[446] Tr. Day 4 83:5-88:24.
[447] Tr. Day 4 88:9-24

251.    To arrive at his future lost profits figure, Mr. Malkiewicz said he was instructed to project the same calculation through December 2026.  Doing so resulted in an additional $26.9 million in future lost profit damages which, added to the original $6.2 million, projects a total of $33.1 million in total lost profit damages.[448]

252.    At the hearing, Mr. Malkiewicz addressed why his economic evaluation of damage to TCS was not limited to the diversion of sales to dearcloud.  He said that was:

> [B]ecause my economic evaluation of TCS 2.0 -- meaning the dearcloud-related entities -- it is not limited to someone independently coming up and trying to copy the business model, but it is actually someone who comes in and takes the exact business model, with the exact same relationships, contacts, influencer relationships, team that designs product marketing and packaging, you know, sort of in combination, and establishes and an economic entity that competes, both successfully and unsuccessfully sometimes, but takes the clout away from what was purchased by LG in the roughly $200 million transaction.[449]

253.    Mr. Malkiewicz also explained the concept of "head start" damages:

> The concept of head start damages is that, from the perspective of dearcloud and the related economic entities, starting a business today, given the nature of this industry -- meaning that it is dynamic, the influencers who are hot right now are hot right now, not necessarily three years from now -- that, you know, the trends and products and branding and people who actually are buyers at, say, Walgreens or Ulta may no longer be there three years from now, but those relationships that come out of TCS are more valuable right now than they would be three years from now.  That is effectively the concept.[450]

254.    Asked at the hearing why, if he had already measured what he considered to be the damages caused to TCS from the competition by dearcloud, there was additional damage from the idea that dearcloud got off to a faster start than it would otherwise have been able to manage, Mr. Malkiewicz said:

---

[448] Tr. Day 4 92:6-93:2. The numbers also appear on one of Mr. Malkiewicz's slides, which are (unhelpfully) unnumbered.
[449] Tr. Day 4 96:4-17.
[450] Tr. Day 4 97:13-98:1.

93

So one is basically the benefit that I guess would be, under the finding of liability, unjustly gained by someone, even if it doesn't come at a direct cost to the other entity, would it be equitable, I guess economically, to add those two together? And I don't know that economics necessarily has anything to say about that.[451]

When asked further if this "is something you are doing under instruction from counsel," Mr. Malkiewicz answered: "Certainly, yes."[452]

255.    Mr. Schaner asked Mr. Malkiewicz:

What you are valuing in the head start damages is the value of using Sunna Kim's connections and relationships now, while they are fresh, as opposed to waiting three years and then her using them then when they are less valuable. So you are valuing the loss in the value of her connections, contacts, influence to dearcloud. Is that the idea?

He responded: "That is correct, yes."[453]

256.    Respondents' expert, Dr. McGahee criticized Mr. Malkiewicz's approach. He testified that a lost sales analysis "typically starts with the accused sales of the defendants." The next step, he says, "would be to determine, out of those accused sales, what portion or percentage were diverted from the Claimant as opposed to diverted from other competitors in the market or maybe just expanding the size of the market." Once you figure out the percentage that were lost by the Claimant, he said, "that's your lost sales, and then you would apply a profit margin to figure out what the lost profits on that are."[454]

257.    This is not, Dr. McGahee contends, what Mr. Malkiewicz has done. Instead, he says, Mr. Malkiewicz "has looked at TCS -- The Crème Shop's sales and compared to how they were performing in 2023 and how he says they would have been performing if they had

[451] Tr. Day 4 99:8-100:15.
[452] Tr. Day 4 100:16-18.
[453] Tr. Day 4 102:18-103:1.
[454] Tr. Day 4 171:2-172:1.

94

continued to grow after 2023, he observes that sales have declined; and without exaggerating, he then assumes that that decline was caused by dearcloud."[455]

258.    Dr. McGahee calculated that Mr. Malkiewicz's lost profits analysis assumes lost revenues of $14.5 million, which, he says, "is actually nearly five times what dearcloud's total sales were over the same time period."[456]  He summed up his criticism of Mr. Malkiewicz's analysis by saying that, "however you do the analysis under his model, you get that somehow dearcloud has caused The Crème Shop to lose many, many multiples more than the sales they have actually made, and it doesn't make sense."[457]  He also points out that Mr. Malkiewicz's calculation of $33 million of total lost profit assumes, in his own schedules, $80.9 million of lost sales.[458]

259.    Dr. McGahee said that Pureunbi's books actually show a loss of $3,226,123 for 2024 alone,[459] so any attribution of profit to Pureunbi is entirely hypothetical.  When asked whether there is "a generally accepted econometric or statistical methodology by the profession that you would use to calculate what represents the correct amount" of lost profits damages, Dr. McGahee responded "I have done the math, but you just get a negative number.  Damages would be zero."[460]

260.    Dr. McGahee testified that the best way to quantify the effects of Pureunbi's competition is "to look at the sales."[461]  He calculated that, if TCS's profit margins were applied to the total sales of dearcloud products of $1 million in 2024 and $2 million in 2025, the maximum amount of lost profits damages TCS could have incurred, even assuming

---

[455] Tr. Day 4 172:2-9.
[456] Tr. Day 4 173:17-174:1.
[457] Tr. Day 4 175:14-18.
[458] Tr. Day 4 180:20-182:1.
[459] McGahee ER ¶ 21, Table 5.
[460] Tr. Day 4 207:6-208:2.
[461] Tr. Day 4 237:1-5.

unrealistically, in spite of the presence of other competitors in the market that 100% of every dearcloud sale would have gone to TCS, was $424,000 for 2024 and $608,000 for 2025, for a total of $1,032.000.[462]  Dr. McGahee also calculated that, assuming even more unrealistically that Pureunbi's total sales of all products (including dearcloud) of $1.4 million in 2024 and $3 million in 2025 would have gone to TCS, such sales would only have totaled $4.4 million, generating a maximum lost profit at TCS's profit margins of $1,505,600.[463]

261.    Dr. McGahee criticizes the Claimant's demand for "head start" damages as economically unsound and points out that even the Claimant's expert projected that Pureunbi would have incurred losses for the entire head start period.  His conclusion, he says is that, "given these losses, and given that incurring losses earlier in time only makes you worse off -- none of us wants to incur loss, but we certainly, if we are, don't want to incur it any earlier than we have to --- there is just not a way to get to a head start number that is not speculative."[464]

262.    The Tribunal begins by observing that the evidence before it does not support the attribution of the decline in TCS's performance after 2023 entirely, or even largely, to competition from Pureunbi's dearcloud products.  Rather, the evidence suggests that the principal reason for that decline was the departure from TCS of Sunna Kim.  Questioned by the Tribunal, Mr. Malkiewicz largely agreed with that analysis:

> THE PRESIDENT:  So it seems to me you are creating what I'd call a Sunna Kim effect rather than a competition by dearcloud.  I don't see how dearcloud alone can have the impact you are talking about.  You are creating a "Sunna Kim turned on TCS, and here's the effect I see on business," is what I'm hearing you say.
>
> A.  Yeah, it is very close to that, with the caveat of those haircuts for new product introductions and a delay for, you know, I don't start counting damages until July.  But obviously what I was asked to

---

[462] McGahee Hearing Demonstratives (slide 15); Tr. Day 4 185:15-187:9.
[463] McGahee Hearing Demonstratives (slide 16); Tr. Day 4 187:10-23.
[464] McGahee Hearing Demonstratives (slide 19); Tr. Day 4 188:3-190:24.

assume, even, was that the activities of competition happened -- you know, contacting vendors and all that happened before July of 2024. But yes, it's sort of like a Sunna Kim and the other employees who were at TCS who she has directed and took, under my assumption, too -- dearcloud and LPF and Pureunbi and whoever else we have talked about this whole week -- minus some transition period effect for TCS, that, yes, there is going to be some disruption even if she left and did not compete. So that's what my model tries to capture.[465]

263.    With respect to what Mr. Malkiewicz calls past lost profit damages, the Tribunal agrees in principle that Pureunbi's sales of dearcloud products during 2024 and 2025 may be assumed to have been diverted sales from TCS because of the activities of Sunna Kim and her Affiliates that breached the non-compete provisions of the SPA. However, the Tribunal cannot accept the Claimant's contention that such damages amounted to $6.2 million, since that number is based on the decline in TCS's sales rather than the sales of dearcloud products. As noted above, the decline in TCS's sales is more readily explained by the evidence before us by Sunna Kim's departure than by competition from dearcloud products.

264.    Pureunbi had total sales in 2024 of $1.4 million and in 2025 of $3 million, for a total of $4.4 million, but was actually operating at a loss.[466] Dr. McGahee calculated that, if TCS's profit margins of 42.4% in 2024 and 30.4% in 2025 were applied to Pureunbi's total sales, which included products in addition to dearcloud, those sales would have generated a profit of $593,600 in 2024 and $912,000 in 2025, for a total of $1,505,600. This latter figure, which ignores competition from other K-beauty brands, seems to the Tribunal to be the maximum amount of past lost profits that TCS can have suffered from the competition of Pureunbi's products during 2024 and 2025. The Tribunal considers it appropriate to direct Sunna and Insil Kim to pay that amount to the Claimant as damages for their breaches of the

---

[465] Tr. Day 4 161:4-162:3.
[466] McGahee Hearing Demonstratives (slide 16); McGahee ER ¶ 21.

97

non-compete provisions of Section 4.7(a) the SPA.  Since that amount compensates the Claimant for breaches during both 2024 and 2025, interest will run on that amount only if it is not paid within 30 days of the date of this Final Award.

265.    The Tribunal considers that the injunctive relief provided for in this Final Award makes it unnecessary to calculate future lost profits, since the Respondents will no longer be engaging in any activity that breaches their non-compete agreement with the Claimant after the date of this Award.  The Claimant argues that "the harm will continue to unfold and Lost Profits will continue to accrue, until Respondents are actually held to an injunction."[467] The corollary of that proposition, of course, is that holding the Respondents to an injunction will stop any lost profits from accruing further.

266.    To the extent there is any merit to the claim for "head start" damages, which the Tribunal finds in any event to be unconvincing, such injunctive relief should also make any such damages award unnecessary.  Indeed, Mr. Malkiewicz was pressed at the hearing as to whether, "if Pureunbi and dearcloud are no longer operating, your head start damage analysis no longer applies to this case?"[468]  His eventual response was, "in terms of the actual head start calculation, if we made that assumption that there is a solid injunction, the products are not reused, someone burned them, yeah, there is no continuation of making profits."[469]

267.    The Tribunal has previously noted that Insil Kim's breaches of Section 4.7(a) of the SPA have not been shown to have resulted in any increase in the damages suffered by TCS over and above the damages we have found to have been caused to TCS by the competition from Pureunbi's dearcloud products.  The Tribunal does not consider that any causal connection

---

[467] CRPHB ¶49.  The Respondents do not engage on this point, but simply argue that the Claimant is entitled to no damages.  S.Kim PHB ¶136; I. Kim PHB ¶97.
[468] Tr. Day 4 130:3-131:5.
[469] Tr. Day 4 131:24-132:11.

has been shown between Sunna Kim's breaches of Section 4.7(b) of the SPA and any injury suffered by the Claimant. It therefore awards no additional damages on account of either of these breaches.

## V.   INTEREST

268.   In its Partial Award, the Tribunal determined that 5.5% would be a fair and reasonable rate of interest in the circumstances of Phase One of this arbitration.[470] Neither side has argued for a different rate to be applied in Phase Two, and the Tribunal considers that the reasoning that led to its adoption of that rate in Phase One still applies.

269.   The Tribunal accordingly directs that interest on the amounts awarded in this Final Award will bear interest from the date specified as to each amount at the rate of 5.5%, compounded annually, until paid.

## VI.   COSTS

270.   Section 8.3(b) of the SPA and Section 5.6(b) of the SA permit the Tribunal to apportion the costs of arbitration in the award. The ICC Rules authorize, but do not require, an arbitral tribunal to allocate the costs of the arbitration as between the parties, taking into account the circumstances it considers relevant.[471]

271.   Both the Claimant and the Respondents submitted applications for their respective costs of Phase One of this Arbitration on 17 January 2025. In its Partial Award, the Tribunal reserved decision as to the costs of Phase One for determination at the conclusion of the Arbitration.[472]

---

[470] Partial Award ¶¶ 280-283.
[471] ICC Rules Art. 38(5).
[472] Partial Award ¶ 285.

99

272.     The Parties submitted additional applications for their respective costs of Phase Two on 31 October 2025.  All Parties asked to be awarded the entirety of their fees and costs for both Phases One and Two of this arbitration, on the principle, accepted by all Parties, that costs should generally be awarded to the prevailing party.[473]

273.     The Claimant submitted an application for its costs for both Phase One and Phase Two of this arbitration for the legal fees and disbursements of its counsel totaling KRW 9,853,301,303 plus interpreter's fees of KRW 22,598,947, for a total in Korean Wong of KRW 9,875,900,250.  In addition, the Claimant applied for reimbursement of expert witness fees totaling USD 565,177.40 and for hearing and other expenses (exclusive of payments to the ICC) of USD 136,686.06, for a total in U.S. dollars of USD 701,863.46.[474]

274.     Respondents Insil and Sunna Kim jointly submitted an application for their legal fees, expert witness fees, and hearing and other expenses (exclusive of payments to the ICC) for Phase One of this arbitration of USD 2,571,374.95.

275.     Respondent Insil Kim submitted an application for reimbursement of the fees and expenses of her current counsel in Phase Two of this arbitration totaling USD 138,835.77.  Insil Kim also requests that the Tribunal require the Claimant to reimburse her an unspecified additional amount, to be determined by the Tribunal, due to the "ferocity of the claims made against her as well as the ultimate lack of evidentiary support for any such claims," pursuant to Article 38(2) of the ICC Rules.[475]

---

[473] Claimant's 31 October 2025 Cumulative Costs Submission ¶¶ 1-3; S. Kim's 31 October 2025 Bill of Costs at Note 5; I. Kim's 31 October 2025 Costs & Fees Submission at 2.
[474] Claimant's 31 October 2025 Cumulative Costs Submission.
[475] Respondent I. Kim's 31 October 2025 Costs & Fees Submission.

276.     Respondent Sunna Kim submitted an application for legal fees, expert witness fees, and hearing and other expenses (exclusive of payments to the ICC) for Phase Two of this arbitration of USD 1,131,767.50.

277.     None of the Parties challenges the propriety or magnitude of the costs incurred by any other.  In any event, based on the collective experience of the members of the Tribunal, the costs incurred by both Parties seem reasonable and in proportion to the size and complexity of the case and the amounts of money at stake.

278.     The Tribunal does not consider either Party to have been the prevailing party in Phase One of this arbitration, which involved dueling claims, in which each Party saw itself as the injured party.  Both Parties advanced substantial claims and defenses, and both Parties were ultimately successful on some key issues in Phase One.  In these circumstances, the Tribunal considers it appropriate for each Party to bear its own costs of Phase One and for the Parties to share equally the costs and expenses of this arbitration for Phase One.

279.     The Tribunal considers the Claimant to be the prevailing party in Phase Two of this arbitration.  The Claimant has asserted and convinced the Tribunal that both Respondents were, and may continue to be, in breach of their obligations under Section 4.7 of the SPA.  The Claimant has presented its costs for Phase One of this arbitration in its Costs Submission dated 17 January 2025 and cumulatively for both phases in its Costs submission dated 31 October 2025, presenting no separate request for its costs for Phase Two of this arbitration.  The Tribunal considers it appropriate to deduct from the Claimant's cumulative request for costs in its 31 October 2025 costs submission those costs that were previously attributed to Phase One in the Claimant's 17 January 2025 costs submission.  The result of this deduction (excluding costs

assessed by the ICC) is that the Claimant's costs for Phase Two of this arbitration are 4,229,839,137 Korean Won plus an additional USD 442,033.08.

280.    For the foregoing reasons, the Respondents are directed to pay the legal costs and expenses of the Claimant for Phase Two in the amount of KRW 4,229,839,137 plus USD 442,033.08.  The Respondents may elect to pay the Korean Won amount in United States Dollars, using the date of this Award as the date for currency conversion.

281.    The ICC Court has fixed the total costs of this arbitration, including the administrative expenses of the ICC and the fees and expenses of the Tribunal, at USD 1,290,000.  The ICC did not allocate that sum as between Phase One and Phase Two.  For the same reasons explained with regard to legal fees and expenses, the Tribunal considers it appropriate for the costs of the ICC for Phase One to be borne equally by the Parties, but for the Respondents to bear an approximation of the costs of the ICC for Phase Two.

282.    Although there was some overlap of the Tribunal's work between Phase One and Phase Two, for this purpose the Claimant's share of the ICC costs for Phase Two will be deemed to be the difference between the amount shown by the Claimant as advanced to the ICC in its 17 January 2025 Costs Submission (USD 460,000) and the amount shown by it as advanced to the ICC in its 31 October 2025 Costs Submission (USD 645,000).  That difference is USD 185,000.

283.    Post-award interest at the rate stated in Section V will run on the sums awarded from the date of this Award if they are not paid within 30 days of the date of this Award.

284.    All other applications for costs are denied.

102

## VII.    FINAL AWARD

285.    For the reasons explained in the foregoing paragraphs, the Tribunal awards and directs as follows with respect to the issues presented in this arbitration.

286.    The Tribunal's Partial Award dated 21 May 2025 is incorporated into and forms a part of this Final Award.

287.    The Tribunal determines and declares that Sunna Kim and Insil Kim, and/or one or more of their Affiliates, breached their non-compete obligations set forth in Section 4.7(a) of the SPA as set forth in detail in Sections IV.D, IV.E, and IV.F of this Final Award.

288.    Sunna Kim and Insil Kim are directed to pay the Claimant damages of USD 1,505,600 for their breaches of the non-compete provisions of Section 4.7(a) of the SPA.

289.    The Tribunal determines and declares that Sunna Kim has breached her non-compete obligations set forth in Section 4.7(b) of the SPA as set forth in detail in Sections IV.G and IV.H of this Final Award.  No additional damages are awarded for that breach.

290.    Respondents Sunna Kim and Insil Kim are directed, from the date of this Award until 6 August 2028, without the prior written consent of the Claimant and other than as permitted in the various provisos to Sections 4.7(a) and (b) of the SPA, not:

(a)    To engage in, or own, manage, operate or control, or participate in the ownership, management, operation or control of, any Person that engages, in any business which is directly or indirectly competitive with the business of TCS as it was conducted in August 2025, including but not limited to any cosmetics business using the dearcloud brand;

(b)    To enter the employ of, or render any services to, any Competitor of TCS;

(c)    To acquire a direct, material financial interest in a Competitor of TCS;

(d)    To interfere with business relationships (whether formed before or after the date hereof) between TCS and distributors, customers, suppliers, partners, members or investors of TCS;

(e)    Directly or indirectly to recruit, hire or otherwise solicit for employment any

103

director, officer or employee of TCS, or to request or induce any director, officer or employee of TCS to terminate his or her employment with TCS.

The capitalized terms in this paragraph shall have the meanings given to them in the Share Purchase Agreement.

291.    The Parties are to bear their own costs incurred in Phase One of this arbitration. The Respondents are directed to pay the Claimant its legal costs and expenses incurred during Phase Two of this arbitration in the amount of KRW 4,229,839,137 plus USD 442,033.08.

292.    As to the costs of the arbitration as established by the ICC, the Respondents are directed to reimburse the Claimant USD 185,000 for the amounts it has paid the ICC during Phase Two of this arbitration.

293.    The Respondents are directed to pay interest at the rate of 5.5%, compounded annually from the date of this Final Award until such amounts are paid, on all amounts awarded in this Final Award that are not paid within 30 days of the date of this Final Award.

294.    All other claims asserted or applications made in Phase Two of this Arbitration are dismissed.

**CERTIFICATION**

The undersigned arbitrators hereby certify that, for purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Los Angeles, California, U.S.A. on 23 December 2025.


_____          _____
Richard Chernick                          Lawrence S. Schaner


_____
John M. Townsend
President


105